Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

EASTERN DIVISION


RACHAEL CUMBIE,

      Plaintiff


v.                                          Civil Action No.

                                    3:05CV569-W


RUBY TUESDAY, INC.

BOBBY VAUGHN,

      Defendants


    The deposition of RACHAEL CUMBIE was taken at

the offices of Sherrie V. McKenzie, 25 West

Claiborne Street, Monroeville, Alabama 3460 on the

28th day of September 2006, commencing at

approximately 1 p.m.



DEFENDANT'S
EXHIBIT
A

ORIGINAL

Deposition of:   Rachael Cumbie        9-28-2006

Page 2

1                    A P P E A R A N C E S

2

3    For the Plaintiff:

4         BY: CORNELIUS HEUSEL, ESQ.

5         JONES, WALKER, WAECHTER,

6         POITEVENT, CARRERE & DENEGRE LLP

7         201 ST. CHARLES AVENUE

8         SUITE 5100

9         NEW ORLEANS, LOUISIANA 70170

10        (504)582-8000

11

12   For the Defendant:

13        BY: SHERRIE V. MCKENZIE ESQ.

14        LAW OFFICES OF SHERRIE V. MCKENZIE

15        25 WEST CLAIBORNE STREET

16        MONROEVILLE, ALABAMA 36460

17        (251)575-7037

18

19   Also Present:

20   Bobby Vaughn

21

22   Dianne Phillips

23   Court Reporter

Deposition of:   Rachael Cumbie      9-28-2006

Page 3

1                         I N D E X

2  WITNESS:

3  RACHAEL CUMBIE

4

5  EXAMINATION:                           PAGE:

6  BY MR. HEUSEL

7

8  EXHIBITS:

9  Defendant's Exhibit No. 1                    93

10      (Charge of Discrimination)

11  Defendant's Exhibit No. 2                    99

12      (Respect & Responsibility Policy)

13  Defendant's Exhibit No. 3                   102

14      (Open Door Policy)

15

16

17

18

19

20

21

22

23

Deposition of:   Rachael Cumbie        9-28-2006

Page 4

1                S T I P U L A T I O N

2

3        It is stipulated by and between the parties

4   hereto, through their respective counsel, that the

5   deposition of RACHAEL CUMBIE be taken before Dianne

6   Phillips, Notary Public for the State at Large, at

7   the offices of Sherrie V. McKenzie, 25 West

8   Claiborne Street, Monroeville, Alabama 36460, on

9   September 28, 2006.

10

11       It is further stipulated and agreed that this

12   deposition is taken pursuant to the Federal Rules of

13   Civil Procedure.   The provisions of Rule 32(d)(3)

14   dealing with waiver of errors and irregularities as

15   to the taking of the deposition apply fully to this

16   deposition.

17

18       Notice of the deposition and any errors or

19   irregularities therein [Rule 32(d)(1)] and any

20   objections to the qualifications of the officer

21   before whom this deposition is taken [Rule 32(d)(2)]

22   are waived.

23

Page 5

1      The submission of the deposition to the witness

2  for reading to or by him and the signing of the

3  deposition by him [Rule 30(e)] is WAIVED

4

5      Filing of the original of the transcript of

6  this deposition [Rule 30(f)(1)] is waived.

7

8      Any other technicality or defect in the taking

9  of this deposition not otherwise covered by the

10  terms of this stipulation is waived.

11

12                    * * * * * *

13

14      I, Dianne Phillips, Commissioner and Court

15  Reporter, certify that on this date, as provided by

16  the Federal Rules of Civil Procedure and the

17  foregoing stipulation of counsel, there came before

18  me at the offices of Sherrie V. McKenzie, 25 West

19  Claiborne Street, Monroeville, Alabama 36460, on

20  September 28, 2006, commencing at 10:00 a.m.,

21  RACHAEL CUMBIE, witness in the above cause, for oral

22  examination, whereupon the following proceedings

23  were had:

Deposition of:    Rachael Cumbie        9-28-2006

Page 24

1    touched on?

2        A.    No, sir.

3        Q.    Now, we've been talking about coming back

4    and you mentioned that you live with your dad in

5    Uriah.  Is that home to you?  Is that your original

6    home?

7        A.    Technically, yes.

8        Q.    Okay.  When you went to work for Ruby's

9    the first time, where did you work?  Which Ruby's?

10       A.    I went to the Ruby Tuesday's in Bay

11   Minette.

12       Q.    Okay.  Did you live in Uriah and work

13   there?

14       A.    Yes, sir.

15       Q.    About how long did you work there?

16       A.    Around five months or so.  Five or six

17   months.

18       A.    Do you remember who hired you?

19       A.    I do not.

20       Q.    Do you know if it was the general manager?

21       A.    Yes, sir.

22       Q.    Do you recall if it was a man or woman?

23       A.    It was a man.

Deposition of:    Rachael Cumbie          9-28-2006

Page 25

1    Q.    Did you undergo any training when they

2    first hired you?

3    A.    Yes, sir.

4    Q.    Did they give you some copies of company

5    policies and an opportunity to read them and

6    understand them?  What you had to do as a server,

7    etc.?

8    A.    Yes, sir.

9    Q.    Do you recall seeing the various training

10   videos?

11   A.    Yes, sir.

12   Q.    And was one of them the respect and

13   responsibility or the sex harassment video as it's

14   referred to?

15   A.    Yes, sir.

16   Q.    Okay.  Am I correct that that's shown

17   periodically during the year to all the staff?

18   A.    Yes, sir.

19   Q.    So you would have seen it a number of

20   times during your employment?

21   A.    Yes, sir.

22   Q.    What do you recall about what the video

23   was about?  What do you recall that video being

Deposition of:    Rachael Cumbie    9-28-2006

Page 26

1    about?

2        A.    I recall it being -- just it would state

3    the types of sexual harassment and it would give you

4    a number to call.  What the steps you would take if

5    you were being sexually harassed.  Steps you would

6    take to -- what you could do about it.

7        Q.    Okay.  Am I correct that one of the steps

8    would be to report it to a manager or to the general

9    manager or if you weren't satisfied with that or

10   uncomfortable doing that, you could use the 800 hot

11   line number to call the corporate office; is that

12   right?

13       A.    Yes, sir.

14       Q.    Did you ever have occasion to use the

15   corporate hot line for anything other than a sex

16   harassment issue?

17       A.    No, sir.

18       Q.    Did the video make clear that the

19   company's policy was that they did not tolerate

20   sexual harassment or harassment of any kind?

21       A.    Yes, sir.

22       Q.    And did they encourage employees to use

23   the hot line to call if they had complaints?

