Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

EASTERN DIVISION

RACHAEL CUMBIE,

    Plaintiff

v.                                          Civil Action No.

                                        3:05CV569-W

RUBY TUESDAY, INC.

BOBBY VAUGHN,

    Defendants

The deposition of BOBBY VAUGHN was taken at the offices of Sherrie V. McKenzie, 25 West Claiborne Street, Monroeville, Alabama 36460 on the 28th day of September 2006, commencing at approximately 1 p.m.




Bay Area Reporting, Inc.
2102 Government Street, Mobile, AL 36606

Page 2

APPEARANCES

For the Defendants:

BY: CORNELIUS R. HEUSEL

JONES, WALKER, WAECTHER,

POITEVANT, CARRERE & DENEGRE LLP

201 St. Charles Avenue

Suite 5100

New Orleans, Louisiana 70170


For the Plaintiff:

BY: SHERRIE V. MCKENZIE

LAW OFFICES OF SHERRIE V. MCKENZIE

25 West Claiborne Street

Monroeville, Alabama 36460


Also Present: Rachael Cumbie




Dianne Phillips

Court Reporter

1    I N D E X
2
3   WITNESS:
4   BOBBY VAUGHN
5
6   EXAMINATION:                                          PAGE:
7
8   By Ms. McKenzie                                          6
9
10
11
12
13  EXHIBITS:                                              PAGE
14
15  Plaintiff's Exhibit 1                                    37
16      (Ruby Tuesday letter to EEOC)
17
18
19  Certificate                                              41
20  Reporter's Page                                          42
21  Errata Sheet                                             43
22  Certificate of Witness                                   44
23

S T I P U L A T I O N

It is stipulated by and between the parties hereto, through their respective counsel, that the deposition of BOBBY VAUGHN be taken before Dianne Phillips, Notary Public for the State at Large, at the offices of Sherrie V. McKenzie, 25 West Claiborne Street, Monroeville, Alabama 36460, on September 28, 2006.

It is further stipulated and agreed that this deposition is taken pursuant to the Federal Rules of Civil Procedure.  The provisions of Rule 32(d)(3) dealing with waiver of errors and irregularities as to the taking of the deposition apply fully to this deposition.

Notice of the deposition and any errors or irregularities therein [Rule 32(d)(1)] and any objections to the qualifications of the officer before whom this deposition is taken [Rule 32(d)(2)] are waived.

1    The submission of the deposition to the witness
2    for reading to or by him and the signing of the
3    deposition by him [Rule 30(e)] is NOT WAIVED
4
5    Filing of the original of the transcript of
6    this deposition [Rule 30(f)(1)] is waived.
7
8    Any other technicality or defect in the taking
9    of this deposition not otherwise covered by the
10   terms of this stipulation is waived.
11
12              * * * * * *
13
14    I, Dianne Phillips, Commissioner and Court
15   Reporter, certify that on this date, as provided by
16   the Federal Rules of Civil Procedure and the
17   foregoing stipulation of counsel, there came before
18   me at the offices of Sherrie V. McKenzie, 25 West
19   Claiborne Street, Monroeville, Alabama 36460, on
20   September 28, 2006, commencing at 1 p.m., BOBBY
21   VAUGHN, witness in the above cause, for oral
22   examination, whereupon the following proceedings
23   were had:

Page 17

1  the beginning of '04; is that right?
2     A.   No.  Not as general manager.  Yeah.  That
3  would be right.
4     Q.   So your first job as general manager would
5  have been at the Opelika Ruby's; is that right?
6     A.   Correct.
7     Q.   And did you move from the Columbus Ruby's
8  to the Opelika Ruby's to become the general manager?
9     A.   No.
10    Q.   All right.  Tell me how that happened?
11    A.   All right.  Once when I -- when I first
12 got promoted, I was an assistant manager in the
13 Auburn store.
14    Q.   Okay.
15    A.   I worked there for about two years and
16 then I got transferred to La Grange, Georgia.  I
17 worked there for about another two years and then I
18 came back as the general manager of the Ruby
19 Tuesday's on Opelika Road.
20    Q.   Okay.  So you went from Columbus to Auburn
21 to La Grange and back to Opelika as the general
22 manager?
23    A.   Right.