Deposition of:   Rachael Cumbie          9-28-2006

Page 27

1        A.    Yes, sir.

2        Q.    How many times would you estimate you had

3    to see that video?

4        A.    I would guess around four times.

5        Q.    Okay.

6        A.    At the least.

7        Q.    Was it your understanding that they

8    replayed it because it was a requirement of the

9    company to show it to employees at least annually?

10       A.    Yes, sir.

11       Q.    And you were asked to sign a sheet to

12   indicate that you had attended the meeting whenever

13   it was shown?

14       A.    Yes, sir.

15       Q.    Okay.  The -- did you have any problems in

16   terms of your -- the issues that we're dealing with

17   here today when you worked at Bay Minette?

18       A.    No, sir.

19       Q.    Am I correct that you were moving to

20   Auburn to attend college or go to college?

21       A.    Yes, sir.

22       Q.    Had you gone to college prior to that

23   time?

Deposition of:    Rachael Cumbie        9-28-2006

Page 30

1    made me come back.

2              MR. HEUSEL:  I like your mom.

3    BY MR. HEUSEL:

4         Q.   So she thought you were enjoying college a

5    little too much?

6         A.   Not too much just not enough to study.

7         Q.   Okay.  After -- what time of year, do you

8    recall, did you go back after leaving the Bay

9    Minette Ruby's.  Did you go back at the start of a

10   semester?

11        A.   Yes, sir.

12        Q.   What semester was it?

13        A.   It was a fall semester in 2002, it would

14   be.

15        Q.   Okay.  How many Ruby's are there in

16   Auburn?

17        A.   There is one in Opelika.  That was the one

18   where I worked at.  And then there was one in

19   Auburn.  They just built one in Auburn while I was

20   working there.

21        Q.   And when you went there you said you

22   transferred, was that arranged in advance?

23        A.   Yes, sir.

Deposition of:    Rachael Cumbie        9-28-2006

Page 32

1   BY MR. HEUSEL:

2       Q.    Heidi Finnegan.   And do you recall who

3   else?

4       A.    I do not recall who else.

5       Q.    Do you remember if -- let me ask you

6   generally how many managers are working in a

7   restaurant or not at one time but generally

8   assigned?

9       A.    Usually there's about four or five just

10  depending on the restaurant.

11      Q.    And do you recall if the other managers

12  when you got there were male or female?

13      A.    They were both male and female there to be

14  honest with you.

15      Q.    Okay.  Did you work continuously from the

16  fall 2002 at the Opelika Ruby's until you were

17  terminated?

18      A.    Yes, sir.

19      Q.    So that would be till May of '04 about a

20  year and a half to going on two years something like

21  that?

22      A.    Yes, sir.

23      Q.    When did the management staff change as

Deposition of:   Rachael Cumbie      9-28-2006

Page 33

1    best you can recall?

2         A.    I'm trying to think.   Whenever they built

3    the Ruby Tuesday in Auburn, Terry Abate or Abbott

4    she transferred over there.   I don't recall the date

5    that she transferred over there; but when she

6    transferred over there, that's when Bobby came in

7    and took her place.

8         Q.    Did you know Bobby and by Bobby I'm

9    referring --

10        A.    Bobby Vaughn.

11        Q.    -- for the record to the person sitting to

12   my right is Bobby Vaughn.   Did you know Bobby before

13   he came over there?

14        A.    No, sir, I did not.

15        Q.    Did you know whether he had any background

16   working in that restaurant prior to that time?

17        A.    No, sir.

18        Q.    Did you recall about how long it was

19   between the time Bobby came and you left in May of

20   '04?

21        A.    I would say it was over a year and a half

22   I would guess.   He was there a pretty good time.

23        Q.    When Bobby took over, do you recall who

1  to?

2          A.    It was the manager of The New You.    I

3  cannot recall her name at this point in time.

4          Q.    And where is The New You located?

5          A.    It's located in Thomasville.

6          Q.    Are they still in business as far as you

7  know?

8          A.    Yes, sir.

9          Q.    When you went to Auburn and started

10  working under Terry Abate, did you get along with

11  Ms. Abate?

12          A.    Yes, I did.

13          Q.    Were you a server at that time?

14          A.    Yes, sir.  Excuse me.  I was a hostess.

15          Q.    Hostess.  And just for the people who are

16  reading this, tell me what a hostess does?

17          A.    A hostess -- when guests come in, they

18  take the number of guests, ask them if they want

19  smoking or non, and place them in a certain section

20  and go down the list of whose turn it was to get a

21  table and you just sit them in a certain section.

22          Q.    When you went back to Auburn in the fall

23  of '02, were you a full-time student?

Deposition of:   Rachael Cumbie      9-28-2006

Page 42

1   did you stay beyond?

2       A.   No, I stayed in Auburn until I worked

3   through Bumpers.

4       Q.   Okay.

5       A.   I stayed in Auburn the whole time.

6       Q.   I see.

7       A.   Until 24, I mean '04.

8       Q.   So another year plus.  While through

9   Appleby's, Copper Creek, and Bumpers?

10      A.   Yes, sir.

11      Q.   So my question is:  To the best of your

12  knowledge, while you were working at Ruby's, you

13  were a full-time student?

14      A.   Yes, sir.

15      Q.   Okay.  Did you date any employees of

16  Ruby's?

17      A.   I did.

18      Q.   Who did you date?

19      A.   His name is Wilfredo Cartagena.

20      Q.   Okay.  And who else?

21      A.   That was it.

22      Q.   Is he the only one you dated?

23      A.   To me knowledge.

Deposition of:    Rachael Cumbie        9-28-2006

Page 43

1    Q.    And by date I don't mean going steady or

2  whatever they call it anymore but just a date.  I

3  mean did you go out on a -- what a boy or girl would

4  know as a date with anyone else other than Wilfredo?

5    A.    No, sir, not that I know of.

6    Q.    Okay.  Did you have any good friends that

7  worked there?

8    A.    Yes, sir.

9    Q.    Who were they?

10    A.    Leanne Jenkins was her name.

11    Q.    Jenkins?

12    A.    Yes.

13    Q.    Lynne is the first name?

14    A.    Leanne.

15    Q.    Leanne?

16    A.    Leanne.  Let's see.  There was Enis.  I

17  don't know his last name.

18    Q.    Wait.  Let me get my notes here.  Enis

19  Kirkland?

20    A.    Yes.

21    Q.    Who else?

22    A.    Kyle Austin, James Burton.

23    Q.    Wait.  I got to get these down.  Who is

Page 44

1    the first one you said?