Page 20

1  harassment video together everybody as a whole unit.
2      Q.  Okay.  Did somebody come from another
3  office and conduct that meeting or was it the
4  responsibility of the team leaders to do that?
5      A.  It was the responsibility of the general
6  manager to do that.
7      Q.  Okay.  All right.  Tell me who the team
8  leaders are?
9      A.  Team leaders as far as?
10     Q.  The team members.
11     A.  Team members are anybody that is employed
12 by that restaurant.
13     Q.  Okay.  All right.  I'm going to show you
14 what was marked as Defendant's Exhibit 2 in
15 Ms. Cumbie's deposition and ask you if you've seen
16 that before?
17     A.  Have I seen this before?  Yes.
18     Q.  Okay.  How many times?
19     A.  Honestly I see it about once a week.
20     Q.  Where do you see it?
21     A.  In orientation that I do now.
22     Q.  Okay.  Is it posted anywhere physically in
23 the building?

1   A.  No.  Not right now.  No.

2   Q.  Has it ever been?

3   A.  No.

4   Q.  Is there a big poster anywhere like in the kitchen or in a break area that says equal employment opportunity and it has a number to call and stuff to do if you feel like you're being harassed?

8   A.  Yes.

9   Q.  Okay.  Where is that?

10  A.  It's located in several areas.  Kitchen door heading out of the kitchen.  I think there's one on the office door.  I just moved the schedule.  There was one by the schedule box but there isn't now.

15  Q.  Okay.  Is this team member hotline the phone number that's located on that poster?

17  A.  Yes.

18  Q.  Okay.  Now, look at the last paragraph.  Where it says, "If you see a violation of company policy, you must promptly inform us.  Communication is the key."  And then it says, "Talk to your manager at the Ruby's location."  That would be you?

23  A.  Correct.

1    Q.   Well, then it says general manager.  So
2  manager might be -- that confuses me.  Explain it to
3  me.
4    A.   That's the assistant managers.  Those are
5  the guys that work directly -- or girls -- that work
6  under me.
7    Q.   Does that include shift leaders?
8    A.   They're hourly team members.  They're
9  considered hourly team members that can work manager
10 functions.
11   Q.   Okay.  Then you got general manager which
12 is?
13   A.   Which is the person that runs the unit.
14   Q.   I mean that is?
15   A.   Me.
16   Q.   You.  Okay.  Who's the director?  Well,
17 let's get this right.  There's director dash people
18 standards and results.  Can you explain that for me?
19   A.   They are called DPSR's and that's what
20 that stands for.  Director of Peoples, Standards and
21 Results but basically they are director of
22 operations.
23   Q.   Where are they?

1      A.   What do you mean where are they?

2      Q.   Well, it's not clear to me from this
3 policy who those people are and how you get in touch
4 with them?

5      A.   They basically are multi-unit partners.
6 So they run more than one unit. The general manager
7 is the overall say so in each unit. But then our
8 boss is the director of operations.

9      Q.   Okay. Then you've got regional partner.
10 Who is that?

11     A.   That's his boss.

12     Q.   Do you know where that person is located?

13     A.   Do I know where he is?

14     Q.   Yeah.

15     A.   A phone call away. But he's over about 40
16 units.

17     Q.   Well, that's not a tricky question. I
18 probably should have asked this earlier. Do you
19 know how many Ruby's there are?

20     A.   In my district?

21     Q.   No.

22     A.   Overall?

23     Q.   Yeah.

Page 24

1   A.   700 and something.
2   Q.   Are they all owned by the same
3   corporation, as far as you know, or are there
4   franchises?
5   A.   There are some franchise units.
6   Q.   Okay. Do you know where the home office
7   is?
8   A.   Yeah.
9   Q.   Where is it?
10  A.   Maryville, Tennessee.
11  Q.   Okay. And then you've got the direct --
12  the DHR director for the entire corporation. Is
13  that the next person?
14  A.   Above that is regional VP.
15  Q.   Well, regional partner and then after that
16  it says director of human resources?
17  A.   Then you have -- a director of human
18  resources is a -- well, that's a human resource
19  department. That's kind of a different area.
20  Q.   Okay. Or call the team member hot line,
21  right?
22  A.   Yes.
23  Q.   And then it says, "Whichever is most

1    Q.   All right.  If you'll look on the second
2  page of this, you indicated to me just a moment ago,
3  I believe, that some of the people that you talked
4  to did say that there was this but slapping practice
5  going on?
6    A.   Correct.
7    Q.   Okay.  And you heard Ms. Cumbie tell us
8  that it got out of control in her opinion.  Did you
9  remember that?
10   A.   Reask the question.
11   Q.   Okay.  She tearfully reiterated a story in
12  which it got out of control --
13   A.   Today?
14   Q.   Yes, today.  And you heard that?
15   A.   Yes.
16   Q.   Right?
17   A.   Yes.
18   Q.   She also testified that she saw you see
19  Zach touch her breast?
20   A.   I do not recall that.  I honestly do not
21  recall that.
22   Q.   Okay.  If you had seen that, would you
23  have thought it was mandatory for you to report that