2         A.    Kyle Austin.

3         Q.    James Burton.  Burton or Burdett?

4         A.    Burton.

5         Q.    Burton?  Okay.  What about Bobby Betts?

6         A.    Yes.

7         Q.    Who else?  Any others?

8         A.    Erica Shehan or Mehan.  I can't remember

9    her last name.

10        Q.    Any others?

11        A.    Sara Novak.

12        Q.    Can you think of any --

13        A.    I'm sure I can if I could see a list.  I

14   was friends with a lot of people at Ruby Tuesdays.

15        Q.    Did you keep in tough with most of these

16   after you left Ruby's?

17        A.    I kept in touch with them but I did not

18   speak to them for a few months.  I don't keep in

19   touch with them if that's what you're trying to say.

20        Q.    You didn't speak to them?

21        A.    Because I was working at Ruby Tuesdays and

22   because it was a sticky situation.

23        Q.    What was the sticky situation that you

Deposition of:   Rachael Cumbie       9-28-2006

Page 45

1   couldn't speak to them for a few months?

2       A.   Well, the termination and the lawsuit.

3       Q.   What was it about the termination that

4   made it difficult to speak to them?

5       A.   Well, basically whenever I was fired, I

6   felt I was wrongly fired because of supposedly

7   drinking behind the bar when Zach whatever his last

8   name is and Erica Shehan were both drinking at the

9   same time and they were not fired as well.

10      Q.   Okay.  Just for the record is that Zach

11  Taylor?

12      A.   Yes.

13      Q.   Was there ever a time when you considered

14  Zach to be one of your friends?

15      A.   I never considered him as a close friend.

16  I tolerated him as an acquaintance but never as I

17  close friend.

18      Q.   Okay.  Now, you mentioned that you didn't

19  speak to him for a few months because of the

20  termination and lawsuit.  But again what was it

21  about the fact that you were filing a suit or

22  contemplating filing a suit that caused you not to

23  be able to talk to your friends?

Page 46

1          MS. MCKENZIE:   Object to the form.   You

2    can answer.

3          A.    Well, basically Bobby Vaughn was a really

4    good friends with a lot of those friends that I was

5    friends with and in regards to the lawsuit somehow

6    or another it had gotten out to some of them that I

7    was accusing them of sexual harassment when I was

8    not accusing certain people of sexual harassment on

9    that list.   And a lot of them they were just -- they

10   didn't want to talk to me.

11         Q.    Okay.   When -- so you didn't feel that

12   they'd misunderstood what you were doing apparently?

13         A.    Yes, sir.

14         Q.    And in fact you didn't accuse Wilfredo or

15   Enis or Kyle or James or Bobby or Erica or Sarah or

16   Leanne of sexual harassment?

17         A.    No, sir.

18         MS. MCKENZIE:   Object to the form.

19   BY MR. HEUSEL:

20         Q.    All right.   I wanted to cover all of them.

21   If any of those that you felt engaged in sexual

22   harassment toward you, I'd like to know that?

23         A.    No, sir.

Deposition of:   Rachael Cumbie         9-28-2006

Page 47

1     Q.    Okay.   Did any of them -- what was the --

2   was Zach the only person that you felt sexually

3   harassed you?

4             MS. MCKENZIE:   Object to the fact.   Define

5   sexually harassed.

6   BY MR. HEUSEL:

7     Q.    Well, I mean this lawsuit is about

8   harassment.   I want your understanding -- you've

9   been talking sexual harassment.   Whatever you

10  consider to be sexual harassment.   Was Zach the

11  person that did it?

12    A.    Yes.

13    Q.    Okay.   Was there anyone else that you

14  thought sexually harassed you?

15    A.    No.

16            MS. MCKENZIE:   Same objection.   Answer the

17  question.

18    A.    Okay.   No.   I do not feel any one of them

19  sexually harassed me.   They never crossed a line

20  with me.

21  BY MR. HEUSEL:

22    Q.    Okay.   And were there other employees that

23  we didn't name that sexually harassed you?

Deposition of:    Rachael Cumbie        9-28-2006

Page 48

1    A.    No.

2    Q.    Okay.

3    A.    No, sir.

4    Q.    I mean the lawsuit says what it says and

5    I've read it, obviously, and you named, obviously,

6    Zach Taylor.  I just wanted to be sure there was no

7    one else other than Zach Taylor that you felt

8    sexually harassed you.

9    A.    No.

10    Q.    Okay.  When did -- let me rephrase this.

11    Did you go to school with any of these individuals?

12    A.    A few of them were going to school at

13    Auburn but I never had any classes with any of them.

14    Q.    Okay.  So your friendship developed out of

15    working at Ruby'?

16    A.    Yes, sir.

17    Q.    And you said you didn't speak to them for

18    a few months but then it -- apparently y'all got

19    over that and you reestablished contact with these

20    people?

21    A.    Yes, sir.

22    Q.    About when did that occur?

23    A.    It was just kind of sporadically.  Every

1    vodka that Smirnoff made.  So they were all one

2    alcohol.

3        Q.    So two types of vodka and lemonade?

4        A.    One type of vodka and lemonade.

5        Q.    All right.

6        A.    Watermelon Smirnoff Vodka and lemonade.

7        Q.    I just drink.  I don't know what any of

8    this is.  And how many drinks did y'all make each?

9        A.    One.

10        Q.    Were you all standing at the end of the

11    bar just talking and drinking?

12        A.    They were sitting at the bar.  I was

13    behind the bar cleaning.

14        Q.    Okay.  Did you -- who concocted the drink?

15        A.    I made mine, Erica made hers, and Zach

16    made his.

17        Q.    Okay.  What were you all talking about?

18    Do you remember?

19        A.    Well, basically how we came about the

20    little miniatures.  A Smirnoff representative came

21    into the bar earlier that evening and was eating,

22    having drinks, and saw that we had a certain type of

23    vodka on our selves in the back.  He was like,

1   "Well, you know I've got miniatures and bar mats and

2   everything in my car.  Why don't you let me give you

3   these because of -- as reward for y'all having this

4   type of vodka.  This is what I do.  This is my job.

5   So he handed me a whole bag full of miniatures.

6        And we asked -- what is her name?  Not Keely,

7   the other manager.  Anyway, we asked a manager if it

8   was okay if we tried it, if we tasted it.  And she

9   said, "Yes.  As long as I do not see it."  And we

10  made the drinks and I sat mine on the bar.  Took a

11  drink.  Sat it on the bar and then didn't touch it

12  the rest of the night.  And Erica and Zach sat at

13  the bar with their drinks and drank theirs.