1  happened and she basically told me --
2      Q.  Wait.  Wait.  Wait.  I'm going to stop
3  you.  When did she come to you and talk to you?  Do
4  you recall?
5      A.  Time of day or --
6      Q.  No.  Month.  You know, time of year?
7      A.  Oh, I would honestly say it was probably
8  about a week or two before her termination.
9      Q.  Okay.  All right.  What did she tell you?
10     A.  She told me that Zach was making her feel
11 uncomfortable.
12     Q.  Uh-huh.
13     A.  And I asked her why and, of course,
14 everything that's in here that she alleges is what
15 she told me.
16     Q.  She told you about this but slapping?
17     A.  And --
18     Q.  And the breast grabbing?
19     A.  Yes.
20     Q.  Okay.
21     A.  And I told her at that point that I would
22 take care of it.
23     Q.  Okay.

Page 34

1  A.  And the very next time that I saw Zach.  I
2  sat him down.
3  Q.  Okay.
4  A.  And I basically told him that because he
5  is gay that it doesn't give him a reason to be able
6  to push the envelope more than anybody else.  I
7  said, you know, you're still a man and you're going
8  to make people feel uncomfortable if you act that
9  way.  So would you please stop it.  Basically.  So
10 at that point, I don't know maybe a day later, I saw
11 Rachael and I told her that I'd had a talk with him
12 and if any other occurrences happened to please let
13 me know and that was it.
14 Q.  Okay.  Tell me what you remember about her
15 termination?
16 A.  From beginning to end, I guess?
17 Q.  Did somebody tell you that she'd been
18 drinking behind the bar?
19 A.  Yes.
20 Q.  Who?
21 A.  I guess I can say now.  It was Zach.
22 Q.  Okay.  And you believed him?
23 A.  Well, I didn't necessary believe him.  See

Page 35

1 the thing is the way you handle it as a manager. If
2 you get a bit of information, you actually want to
3 go to the person and ask them personally and that's
4 when me and Rachael were in the office together.
5    Q.   Okay. Tell me what you remember about
6 that conversation?
7    A.   With me and Rachael?
8    Q.   Yes.
9    A.   It was me and one of my assistant managers
10 in the office and that was Kathy. And, basically, I
11 believe Rachael was off that day. She just happened
12 to come in. I had just gotten the information a
13 short time before that. So I asked her, you know,
14 if she wouldn't mind coming in the office. I needed
15 to talk to her about something. And I, basically,
16 asked her directly, you know, were you drinking
17 behind the bar on your last shift.
18    Q.   Uh-huh.
19    A.   She said yes. And then at that point I
20 believe I said, "Well, Rachael, you do understand at
21 this point that there's nothing I can do. I mean at
22 this point I have to terminate you. Especially
23 since other people know about it. I mean I can't

Page 36

1  let somebody work here -- other people knowing that
2  you were drinking behind the bar and let it go.
3  Because that's just a bad example."
4      Q.   Uh-huh.
5      A.   Okay.  And I'll be honest with you.  At
6  that point Rachael got upset.
7      Q.   Uh-huh.
8      A.   I know -- there was a few strange things
9  that went on that night.  Will, which was her
10 boyfriend at the time, came in the office, was
11 asking for her file.  And all kinds of strange
12 stuff.  I don't know exactly what was going on out
13 front but I, basically, asked him to take Rachael
14 out of the restaurant because she was a little irate
15 at the time.  She was upset.  Which understandably
16 so, if you get terminated, you're going to be upset.
17     Q.   Go ahead.
18     A.   And that's basically it.
19     Q.   Well, then I know you know what my next
20 question is going to be.
21     A.   I don't.
22          MR. HEUSEL:  Objection.  I don't know.
23 Why would he know?

Page 41

1       C E R T I F I C A T E

3  STATE OF ALABAMA    :

4  COUNTY OF COVINGTON:

6       I do hereby certify that the above and
7  foregoing transcript of proceedings in the matter
8  aforementioned was taken down by me in machine
9  shorthand, and the questions and answers thereto
10 were reduced to writing under my personal
11 supervision, and that the foregoing represents a
12 true and correct transcript of the proceedings given
13 by said witness upon said hearing.

15      I further certify that I am neither of
16 counsel nor of kin to the parties to the action, nor
17 am I anywise interested in the result of said cause.

20                              Dianne Phillips
21                              Court Reporter