14       Q.   What time of night was this?

15       A.   It was about one-thirty to two in the

16  morning.

17       Q.   So the restaurant had closed?

18       A.   Yes, sir.

19       Q.   And all the customers were gone?

20       A.   Yes, sir.

21       Q.   Had you already cleaned up?

22       A.   I was cleaning.  I was in the process of

23  cleaning.

1    Q.    Now, when did you speak to Bobby Vaughn?

2    When did he speak to you about the fact liquor was

3    being served that night?

4    A.    He did not say anything to me that night.

5    I can't recall if it was the day after that.  But it

6    was recent -- it was not soon after that that he

7    came to me and told me that he knew of my drinking

8    behind the bar, of me making Margaritas and drinking

9    them behind the bar and of me getting drunk behind

10    the bar and it was not tolerated.

11    Q.    Now, you knew it was not tolerated?

12    A.    Yes.

13    Q.    For people to drink?

14    A.    Yes.

15    Q.    Was he -- do you even recall him being --

16    even working that night?

17    A.    No, sir, he was not working that night.

18    Q.    Okay.  So whatever he knew he knew from

19    someone else?

20    A.    Yes, sir.

21    Q.    Do you know who told him?

22    A.    I do not know who told him.

23    Q.    Did you -- did you ask who told him?

Deposition of:    Rachael Cumbie        9-28-2006

Page 65

1    Q.    Did you acknowledge to him that you had

2    had a drink behind the bar?

3    A.    I tried to defend the fact.  He was

4    referring to a different incident of me making a

5    Margarita behind the bar and drinking it.  And I was

6    not.  That wasn't even in my head at that point in

7    time because I was under the assumption, whenever he

8    was coming at me with this, that it was about the

9    night before.

10    Q.    I see.

11    A.    And it finally came out it was about a

12    Margarita that I had supposedly made which I had

13    made for a customer.  And it had been sent back with

14    a claim there were no liquor in it.  I put it in a

15    styrofoam cup and drank it because Bobby Betts told

16    me -- as a bartender, I was told while I was

17    training as a bartender at Ruby Tuesdays that that

18    was one of the -- not necessarily privileges, but

19    that was one of our duties.  If a drink is sent

20    back, we have to make sure that alcohol was in the

21    drink.

22    Q.    Okay.  But you drank the Margarita?

23    A.    I did not.  I did not.  I tasted it to see

Deposition of:    Rachael Cumbie        9-28-2006

Page 66

1   if there was alcohol in it and threw it away.

2        Q.   Do you contend that you never drank while

3   you were behind the bar?

4        A.   Yes.

5        Q.   The night that we referred to earlier

6   where you made the watermelon vodka drink, that

7   didn't have anything do with a customer sending a

8   drank back?

9        A.   No, it did not.

10       Q.   Okay.  And do you contend that Erica and

11  Zach drank their drinks?

12       A.   Yes, sir.

13       Q.   And did you drink yours?

14       A.   I had one sip out of it because I know I

15  didn't like it and I have a bad case of heartburn

16  and I don't drink stuff like that.  That's why I did

17  not finish it.

18       Q.   What was the rule in Ruby Tuesdays

19  regarding any employee drinking after hours in the

20  restaurant?

21       A.   We could not drink.  If we came in while

22  we were off the clock, we could not drink before

23  shifts.  If we came in while we were not working

Deposition of:    Rachael Cumbie                9-28-2006

Page 68

1  company rules only because you sipped it?

2      A.    I feel like I did violate the company

3  rules.  I should not have done that.

4      Q.    I see.

5      A.    And -- but the fact of the matter is that

6  the reason why I was upset is the fact they did the

7  same thing I did.  They finished their drink.  I

8  took one sip out of mine.  Nothing happened to them.

9      Q.    Did you ever -- you never told him though

10  about them drinking their drink, did you?

11      A.    I told him the night he was firing me.

12      Q.    Okay.

13      A.    I told him what was happening and he

14  thought it was BS.  He wouldn't hear it.

15      Q.    Okay.  Let me back up a second.  When he

16  called you in, he told you -- what exactly did he

17  tell you and what was your response to him.  As best

18  you can remember?

19      A.    As best as I can remember, he said, "Okay.

20  Look, we're firing you because you have been -- I've

21  heard that you have been drinking behind the bar."

22  And I did my best to defend myself and that's all I

23  could do.

Deposition of:   Rachael Cumbie      9-28-2006

Page 73

1  you left?

2       A.   I guess around six months.

3       Q.   Had you ever been in a situation where you

4  socialized with Zach outside of work either in a

5  group or alone?

6       A.   Yes, sir.

7       Q.   What kind of situation?

8       A.   Employees at Ruby Tuesdays would get

9  together either after hours or when they were not

10 working on the weekends.  Have a get together at

11 Leanne Jenkins house or wherever we decided to meet

12 up.  He would be there on occasion.

13      Q.   And I know from the complaint you've

14 alleged that he's gay or known to be gay; is that

15 right?

16      A.   Yes.  He has said openly that he is gay.

17      Q.   Obviously that wasn't a problem for you?

18      A.   It was a problem whenever he professed

19 that he wanted to date Leanne and tried to kiss her

20 at a party.  That's when it became a problem.

21      Q.   But in terms of being a social

22 acquaintance or friend, the mere fact that he was

23 gay didn't matter to you?

Deposition of:    Rachael Cumbie      9-28-2006

Page 74

1      A.    No.  I don't discriminate against gays.

2  It doesn't --

3      Q.    All right.  And would this group that we

4  named earlier beginning with Wilfredo, Leanne, Enis,

5  etc.  Was that kind of the group that would hang out

6  together outside of work?

7      A.    Yes, sir.  There might be a few people

8  that had just been hired in or just acquaintances

9  from everybody else who would show up.  I can't

10 recall the names of who all was there but those

11 people were normally there.

12     Q.    Okay.  Who -- we've been talking around

13 the issue of Zach and what it is that he did.  Let's

14 talk about it directly.  What did Zach do that you

15 considered to be inappropriate in the work place?

16     A.    Well, to begin with Zach came in -- of

17 course, professed that he was gay.  And, basically,

18 he would come up behind me and just slap the tar out

19 of my but.  He would just slap it as hard as he

20 could.  And, you know, I would literally just, you

21 know, I'd scream a little bit.  I wouldn't scream

22 loud.  But there were instances that he hit it so

23 hard that I would scream and it would leave

Deposition of:    Rachael Cumbie        9-28-2006

Page 75

1    handprints and bruises.

2        Q.    In -- in talking to people it's -- there's

3    been indications that it was not uncommon for

4    employees to slap, pat, whatever you want to call

5    it, each other on the but.  Is that a fair

6    statement?

7        A.    Yes, that is fair.  It was not uncommon

8    for that to happen.  Basically everybody would do it

9    to everybody.  In a sense they would come up and

10   just try to hit each other as hard as they could to

11   see who would, you know, could hit each other the

12   hardest.  And it started happening to, you know,

13   girls and everything.

14       Q.    Did you ever do it to anyone?

15       A.    Yes.  I did it to Kyle and James and Enis.

16   I know I did it to Will.  I might have been done it

17   to Zach.  But if they ever told me to stop, I always

18   told -- I never did it again.

19       Q.    Okay.

20       A.    And the thing is with Zach is that I told

21   him to stop repeatedly.  He never stopped.  I told a

22   manager.  And it never stopped.  When it happened

23   again the manager said, "Will you f-ing stop yelling

Deposition of:    Rachael Cumbie        9-28-2006

Page 77

1      A.    She turned around and looked at me because

2  I went to her directly.  He had already hit me once

3  at the hostess stand while customers were coming in.

4  And just, you know, I was looking at our seating

5  chart and he just laid it on me.  Just hit my rear

6  end so hard I couldn't even do anything.  I couldn't

7  scream, couldn't do anything because there were

8  customers there.  He would do it in the back of the

9  kitchen.  He did it around three times before I went

10 to Keely.  And I told her, "Look, if you don't make

11 him stop, I will."  And she was like, "Well, you're

12 a big girl.  Do it yourself.  You can take care of

13 this."  And so the next time he did it I was at a

14 micro and Tracy -- I was showing Tracy how to punch

15 in an order.  Showing her the stuff on the micro.

16 Next thing I know slap and it hurt so bad I screamed

17 to the top of my lungs.  And I said, "Will you f-ing

18 stop."  People at the hostess stand could hear me.

19 That's how loud I yelled.  And Keely turned around

20 and she said, "Will you f-ing stop yelling so loud?"

21     Q.    And just -- I know it's obvious but,

22 again, for the record when you say f-ing, you mean

23 fucking stop?

Deposition of:    Rachael Cumbie    9-28-2006

1    did it.

2    BY MR. HEUSEL:

3        Q.    Did you tell him to stop?

4        A.    Yes, I did.

5        Q.    Did he stop?

6        A.    Yes, he stopped.  He apologized for it.

7    But, I mean, he had done it once or twice before

8    that and didn't get the picture.  But after he did

9    that, you know.

10        Q.    What -- after the incident you described

11    with the -- involving Zach and the Keely, when was

12    the first time you spoke to Mr. Vaughn about Zach?

13        A.    I don't remember a date.  I don't remember

14    going straight to Bobby Vaughn about it.

15        Q.    Okay.

16        A.    I know he saw it on occasion.  He saw it.

17    He seen Zach fondle my breasts and didn't do

18    anything about that.  He seen him hit me on my but

19    before and never did anything about that.  He seen

20    Zach hit me after that instance and never did

21    anything about it.  Nothing was ever done to Zach

22    about that.  And I had already gone to Keely about

23    it.  So I called a 800 number and I never got an

Deposition of:    Rachael Cumbie    9-28-2006

Page 80

1    answer back from that.

2        Q.    Okay.   Let me -- I'm going to cover all of

3    these believe me.   I want to get as much information

4    as you have regarding these events.   I'm not going

5    to minimize any of them but getting back to -- did

6    you ever specifically talk to Mr. Vaughn about Zach?

7        A.    I know that I had spoken to Bobby once or

8    twice and just told him about Zach and how it made

9    me kind of uncomfortable about it.   And the fact

10   that, you know, I didn't necessarily like it but, I

11   mean, the atmosphere in that restaurant was just

12   almost like, you know, it didn't really matter who

13   hit whatever.   It was just like nothing was ever

14   done about it anyway.

15       Q.    Well, you did continue to hit your friends

16   though, didn't you?

17       A.    They were my very good friends and they

18   never said anything to me about it.   The thing is is

19   that I said no to Zach many times.

20       Q.    I understand.   I'm not arguing.   I'm just

21   asking.   You did continue to hit your friends?

22       A.    Yes, I'm assuming I did.

23       Q.    And they continued to hit you?

Deposition of:   Rachael Cumbie          9-28-2006

Page 81

1      A.   Yes.

2      Q.   So if it was that noticeable that everyone

3  was doing it and it was being done among friends who

4  weren't complaining about it.  Am I understanding

5  that you thought that Mr. Vaughn should have singled

6  out which hits to discipline and let the others go?

7      A.   Okay.  For one thing there were -- Erica

8  Shehan, she would not tolerate that stuff for one.

9  She knew -- she did not like it.  There were a lot

10  of women that worked at Ruby Tuesdays that were

11  outspoken about it.  Don't touch me.  Don't do any

12  of that to me.

13      Q.   All right.  And did it stop for Erica

14  because she made it clear that she didn't want it?

15      A.   She was popped on the rear end a few times

16  by Zach and by other men and she didn't like it

17  either.  You know, it's not like it was going to

18  stop.  I mean even the women who did not like it --

19  nothing was ever done about it anyway.

20      Q.   Did you see any problem at all in your

21  continuing to do the same conduct you were

22  complaining about in the restaurant?

23           MS. MCKENZIE:   Object to the form.

Deposition of:   Rachael Cumbie          9-28-2006

Page 82

1    A.   No.  Unless somebody told me to stop, I

2  didn't, I mean --

3    Q.   Okay.

4    A.   It's not like I went around hitting

5  everybody on the but just to hit them.  But if

6  anybody -- if I ever hit anybody hard enough for

7  them to tell me to stop, I stopped.

8  BY MR. HEUSEL:

9    Q.   Okay.  Why did you hit them on the but?

10    A.   Because it was a thing that we just did.

11    Q.   Was it a sign of friendship?

12    A.   No, not really.  It was just:  Let's see

13  how hard we can hit Rachel on the but or let's see

14  how hard we can hit Bobby Vaughn on the but.  See

15  how hard we can hit Kyle Austin on the but.

16    Q.   Did you ever hit Bobby Vaughn on the but?

17    A.   No.  Never touched Bobby Vaughn.  I was

18  just saying as an example.  Never touched him.

19    Q.   But you did the same thing with others.

20  That's what I'm asking.  You did -- when you hit

21  others, some of them were friendly pats, some of

22  them were let's see how hard Er -- I mean --

23    A.   Mine were friendly pats.

1    fondled your breasts?

2         A.    Yes.

3         Q.    When did that begin?

4         A.    The same time he started working there.

5    He just felt it was okay to do that.

6         Q.    So for six or seven months he fondled your

7    breasts?

8         A.    No.  He only -- he did it about four or

9    five times and it's not -- I looked like, I mean, it

10   happened in front of managers and I looked at them

11   like are you going to do anything?  Nothing ever

12   happened.

13        Q.    Well, you say you looked at them like --

14   did you ever say anything to them?

15        A.    Yes.  I went to Keely.  I went to -- I

16   mean, I was just -- I told them what was going on.

17   He's hitting me.  He's touching my boobs.  Make him

18   stop.  Nothing was ever done.

19        Q.    How did he touch them?

20        A.    He would come up from behind and like grab

21   me.  I wouldn't even know he was there.  Come up

22   from behind, reach through my arms.  He would come

23   up towards me and --

Deposition of:    Rachael Cumbie          9-28-2006

Page 85

1    Q.    How do you know that Bobby Vaughn saw

2    anything?

3    A.    Because he was standing in the kitchen at

4    the serving area where you get the food and

5    everything.  We were standing at a micro.  Erica and

6    I were standing at a micro and he just came up.

7    He's like, "Oh, yeah.  These are real nice.  These

8    are real nice."  He looked at Erica and I looked at

9    Bobby and he just smiled and went on about his

10   business.

11   Q.    But did you say anything to him?

12   A.    What am I supposed to do?  I just looked

13   at him and he laughed.  I mean, what else am I

14   supposed to do?  I've already gone to a manager

15   about it before.  What do you expect me to do?  I've

16   called a 1-800 number.  I mean nothing is done about

17   it.  So what do y'all expect me to do?

18   Q.    I'd like you -- I understand this can be

19   difficult.  But it's -- it's necessary.  So I want

20   you to calm down as best you can.  Take whatever

21   time you need and we'll --

22   MS. MCKENZIE:  She's answered your

23   question.  You can ask it one more time and then

Deposition of:   Rachael Cumbie        9-28-2006

Page 86

1   that's it.  About why didn't she talk to a manager.

2              MR. HEUSEL:  I understand.

3   BY MR. HEUSEL:

4       Q.   You said you called the 800 number and no

5   one called you back?

6       A.   Yes.

7       Q.   So you never spoke to anyone?

8       A.   I call a 1-800 number and nobody called me

9   back.

10      Q.   Did you call more -- why didn't you call a

11  second time?

12      A.   Because when I didn't get a call back the

13  first time, you know, they're supposed to be there

14  to help you, right?  You know you don't hear from

15  them, then they are not obviously there to help you.

16  So I just figured, you know, nothing is ever going

17  to be done about it.

18      Q.   You didn't -- did you leave a message?

19      A.   Yes.

20      Q.   What was the message?

21      A.   I don't remember the message --

22      Q.   You didn't tell them --

23      A.   -- off hand.

1          MS. MCKENZIE:  Let her answer the

2    question.

3          A.    I told them that I was being sexually

4    harassed and I didn't know what to do about it.

5    BY MR. HEUSEL:

6          Q.    What number did you leave?

7          A.    Do what?

8          Q.    Did you leave a number?

9          A.    Yes.

10         Q.    Did you leave the restaurant's number or

11    your own?

12         A.    No.  I left my cell phone number.

13         Q.    Do you know the district manager?

14         A.    Yes.

15         Q.    Who was it?

16         A.    Greg Thompson.

17         Q.    How often did he come in the restaurant?

18         A.    Maybe once or twice a month.

19         Q.    Did you ever talk to him about it?

20         A.    No.

21         Q.    Did you have an opportunity to talk to

22    him?

23         A.    Just in passing I was able to say hi.  I

Deposition of:    Rachael Cumbie        9-28-2006

Page 88

1    was always working whenever he came in there.   I

2    never had a chance to talk to him.

3        Q.    When did you make the call to the 800

4    number?  Well, let me ask you this:  Was it after

5    you quit?

6        A.    No, it was not.

7        Q.    Do you know how long before you quit you

8    made the call?

9        A.    It was about a week before.

10        Q.    A week before?  Why did you wait seven

11    months to call?

12        A.    Because I'd already gone to a manager,

13    okay.  Nothing is going to be done about it at all.

14    So I called the number.  I tried everything I could,

15    so.

16        Q.    After -- did Bobby Vaughn ever tell you he

17    talked to Zach?

18        A.    No.

19        Q.    You sure of that?

20        A.    I don't know if he talked to him or not.

21    All I know is that nothing was ever done to Zach.

22        Q.    Do you recall if he ever told you he had

23    talked to Zach about the complaint you made?

Deposition of:    Rachael Cumbie        9-28-2006

Page 89

1        A.    No, I don't recall if he told me.

2        Q.    Is it possible he spoke to him and you

3    don't remember?

4        A.    I don't know if he spoke to him or not.

5             MS. MCKENZIE:   Listen to the question.

6    BY MR. HEUSEL:

7        Q.    My question was:   Is it possible he spoke

8    to you and told you that and you don't remember?

9        A.    Yes, it's possible.

10       Q.    Did you tell your boyfriend what was

11   happening?

12       A.    Yes.

13       Q.    Did he see what was happening?

14       A.    Yes.

15       Q.    Did he ever say anything to Zach?

16       A.    Yes.

17       Q.    How do you know?

18       A.    Because he was my boyfriend and he didn't

19   like the way that it went down.  When I was working

20   the night that I was hit five times and I told him

21   about it.  And he went up to Zach and he was like,

22   "Hey, man don't do it anymore."  After I screamed at

23   Zach and I was told to f-ing shut up.  When I went

Deposition of:    Rachael Cumbie        9-28-2006

Page 90

1    to him and said, "Hey, leave her alone, man."

2        Q.    And do you know that because he told you

3    or because you heard it?

4        A.    Because he told me.  Because I wasn't -- I

5    was too busy working.  All I know is that Will told

6    me that he told him to stop.

7        Q.    All right.  Do you contend that even after

8    your boyfriend told him he still did it?

9        A.    Do what?

10       Q.    Do you contend that even after your

11   boyfriend told him to stop that he still did it?

12   That Zach still slapped?

13       A.    That night he did not slap me again.

14       Q.    Did he ever slap you again after that?

15       A.    I don't know if he did or not.

16       Q.    Did he ever touch you on the breasts after

17   your -- Zach -- after your boyfriend told him to

18   leave you alone?

19       A.    I don't recall if he did or not.

20       Q.    Was he concerned about your boyfriend

21   being there and seeing this?

22           MS. MCKENZIE:  Object to the form.

23       A.    No, sir, he was not.

Bay Area Reporting, Inc.
2102 Government Street, Mobile, AL 36606

Deposition of:    Rachael Cumbie        9-28-2006

Page 93

1    Q.    And when you spoke to him that time, did

2    you talk to him about him touching your breasts or

3    just slapping you on the rear end?

4    A.    I think it was mostly just slapping on the

5    rear.  I mentioned the breasts and that it wasn't

6    cool and that was it.

7            MS. MCKENZIE:  We need a break.

8            MR. HEUSEL:  Sure.  I'm almost done so.

9    No.  That's okay.  I've got to get my papers

10   together.  I've got a few exhibits to introduce and

11   then we will be close to done.

12                  (A short break was taken.)

13   Q.    I'll mark this copy of your EEOC charges

14   as Exhibit 1.  Would you take a look at this.  Do

15   you recall that document?

16                  (Defendant's Exhibit No. 1 was

17                  marked for identification.)

18   A.    Yes, sir.

19   Q.    Take a look at the next page.  Is that

20   your signature on it?

21   A.    Yes, sir.

22   Q.    Who prepared this?  Did the EEOC do it?

23   A.    No, my attorney.

1       A.    Yes, sir.

2       Q.    Okay.   When you referred earlier to

3    being -- to the conversation with the lady manager

4    who you sai used the term f-ing term toward you.

5    Mr. Vaughn never cursed you, did he?

6       A.    He cursed -- the day that I was fired it

7    was very heated.   There was cussing going on.

8       Q.    Were you crying?

9       A.    Yes.

10      Q.    Were you cursing?

11      A.    Yes.

12      Q.    Okay.   Prior to that time he never -- did

13   he say anything in the way of cursing in that

14   meeting?

15      A.    To me personally?

16      Q.    Yeah.

17            MS. MCKENZIE:   During what meeting?

18      Q.    The termination.

19      A.    During the termination.   I don't

20   understand.

21      Q.    Yeah.   Did he ever curse you period?

22   Let's start with that?

23      A.    Yes.

Deposition of:   Rachael Cumbie          9-28-2006

Page 96

1      Q.    When?

2      A.    If I ever screwed up an order or anything

3  like that, he would cuss me out for doing something

4  like that.

5      Q.    Okay.  Did he ever curse at you in

6  connection with any complaints about Zach Taylor or

7  slapping or grabbing your boobs or anything like

8  that?

9      A.    I'm not sure if he cussed during our

10 conversations.

11     Q.    Okay.  Your complaint mentions an issue

12 regarding overtime.  Does that relate to the night

13 of the alleged drinking that lead to your

14 termination?

15     A.    Yes.

16     Q.    And specifically does it relate to a

17 manager changing your hours that night?

18     A.    Basically if I ever had any overtime,

19 they'd knock it down.

20     Q.    Okay.  But am I correct that the overtime

21 -- when you say change your overtime, it refers to

22 the fact that you -- you are alleging that you

23 worked past your normal shift and somehow or other

Deposition of:    Rachael Cumbie        9-28-2006

Page 97

1    they changed your time.  Is that what you're saying?

2        A.   Yes.

3        Q.   Your schedule was never changed to reduce

4    your hours simply because of this allegation, was

5    it?

6        A.   I don't understand the question, I mean.

7        Q.   Okay.  On the second page it relates --

8    you say in here they cut all my overtime hours that

9    I had already worked so that management could get a

10   bonus?

11       A.   Yes.

12       Q.   Did they do that to other employees?

13       A.   Yes.

14       Q.   It was because of the bonus issue that you

15   believe they cut hours; is that right?

16       A.   Yes.

17       Q.   It was not because you were being slapped

18   on the but?

19       A.   No.

20       Q.   Or Zach had anything to do with it.  It

21   was strictly an issue of overtime nothing else;

22   isn't that right?

23       A.   Yes.

Deposition of:    Rachael Cumbie        9-28-2006

Page 99

1    Q.    But not a server because she wouldn't have

2    seen it?

3    A.    No, sir.

4    Q.    Well, let me show you what I've marked as

5    Exhibit 2.

6              (Defendant's Exhibit No. 2 was marked

7              for identification.)

8    BY MR. HEUSEL:

9    Q.    Do you recall this being the written

10   version of the information that was conveyed in the

11   sexual harassment video?  That this is actually the

12   written policy?

13   A.    Yes, sir.

14   Q.    Down at the bottom.  The second to last --

15   the last full paragraph it states:  If you see a

16   violation of company policy you must promptly inform

17   us.  Did you promptly inform them of this?

18   A.    The management or the hot line?

19   Q.    Let's talk about the managers.  Did you

20   first -- did you promptly inform them of Zach

21   slapping you on the behind or was it only when it

22   got to a point that you became offended by it that

23   you --

Deposition of:    Rachael Cumbie    9-28-2006

Page 100

1              MS. MCKENZIE:    Object to the form.

2        A.    Yes.

3  BY MR. HEUSEL:

4        Q.    That's when you reported it; is that

5  right?

6        A.    Yes.

7        Q.    It says, "Communication is the key.  Talk

8  to your manager, general manager, director of people

9  standards and results, regional partner, director of

10  human resources, or call the team member hot line.

11  Whichever is most comfortable to you."  Is that

12  right?

13        A.    Yes.

14        Q.    And you say you did tell a manager and

15  general manager; is that right?

16        A.    Yes, sir.

17        Q.    You didn't talk to the director about it?

18        A.    No, sir.

19        Q.    Or call human resources directly but you

20  did call the hot line?

21        A.    Yes, sir.

22        Q.    Once; is that right?

23        A.    Yes, sir.

Deposition of:    Rachael Cumbie        9-28-2006

Page 102

1    stop having everybody slap so hard to make it stop,

2    you know.

3        Q.    Okay.  So soft slaps would have been all

4    right with you?

5        A.    Well, no slaps would have been great with

6    me.  But it's not like it was ever going to stop

7    anyway.

8        Q.    Would that have required you to stop

9    slapping also?

10       A.    Yes.

11       Q.    You were willing to give that up then?

12       A.    Yes.

13       Q.    Let me show you what I'm going to mark as

14   Exhibit 3.  You are aware that Ruby's profess to

15   have what is known as an open door policy; is that

16   right?

17                    (Defendant's Exhibit No. 3 was

18                    marked for identification.)

19       A.    Yes, sir.

20       Q.    Is this a copy of that policy?

21       A.    Yes, sir.

22       Q.    And you're aware that the policy provided

23   that you could use -- get access to the human

Page 103

1   resource department again by the 800 hot line and

2   calling and asking for human resources to talk about

3   any problems that you had?

4       A.   Yes, sir.

5       Q.   But you didn't do that, did you?

6            MS. MCKENZIE:   Object to the form.

7       A.   I did call them.

8   BY MR. HEUSEL:

9       Q.   I know.  But you didn't ask for the human

10  resources department specifically, did you?

11      A.   I didn't know I had to.  I know I called

12  the hot line because --

13      Q.   I'm not saying you had to.  It was just

14  another option that you could have asked for; isn't

15  that right.

16           MS. MCKENZIE:   Object to the form.

17  BY MR. HEUSEL:

18      Q.   Isn't that right?

19      A.   Yes.

20      Q.   Okay.  Am I correct that you're not

21  alleging that any manager or shift supervisor ever

22  slapped you on the rear end or caused battery on

23  you?

Deposition of:    Rachael Cumbie                 9-28-2006

Page 104

1      A.    There was one -- I can't remember.  He was

2    a manager-in-training.  He was in and out real

3    quick.  Chad, he become a manager-in-training.  He

4    hit me with a towel many times.

5      Q.    But that was when he was an hourly or

6    manager-in-training?

7      A.    I can't recall.  I just know he did it.

8      Q.    Did you hit him?

9      A.    No, I never touched Chad.

10      Q.    But he was the one that apologized and you

11    didn't have any problem after that?

12      A.    Well, yeah.  I told him to leave me alone

13    but I mean, you know.

14      Q.    Once you made it clear, he didn't do it

15    again; is that right.

16      A.    Yeah, it didn't happen again.

17      Q.    So you don't know of any managers that

18    allegedly touched you in an inappropriate way; is

19    that right?

20      A.    There was one other manager that in

21    training.  I cannot remember his name.  I would be

22    able to recognize it if I saw it.  Like I said he

23    was in and out but he did slap me on the rear one

Deposition of:    Rachael Cumbie        9-28-2006

Page 105

1   time.

2        Q.    One time.   Did you slap him?

3        A.    No.

4        Q.    But you didn't file a charge against him,

5   did you?

6        A.    No, sir.

7        Q.    Other than that this gentlemen never

8   touched you?

9        A.    No. He never touched you.

10       Q.    Did you ever curse in the restaurant?

11       A.    Yes, sir.

12       Q.    Did you curse the night you were fired?

13       A.    Oh, yes, sir.

14       Q.    Have you ever been what you consider to be

15   inappropriately touched in any other job you were

16   in?

17       A.    No.

18       Q.    We can take a short break.   I think we are

19   done.   I just want to talk to him.

20              (A short break was taken.)

21           MR. HEUSEL:   I'm done.

22              (The deposition concluded at

23              12:30 p.m.)

Page 106

1                    C E R T I F I C A T E

2

3    STATE OF ALABAMA    :

4    COUNTY OF COVINGTON:

5

6            I do hereby certify that the above and

7    foregoing transcript of proceedings in the matter

8    aforementioned was taken down by me in machine

9    shorthand, and the questions and answers thereto

10   were reduced to writing under my personal

11   supervision, and that the foregoing represents a

12   true and correct transcript of the proceedings given

13   by said witness upon said hearing.

14

15            I further certify that I am neither of

16   counsel nor of kin to the parties to the action, nor

17   am I anywise interested in the result of said cause.

18

19

20                        Dianne Phillips

21                        Court Reporter

22

23

# RESPECT AND RESPONSIBILITY POLICY

Harassment of any type or any nature, whether based on race, gender, sex, age, religious affiliation, disability, national origin, or any other protected category, is wrong, unfair, and will not be tolerated at Ruby Tuesday, Inc. The success of our great Company is based on building great teams. The foundation of great teams is treating people as they want to be treated and showing true respect for all individuals. **Anyone who engages in harassing conduct will be subject to discipline, up to and including termination.**

Company policy prohibits unwelcome advances, propositions, requests for favors, verbal abuse of any nature, offensive jokes, flirtations, explicit or degrading verbal comments about another individual or his/her physical appearance, the display of sexually suggestive pictures or objects, any offensive or abusive physical conduct, sexually or racially explicit language or jokes, unwelcome touches or other unwelcome physical contact, whether on or off duty, or in conjunction with work in any way. Basing employment decisions, such as scheduling, raises or promotions, on a Team Member's agreement or refusal to be subject to or tolerate offensive conduct is strictly prohibited. A Team Member's agreement or refusal to submit to or tolerate this type of conduct cannot be used as a basis for an employment decision. Any type of conduct that interferes with a Team Member's work performance or creates an intimidating, hostile or offensive work environment is a violation of Company policy.

The Company does not permit Management/Team Member dating. Dating or other personal involvement of a romantic nature between a Manager and a Team Member could lead to favoritism (or the appearance of favoritism) and morale issues. If such a situation arises, it is the responsibility of the parties involved to notify their supervisors so that the two parties no longer work in the same unit.

Each of us plays a critical role in the Company's success and is expected to project a positive and professional image. Professionalism in appearance and conduct is crucial to motivating others and promotes a positive and fair work environment.

If you see a violation of Company policy, you must promptly inform us. Communication is the key. Talk to your Manager, General Manager, Director – People, Standards, and Results, Regional Partner, Director of Human Resources, or call the Team Member Hotline, whichever is most comfortable for you. We want and need you to **speak freely without fear of retaliation, or adverse consequences for expressing your concerns.**

Team Member Hotline: 1-800-633-8483

Revised 10/09/03



"NOTHING CONTAINED IN THIS POLICY IS INTENDED TO CREATE A CONTRACT FOR EMPLOYMENT. ALL EMPLOYEES OF RUBY TUESDAY, INC. ARE EMPLOYEES AT-WILL."

# OPEN DOOR POLICY

Ruby Tuesday, Inc. maintains that Team Member concerns can be addressed through fair, honest, and consistent communication of policies and procedures for everyone. If you have concerns about your work, work environment, team, team leadership, policies or any other work related issue, please feel free to discuss them with your Supervisor. If you are not satisfied with your Supervisor's response, you may choose to discuss the matter through Human Resources or the Team Member hotline at 1-800-633-8483. At Ruby Tuesday, Inc. Team Members are free to raise concerns at any level without fear of retaliation.

Revised 08/30/04



"NOTHING CONTAINED IN THIS POLICY IS INTENDED TO CREATE A CONTRACT FOR EMPLOYMENT. ALL EMPLOYEES OF RUBY TUESDAY, INC. ARE EMPLOYEES AT-WILL."