# EXHIBIT 1

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

EASTERN DIVISION


RACHAEL CUMBIE,

      Plaintiff


v.                           Civil Action No.

                                3:05CV569-W


RUBY TUESDAY, INC.

BOBBY VAUGHN,

      Defendants


The deposition of RACHAEL CUMBIE was taken at

the offices of Sherrie V. McKenzie, 25 West

Claiborne Street, Monroeville, Alabama 3460 on the

28th day of September 2006, commencing at

approximately 1 p.m.



Deposition of:   Rachael Cumbie        9-28-2006

Page 2

1               A P P E A R A N C E S

2

3    For the Plaintiff:

4          BY: CORNELIUS HEUSEL, ESQ.

5          JONES, WALKER, WAECHTER,

6          POITEVENT, CARRERE & DENEGRE LLP

7          201 ST. CHARLES AVENUE

8          SUITE 5100

9          NEW ORLEANS, LOUISIANA 70170

10         (504)582-8000

11

12   For the Defendant:

13         BY: SHERRIE V. MCKENZIE ESQ.

14         LAW OFFICES OF SHERRIE V. MCKENZIE

15         25 WEST CLAIBORNE STREET

16         MONROEVILLE, ALABAMA 36460

17         (251)575-7037

18

19   Also Present:

20   Bobby Vaughn

21

22   Dianne Phillips

23   Court Reporter

Deposition of:    Rachael Cumbie        9-28-2006

Page 3

1                    I N D E X

2  WITNESS:

3  RACHAEL CUMBIE

4

5  EXAMINATION:                        PAGE:

6  BY MR. HEUSEL

7

8  EXHIBITS:

9  Defendant's Exhibit No. 1                93

10      (Charge of Discrimination)

11  Defendant's Exhibit No. 2        .       99

12      (Respect & Responsibility Policy)

13  Defendant's Exhibit No. 3               102

14      (Open Door Policy)

15

16

17

18

19

20

21

22

23

Deposition of:   Rachael Cumbie      9-28-2006

Page 4

1            S T I P U L A T I O N

2

3      It is stipulated by and between the parties

4   hereto, through their respective counsel, that the

5   deposition of RACHAEL CUMBIE be taken before Dianne

6   Phillips, Notary Public for the State at Large, at

7   the offices of Sherrie V. McKenzie, 25 West

8   Claiborne Street, Monroeville, Alabama 36460, on

9   September 28, 2006.

10

11      It is further stipulated and agreed that this

12   deposition is taken pursuant to the Federal Rules of

13   Civil Procedure.  The provisions of Rule 32(d)(3)

14   dealing with waiver of errors and irregularities as

15   to the taking of the deposition apply fully to this

16   deposition.

17

18      Notice of the deposition and any errors or

19   irregularities therein [Rule 32(d)(1)] and any

20   objections to the qualifications of the officer

21   before whom this deposition is taken [Rule 32(d)(2)]

22   are waived.

23

Deposition of:   Rachael Cumbie        9-28-2006

Page 5

1        The submission of the deposition to the witness

2   for reading to or by him and the signing of the

3   deposition by him [Rule 30(e)] is WAIVED

4

5        Filing of the original of the transcript of

6   this deposition [Rule 30(f)(1)] is waived.

7

8        Any other technicality or defect in the taking

9   of this deposition not otherwise covered by the

10  terms of this stipulation is waived.

11

12                    *  *  *  *  *  *

13

14       I, Dianne Phillips, Commissioner and Court

15  Reporter, certify that on this date, as provided by

16  the Federal Rules of Civil Procedure and the

17  foregoing stipulation of counsel, there came before

18  me at the offices of Sherrie V. McKenzie, 25 West

19  Claiborne Street, Monroeville, Alabama 36460, on

20  September 28, 2006, commencing at 10:00 a.m.,

21  RACHAEL CUMBIE, witness in the above cause, for oral

22  examination, whereupon the following proceedings

23  were had:

Deposition of:    Rachael Cumbie        9-28-2006

Page 6

1                          RACHAEL CUMBIE

2    having been first duly sworn to tell the truth, the

3    whole truth, and nothing but the truth, was examined

4    and testified as follows:

5

6                          EXAMINATION

7    BY MR. HEUSEL:

8        Q.   Okay.  Ms. Cumbie, I'm Mr. Heusel, an

9    attorney, representing Ruby Tuesday's and Bobby

10   Vaughn in this matter.  In any event, I represent

11   Ruby Tuesday and Mr. Vaughn.  And we're going to be

12   taking your deposition here today.  And I'm sure

13   your attorney has told you a lot of the background

14   information necessary to get you to this point.  But

15   let me ask generally, have you ever had a chance to

16   give a deposition before?

17       A.   No.

18       Q.   Okay.  The only thing of significance --

19   not the only thing, but the main thing of

20   significance here is that you're under oath to tell

21   the truth as are all witnesses.  This is a federal

22   court proceeding and all witnesses are required to

23   tell the truth under penalty of perjury.  And -- but

Deposition of:   Rachael Cumbie        9-28-2006

Page 7

1   in the context of this case, this is a civil suit

2   and both sides have the opportunity to ask questions

3   of the other in a deposition to understand all of

4   the allegations in the case.  And what I hope to do

5   before I leave here today is to understand as

6   clearly as we can exactly what events and what acts

7   you are complaining about that lead to this lawsuit.

8   So I'm going to ask a lot of questions in that

9   regard.

10       If you don't understand my questions, just let

11  me know.  If you need a break, you don't need a

12  reason for it.  You don't have to give me a reason

13  for it.  If you want to just take a break to take a

14  break or if you need to use the restroom or you want

15  water or coffee or whatever, just let me know.  Send

16  a signal some kind of way or tell your counsel and

17  I'll be happy to stop.

18       What's your address now?

19       A.   My physical address is 64 Poplar Street

20  and the P.O. Box is 277 Uriah, Alabama 36480.

21       Q.   Okay.  And who do you live there with?

22       A.   I live there with my father, Robert

23  Cumbie, and grandmother, Florence Cumbie.

Deposition of:    Rachael Cumbie        9-28-2006

Page 8

1      Q.    If you don't understand my question, feel

2   free to let me know and I'll try to restate it.

3      A.    Okay.

4      Q.    Is there any -- have you taken any

5   medications or is there any other reason, physical

6   or emotional or otherwise, why you don't think you

7   will be able to answer my questions fully today?

8      A.    No.

9      Q.    Okay.

10          MS. MCKENZIE:  Something I should have

11   told you:  Be sure and verbalize your answers.  Try

12   not to shake your head or nod your head because it's

13   hard for her to get it down.

14          THE WITNESS:  Oh, okay.  All right.

15   Sorry.

16          MR. HEUSEL:  That's all right.  And if I

17   happen to point that out to you, it's not to

18   embarrass you but --

19          THE WITNESS:  Oh, no.  It's fine.  You

20   need to.

21          MR. HEUSEL:  In fact it's normal in

22   everyday conversation, we take it for granted

23   although we probably don't think about it but --

Deposition of:  Rachael Cumbie        9-28-2006

Page 9

1          THE WITNESS:  Okay.

2          MR. HEUSEL:  -- when a person starts to

3     ask a question, and you know where I'm going it's

4     very often that you will go ahead and volunteer the

5     answer but since this lady is taking a verbatim

6     statement of everyone who speaks in this room

7     including your counsel who just spoke or whatever.

8     It's important that I get my questions out and that

9     I allow you to give your full answers out.  So I'll

10    try not to interrupt you and if I do I'm sure

11    someone will point it out your counsel or -- I try

12    not to but -- and even if I do, if you do interrupt

13    and I point it out, it's not again not to embarrass

14    you.  It's just that we have to get my full question

15    on the record in order for whoever is reading this

16    to understand because they may not have -- it may

17    not have been as obvious to them as to where I was

18    going.

19         A.   Okay.

20         Q.   Okay.  Are you employed now?

21         A.   Yes, I am.

22         Q.   Where do you work?

23         A.   Currently I'm still working for Phillip

Deposition of:    Rachael Cumbie        9-28-2006

Page 10

1    Mason in Thomasville --

2        Q.    Uh-huh.

3        A.    -- and I'm self-employed as a mobile

4    notary.

5        Q.    Okay.  Let me take them one at a time.

6    Phillip Mason in Thomasville.  What is that job?

7        A.    Attorney at law.

8        Q.    Okay.  And what do you do there?

9        A.    Basically just a secretary, legal

10    secretary.  We work with loans and stuff so.

11        Q.    And how long have you been doing that?

12        A.    A little over a year around a year and a

13    half now.

14        Q.    What is your rate of pay there?

15        A.    Eight dollars an hour.

16        Q.    And is that a full time job?

17        A.    No, it's not.

18        Q.    Okay.  How many hours a week ordinarily do

19    you work?

20        A.    I would say around 15 to 20.  It just

21    became 15 to 20.  I used to be full time.

22        Q.    When you first started, it was full time?

23        A.    Yes.

Deposition of:    Rachael Cumbie        9-28-2006

1      Q.    And why did you go from full time to part

2   time?

3      A.    Because I started doing loan signings on

4   the side as a mobile notary.

5      Q.    Okay.  And I'm not familiar with the term

6   mobile notary.  I take it that means you "have seal

7   will travel" or something?

8      A.    Yes.  I travel everywhere to do loan

9   signings.

10      Q.    Okay.

11      A.    I -- basically I'm just a loan signer.  I

12   take legal documents just -- refinancing and take

13   them to the borrower's house, let them sign,

14   notarize it, and explain everything to them, and

15   then I send it on their way.

16      Q.    Did you have to undergo any training to

17   become a notary?

18      A.    No.

19      Q.    All right.  Are you paid by the job --

20      A.    Yes.

21      Q.    -- or by the signing?

22      A.    Yes, just by the job.

23      Q.    Is it basically the same rate every time

Deposition of:   Rachael Cumbie        9-28-2006

Page 12

1    or does it depend on --

2        A.    It depends on who hires me.  If it's a

3    title company, it's going to be more.  If it's a

4    notary company, it's going to be considerably less.

5        Q.    Okay.  So you voluntarily took that

6    position --

7        A.    Yes.

8        Q.    -- and went part time at the other?

9        A.    Yes, sir.

10        Q.    How long have you been doing that?

11        A.    I would say since March of this year.

12        Q.    Okay.  March of 2006.  And you started

13    with him you said about a year and a half ago.

14    Would that be --

15        A.    I would think --

16        Q.    About when in '05?

17        A.    I want to say around March of last year,

18    as well.

19        Q.    Okay.  During the time that you started --

20    since the time you started working for Phillip

21    Mason, other than the loan signing, have you been

22    doing any other type of work?

23        A.    While I was working for Phillip, there

Deposition of:    Rachael Cumbie      9-28-2006

Page 13

1    were a few months where I worked at a spa in

2    Thomasville.  It's called The New You.  I was just

3    basically taking clients and that's about it.

4        Q.    What kind of work were you doing?

5        A.    Just computer work and whenever we would

6    do client intakes we'd show them everything.  All

7    the equipment and how to use it and the benefits

8    they would get out of it and I would just work

9    one-on-one with clients as well.

10        Q.    Did you start working at The New You after

11    you went to work for Mr. Mason?

12        A.    Yes, sir.

13        Q.    Do you remember about when you started

14    there?

15        A.    It was two months, month and a half to two

16    months after I started for Phillip.

17        Q.    And was that part time?

18        A.    Yes, sir.

19        Q.    About what -- how many hours a week?

20        A.    I would guess around 20, no more than 20.

21        Q.    And your average pay hourly pay was what?

22        A.    It was $6.25?  I don't know.

23        Q.    About -- as best you can recall?

Deposition of:    Rachael Cumbie        9-28-2006

Page 14

1      A.    That's the best I can recall, $6.25.

2      Q.    Okay.  In regard to the loan signing, can

3  you give me an approximation as to what your average

4  weekly income is from that?

5      A.    Well, it's climbed considerably.  When it

6  started, it was around three to four hundred

7  dollars.  Now it's anywhere from 15 to 2500.

8      Q.    Per week or month?

9      A.    Per month.

10      Q.    15 to 2500?

11      A.    Uh-huh.

12      Q.    1500 to 2500.  Okay.  And are you an

13  independent contractor, so to speak, in that you are

14  not affiliated with Mr. Mason when you are doing

15  this?

16      A.    Yes.

17      Q.    And you work for the title companies

18  basically?

19      A.    Yes, sir.

20      Q.    Okay.  Do you work for more than one title

21  company?

22      A.    Yes, sir.

23      Q.    Does Mr. Mason refer -- did he refer you

Deposition of:  Rachael Cumbie        9-28-2006

Page 15

1    to the title companies?

2        A.   No, sir.

3        Q.   Okay.  Prior to -- let me get a time frame

4    on a couple of things first.  Since we're going to

5    be talking about your employment at Ruby's, do you

6    remember when your employment ended?

7        A.   I mean, it was in my deposition.  It was

8    around the 15th of 2004.

9        Q.   The complaint alleges May 15, 2004.

10       A.   Okay.

11       Q.   Is that about right?

12       A.   It was in the middle of the month.  I

13   remember that.

14       Q.   All right.  And you said your deposition.

15   I assume you mean your statement to the EEOC or

16   something like that?

17       A.   Yes.

18       Q.   Okay.  Have you given any other -- well,

19   you haven't given any other depositions?

20       A.   Not my deposition,  I'm sorry.

21       Q.   That's okay.

22       A.   Just my statement to my lawyer.

23       Q.   Okay.  Since that date let me -- instead

1    of going backwards from Mr. Mason's job, let me

2    start from that date.   What was the first job you

3    had after you left Ruby's?

4        A.    I worked at Appleby's in Auburn.

5        Q.    And do you recall about how long you were

6    there?

7        A.    I would think -- I think it was around six

8    months.

9        Q.    And what was your job?

10        A.    It was just a server.

11        Q.    What was your rate of pay?

12        A.    $2.13 an hour plus tips.

13        Q.    Were your earnings there comparable to

14    your earnings at Ruby's?

15        A.    No.   They are not.

16        Q.    Well, lower or higher?

17        A.    They were lower.

18        Q.    Did you work more or less hours there?

19        A.    I worked the same -- round about the same

20    hours.

21        Q.    And how many hours a week did you work on

22    average would you say?

23        A.    I would -- around 30 hours a week.

Deposition of:   Rachael Cumbie      9-28-2006

Page 17

1        Q.    Why did you leave Appleby's?

2        A.    I was fired.

3        Q.    What reason did they give you?

4        A.    For showing up late.

5        Q.    Did you file for unemployment compensation

6   after you left Ruby's?

7        A.    No, sir.

8        Q.    Did you file after you left Appleby's?

9        A.    No, sir.

10       Q.    Have you ever filed for unemployment?

11       A.    No, sir.

12       Q.    Okay.  Were you working more than one job

13  when you worked at Appleby's?

14       A.    Not that I recall.  I know I started --

15  right after Appleby's I worked at a bar, Copper

16  Creek Tavern.

17       Q.    Copper Creek Tavern?

18       A.    Yes, sir.

19       Q.    Was that in Auburn also?

20       A.    Yes, sir, it was.

21       Q.    And what did you do there?

22       A.    I was a bartender.

23       Q.    What was your rate of pay?

Page 18

1      A.    $2.13 an hour plus tips.

2      Q.    Was that a full time job?

3      A.    No, it was not.

4      Q.    Was -- do you recall about your average

5  hours per week?

6      A.    It was mainly weekends for football.  So I

7  would guess around 16 hours per week.

8      Q.    Would that be two nights a weekend or

9  three nights?

10     A.    It would just be the weekend.  Just two

11  nights, Friday and Saturday.

12     Q.    How was the income there?

13     A.    It was considerably higher than Appleby's

14  considering it was football weekends.  We'd make

15  around three to four hundred dollars a night.

16     Q.    How did that compare to Ruby's?

17     A.    Considerable.

18     Q.    More?

19     A.    Considerably more.

20     Q.    More than Ruby's?

21     A.    Yes, sir.

22     Q.    What would you estimate your weekly

23  earnings at Ruby's averaged?

Deposition of:   Rachael Cumbie      9-28-2006

Page 19

1      A.    It just -- it depended if I bartended at

2  all.  When I was serving, it would -- the weekly, I

3  guess it would be around a little over $200 a week

4  maybe.

5      Q.    At serving?

6      A.    Yes, sir.

7      Q.    And if you had a bar shift?

8      A.    It would be around $100 more, around $300

9  more a week.  It just depends on how many bar shifts

10  I had that week.

11      Q.    Okay.  After the Copper Creek, where did

12  you work?

13      A.    Bumpers Billiards.

14      Q.    Say it again.

15      A.    Bumpers Billiards.

16      Q.    Bumpers.  Okay.  In Auburn also?

17      A.    Yes, sir.

18      Q.    What did you do there?

19      A.    I was a cocktail waitress but mainly I was

20  a bartender.

21      Q.    Did -- between leaving Appleby's -- how

22  long did it take before you went to Copper Creek?

23      A.    Probably --

Deposition of:   Rachael Cumbie          9-28-2006

Page 20

1     Q.    Pretty quick?

2     A.    Well, I went to Bumpers after I went to

3   Appleby's but while I was at Bumpers I went to

4   Copper Creek.

5     Q.    Okay.

6     A.    So they kind of coincide.

7     Q.    So after leaving Appleby's, the first job

8   you had after that would have been Bumpers Creek?

9     A.    Yes, sir.

10    Q.    Bumpers Billiard.  I'm sorry.  And about

11  how long were you unemployed?

12    A.    It wasn't too long.  I'd say about a month

13  and a half.

14    Q.    And then while you were working Bumpers, I

15  assume that was during the week?

16    A.    Uh-huh.

17    Q.    At least it was while you were working at

18  Copper Creek?

19    A.    Yes, sir.

20    Q.    You would work Copper Creek on weekends

21  and Bumpers during -- what were you making at

22  Bumpers on average?

23    A.    On average I would guess around two -- in

Deposition of:    Rachael Cumbie        9-28-2006

Page 21

1   between two and three hundred a week.

2       Q.   And about how long did you pull the

3   working at both Copper Creek and Bumpers?

4       A.   I only worked at Copper Creek for a month.

5       Q.   Okay.  Can you tell me about how long you

6   worked at Bumpers?

7       A.   I worked there for around seven months.

8       Q.   Seven months?

9       A.   Yes, sir.

10      Q.   So if you left Ruby's in May -- mid May of

11  '04 and worked about six months at Appleby's, it

12  would take you up to about November sometime in late

13  '04.  Is that about right?

14      A.   I would assume so, yes.

15      Q.   I mean does that -- aside from what you

16  said before, tell me your best recollection.  It was

17  about what time of year you left Appleby's?  Do you

18  remember it being before Christmas or after

19  Christmas or after semester or --

20      A.   Let me get it all together.  Hold on one

21  second.  I think it was around before Christmas.

22      Q.   Okay.  And you went to Bumpers shortly

23  after leaving Appleby's.  Is that what you said?

Deposition of:    Rachael Cumbie        9-28-2006

Page 22

1      A.    Yes, sir.

2      Q.    Okay.  And you were there about another

3   seven months, which would take you up to middle '05

4   sometime, I guess.  Is that right?

5      A.    Yes, sir.

6      Q.    How long were you in Auburn?

7      A.    Total?

8      Q.    Yeah.

9      A.    My whole life?

10     Q.    Well, from -- I understood you came

11   somewhere outside of Auburn.  Is that right?  You

12   went to Auburn to go to school?

13     A.    Yes, sir.  I went to Auburn to go to

14   school in 2000 and then I left that next year and

15   moved back home.

16     Q.    Okay.  In 2001?

17     A.    Yes, sir.  That's when I got the job at

18   Ruby Tuesday and then I moved back during that next

19   year.

20     Q.    Okay.  When did you ultimately leave

21   Auburn to come back or to leave Auburn.  When is the

22   last time you left Auburn to --

23     A.    Whenever I started working for Phillip.

Deposition of:    Rachael Cumbie        9-28-2006

Page 23

1   As soon as I got that job with Phillip, I left

2   Auburn.

3        Q.    Okay.  And that was mid last year mid '05

4   something like that, I guess.  Let me look at my

5   notes.  March '05 about; is that right?

6        A.    Yes, sir.

7        Q.    So you would have been in Auburn til just

8   until March of '05?

9        A.    Yes, sir.

10       Q.    All right.  Then -- did you work anywhere

11  in Auburn after you left Bumpers?

12       A.    No, sir.

13       Q.    So about -- was Bumpers the last job you

14  held when you came back?

15       A.    Yes, sir.

16       Q.    And if you're right on your estimate of

17  your recollection that you left -- that you came to

18  Mr. Mason -- worked for Mr. Mason around March of

19  '05, then you would have left Auburn somewhere

20  around March of '05?

21       A.    Yes, sir.

22       Q.    Okay.  Has there been any other employment

23  since you left Ruby Tuesday's that we haven't

Deposition of:   Rachael Cumbie       9-28-2006

Page 24

1    touched on?

2        A.    No, sir.

3        Q.    Now, we've been talking about coming back

4    and you mentioned that you live with your dad in

5    Uriah.  Is that home to you?  Is that your original

6    home?

7        A.    Technically, yes.

8        Q.    Okay.  When you went to work for Ruby's

9    the first time, where did you work?  Which Ruby's?

10       A.    I went to the Ruby Tuesday's in Bay

11   Minette.

12       Q.    Okay.  Did you live in Uriah and work

13   there?

14       A.    Yes, sir.

15       Q.    About how long did you work there?

16       A.    Around five months or so.  Five or six

17   months.

18       A.    Do you remember who hired you?

19       A.    I do not.

20       Q.    Do you know if it was the general manager?

21       A.    Yes, sir.

22       Q.    Do you recall if it was a man or woman?

23       A.    It was a man.

Deposition of:    Rachael Cumbie        9-28-2006

Page 25

1    Q.    Did you undergo any training when they

2    first hired you?

3    A.    Yes, sir.

4    Q.    Did they give you some copies of company

5    policies and an opportunity to read them and

6    understand them?  What you had to do as a server,

7    etc.?

8    A.    Yes, sir.

9    Q.    Do you recall seeing the various training

10   videos?

11   A.    Yes, sir.

12   Q.    And was one of them the respect and

13   responsibility or the sex harassment video as it's

14   referred to?

15   A.    Yes, sir.

16   Q.    Okay.  Am I correct that that's shown

17   periodically during the year to all the staff?

18   A.    Yes, sir.

19   Q.    So you would have seen it a number of

20   times during your employment?

21   A.    Yes, sir.

22   Q.    What do you recall about what the video

23   was about?  What do you recall that video being

Deposition of:    Rachael Cumbie        9-28-2006

Page 26

1    about?

2        A.    I recall it being -- just it would state

3    the types of sexual harassment and it would give you

4    a number to call.  What the steps you would take if

5    you were being sexually harassed.  Steps you would

6    take to -- what you could do about it.

7        Q.    Okay.  Am I correct that one of the steps

8    would be to report it to a manager or to the general

9    manager or if you weren't satisfied with that or

10   uncomfortable doing that, you could use the 800 hot

11   line number to call the corporate office; is that

12   right?

13       A.    Yes, sir.

14       Q.    Did you ever have occasion to use the

15   corporate hot line for anything other than a sex

16   harassment issue?

17       A.    No, sir.

18       Q.    Did the video make clear that the

19   company's policy was that they did not tolerate

20   sexual harassment or harassment of any kind?

21       A.    Yes, sir.

22       Q.    And did they encourage employees to use

23   the hot line to call if they had complaints?

Deposition of:    Rachael Cumbie        9-28-2006

Page 27

1    A.    Yes, sir.

2    Q.    How many times would you estimate you had

3 to see that video?

4    A.    I would guess around four times.

5    Q.    Okay.

6    A.    At the least.

7    Q.    Was it your understanding that they

8 replayed it because it was a requirement of the

9 company to show it to employees at least annually?

10    A.    Yes, sir.

11    Q.    And you were asked to sign a sheet to

12 indicate that you had attended the meeting whenever

13 it was shown?

14    A.    Yes, sir.

15    Q.    Okay.  The -- did you have any problems in

16 terms of your -- the issues that we're dealing with

17 here today when you worked at Bay Minette?

18    A.    No, sir.

19    Q.    Am I correct that you were moving to

20 Auburn to attend college or go to college?

21    A.    Yes, sir.

22    Q.    Had you gone to college prior to that

23 time?

Deposition of:    Rachael Cumbie        9-28-2006

Page 28

1      A.    Yes, sir.

2      Q.    Somewhere else.  Where did you go?

3      A.    I went to Auburn in the year 2000, and

4  then I moved back.

5      Q.    I see.

6      A.    And I went to school at Alabama Southern

7  for a semester.

8      Q.    Okay.

9      A.    And then I moved back to Auburn.

10      Q.    How much of your education -- your college

11  education have you completed?

12      A.    Around three and a half years.

13      Q.    And did you get to the point of a major or

14  anything like that?

15      A.    I claimed a Liberal Arts Major.

16      Q.    Did you take any courses in regard to

17  business, business administration or anything like

18  that?

19      A.    No, sir.

20      Q.    What's your date of birth?

21      A.    07/01/1982.

22           MS. MCKENZIE:  Excuse me.  I have a

23  terrible cold.

Deposition of:    Rachael Cumbie        9-28-2006

Page 29

1          MR. HEUSEL:  That's all right.

2          MS. MCKENZIE:  I'm so sorry.

3          MR. HEUSEL:  It's when I hear dates like

4    that that I realize how old I am.

5          MR. HEUSEL:  Some comedian used to say

6    that he has -- he still wears shoes that are older

7    than the people born in 1980.

8    BY MR. HEUSEL:

9          Q.    Where did you go to high school?

10         A.    Thomasville High School.

11         Q.    And when did -- the Alabama Southern I

12   take it was after you came back?

13         A.    Yes, sir.

14         Q.    So you started at Auburn after high

15   school?

16         A.    Yes, sir.

17         Q.    Why did you come back after the first

18   year?

19         A.    For personal reasons.

20         Q.    Was it too personal to tell me?

21         A.    Well --

22         Q.    I don't want to delve into it?

23         A.    Basically I made a D in history and my mom

Deposition of:    Rachael Cumbie         9-28-2006

Page 30

1    made me come back.

2              MR. HEUSEL:   I like your mom.

3    BY MR. HEUSEL:

4         Q.    So she thought you were enjoying college a

5    little too much?

6         A.    Not too much just not enough to study.

7         Q.    Okay.  After -- what time of year, do you

8    recall, did you go back after leaving the Bay

9    Minette Ruby's.  Did you go back at the start of a

10   semester?

11        A.    Yes, sir.

12        Q.    What semester was it?

13        A.    It was a fall semester in 2002, it would

14   be.

15        Q.    Okay.  How many Ruby's are there in

16   Auburn?

17        A.    There is one in Opelika.  That was the one

18   where I worked at.  And then there was one in

19   Auburn.  They just built one in Auburn while I was

20   working there.

21        Q.    And when you went there you said you

22   transferred, was that arranged in advance?

23        A.    Yes, sir.

Deposition of:    Rachael Cumbie        9-28-2006

Page 31

1       Q.    How was it arranged?

2       A.    Well, basically I went to my general

3   manager in Bay Minette and told him that I was going

4   to school at Auburn University in Auburn and that I

5   would like to keep working for Ruby Tuesday.  So he

6   contacted I guess it was Terry Abbott or Abate or

7   however you want to say her name and I guess went

8   through the channels and I started working for Ruby

9   Tuesday's when I went up there.

10      Q.    Is Terry a man or a woman?

11      A.    A woman.

12      Q.    And when you went up there, was she the

13  general manager?

14      A.    Yes, she was.

15      Q.    All right.  Do you remember who the other

16  managers were?

17      A.    Her name was Heidi.  I can't remember her

18  last name.  She was there.

19            MR. VAUGHN:  Finnegan.

20      A.    Finnegan.

21            MR. HEUSEL:  Yeah.  Officially you know

22  you'll get a chance --  but you got to wait.

23            MR. VAUGHN:  All right.

Deposition of:    Rachael Cumbie        9-28-2006

Page 32

1   BY MR. HEUSEL:

2       Q.    Heidi Finnegan.  And do you recall who

3   else?

4       A.    I do not recall who else.

5       Q.    Do you remember if -- let me ask you

6   generally how many managers are working in a

7   restaurant or not at one time but generally

8   assigned?

9       A.    Usually there's about four or five just

10  depending on the restaurant.

11      Q.    And do you recall if the other managers

12  when you got there were male or female?

13      A.    They were both male and female there to be

14  honest with you.

15      Q.    Okay.  Did you work continuously from the

16  fall 2002 at the Opelika Ruby's until you were

17  terminated?

18      A.    Yes, sir.

19      Q.    So that would be till May of '04 about a

20  year and a half to going on two years something like

21  that?

22      A.    Yes, sir.

23      Q.    When did the management staff change as

Deposition of:    Rachael Cumbie        9-28-2006

Page 33

1    best you can recall?

2        A.    I'm trying to think.  Whenever they built

3    the Ruby Tuesday in Auburn, Terry Abate or Abbott

4    she transferred over there.  I don't recall the date

5    that she transferred over there; but when she

6    transferred over there, that's when Bobby came in

7    and took her place.

8        Q.    Did you know Bobby and by Bobby I'm

9    referring --

10        A.    Bobby Vaughn.

11        Q.    -- for the record to the person sitting to

12    my right is Bobby Vaughn.  Did you know Bobby before

13    he came over there?

14        A.    No, sir, I did not.

15        Q.    Did you know whether he had any background

16    working in that restaurant prior to that time?

17        A.    No, sir.

18        Q.    Did you recall about how long it was

19    between the time Bobby came and you left in May of

20    '04?

21        A.    I would say it was over a year and a half

22    I would guess.  He was there a pretty good time.

23        Q.    When Bobby took over, do you recall who

Deposition of:   Rachael Cumbie        9-28-2006

Page 34

1    the managers were?

2        A.    Bobby Betts had become a manager.

3        Q.    Bobby Betts.   B-E-T-T-S?

4        A.    Yes.

5        Q.    Is that -- is Bobby a man or a woman?

6        A.    A man.

7        Q.    Okay.

8        A.    We had a few managers in training that I

9    recall.   One -- her name was Keely.

10       Q.    Keely.   Do you recall the last name?

11       A.    No, I do not.

12       Q.    Okay.   Who else?

13       A.    There was another woman there at the time

14   I don't recall her name.   I can't call her name and

15   there were --

16       Q.    I'm sorry.   Was she a manager or

17   manager-in-training?

18       A.    She was a manager-in-training.

19       Q.    Okay.   Who else?   Do you recall any other

20   managers that were there?

21       A.    Yes, sir.   There were a few men who came

22   through as manager in training as well. I don't

23   recall their name either.

Deposition of:    Rachael Cumbie        9-28-2006

Page 35

1       Q.    Do you recall any other female managers

2   being there?

3       A.    Felicia.  She managed there.  She was

4   mainly a cook.  She was a kitchen manager.

5       Q.    Okay.

6       A.    But I do not recall her last name?

7       Q.    Do you recall a Kathy Reed?

8       A.    Yes, sir.  That's one that I could not

9   remember her name.

10      Q.    Okay.  About how long do you think she was

11  there?

12      A.    I would say around six months.

13      Q.    Was she there when you left?

14      A.    Yes, sir.  Yes, sir.

15            MR. HEUSEL:  Do you need a break?

16            MS. MCKENZIE:  I could get some water if

17  you don't care.  Be right back.

18            MR. HEUSEL:  Sure.

19                 (A short break was taken.)

20  BY MR. HEUSEL:

21      Q.    We're back on the record.  Did you know a

22  Sally Tompkins?

23      A.    Yes, I did.

Deposition of:   Rachael Cumbie      9-28-2006

Page 36

1     Q.    What was her job?

2     A.    She was a server to begin with and then

3  she became a manager or like a shift leader, I would

4  say.

5     Q.    Okay.  Before we get into the specifics,

6  let me ask you -- you're not married I take it?

7     A.    No, sir.

8     Q.    Never been married?

9     A.    No, sir.

10    Q.    Okay.  Have you ever been involved in a

11 lawsuit other than this?

12    A.    No, sir.

13    Q.    Have you ever filed a charge of

14 discrimination with any state or federal agency

15 other than this one?

16    A.    No, sir.

17    Q.    Have you ever filed a worker's

18 compensation claim of any kind?

19    A.    No, sir.

20    Q.    Have you ever been treated for any medical

21 condition that relates to emotional or psychiatric

22 treatment?

23    A.    Yes.

Deposition of:    Rachael Cumbie        9-28-2006

Page 37

1    Q.    Have you been treated by any physician or

2    any type of medical personal relating to any of the

3    claims that arose in this lawsuit?

4    A.    No, sir.

5    Q.    Okay.  So you haven't attended any

6    counseling or any psychiatric or psyhcological

7    counseling or medication -- obtained any medication

8    relating to emotional distress or anything of that

9    type relating to this case?

10    A.    No, sir.

11    Q.    Okay.  And before -- again, before I go on

12    in regard to these employments that we've been

13    talking about.  You mentioned Appleby's but did you

14    leave Copper Creek voluntarily?

15    A.    Yes, sir.

16    Q.    Bumpers?

17    A.    Yes, sir.

18    Q.    Have you ever been terminated from any

19    other position other than Ruby's or Appleby's?

20    A.    Yes.  The New You technically because I

21    was not available to work the way she needed me to

22    work.

23    Q.    Okay.  And who is the she you're referring

Deposition of:    Rachael Cumbie        9-28-2006

Page 38

1    to?

2        A.    It was the manager of The New You.    I

3    cannot recall her name at this point in time.

4        Q.    And where is The New You located?

5        A.    It's located in Thomasville.

6        Q.    Are they still in business as far as you

7    know?

8        A.    Yes, sir.

9        Q.    When you went to Auburn and started

10   working under Terry Abate, did you get along with

11   Ms. Abate?

12       A.    Yes, I did.

13       Q.    Were you a server at that time?

14       A.    Yes, sir.  Excuse me.  I was a hostess.

15       Q.    Hostess.  And just for the people who are

16   reading this, tell me what a hostess does?

17       A.    A hostess -- when guests come in, they

18   take the number of guests, ask them if they want

19   smoking or non, and place them in a certain section

20   and go down the list of whose turn it was to get a

21   table and you just sit them in a certain section.

22       Q.    When you went back to Auburn in the fall

23   of '02, were you a full-time student?

Deposition of:   Rachael Cumbie        9-28-2006

Page 39

1      A.    Yes, sir.

2      Q.    How many hours were you taking on average?

3      A.    13.

4      Q.    And how long -- did you attend school

5   continuously other than summers while you were

6   there?

7      A.    Yes, sir.

8      Q.    Did you attend summer school also?

9      A.    No, sir.

10      Q.    In the fall if you did 13, did you do 13

11   in the spring also?

12      A.    Yes, sir.

13      Q.    And then the next year that would have

14   been another fall of '03, were you a full-time

15   student as well?

16      A.    Yes, sir.

17      Q.    And the spring of '04 when you were

18   terminated that summer -- that spring of '04 were

19   you --

20      A.    No, sir.  I was not in school that summer,

21   I mean that semester because I moved home in the

22   middle of that semester.

23      Q.    Okay.  And we're talking about the

Deposition of:    Rachael Cumbie       9-28-2006

Page 40

1    semester when you were terminated?

2        A.    Yes, sir.

3        Q.    Why -- until that?

4        A.    No, I'm sorry.  I didn't understand the

5    question.

6        Q.    I was starting with when you went back in

7    the fall of '02.  Is that -- am I correct on the

8    time when you went back to Auburn?

9        A.    Yes, sir.

10        Q.    After your break?

11        A.    Yes, sir.

12        Q.    You were a full-time student that fall and

13    the next spring which would have been the spring of

14    '03?

15        A.    Yes, sir.

16        Q.    And then the fall of '03, were you full

17    time?

18        A.    As far as -- to my knowledge, yes, sir, I

19    was full time.

20        Q.    All right.  And then the spring of '04

21    next semester beginning in January, whatever it is,

22    of '04 you left Ruby's in May of '04.  Were you a

23    full-time student then that semester?

Deposition of:    Rachael Cumbie        9-28-2006

Page 41

1      A.    No, sir, I was not.  I went to Alabama not

2   Alabama Southern but Southern Union during that

3   time.

4      Q.    Okay.

5      A.    I was taking classes at Southern Union.

6      Q.    And where is Southern Union?

7      A.    It's in Opelika.

8      Q.    Okay.  I'm confused again.  Whenever the

9   fall semester ended I assume it was, what, December

10  or January.  Is that about right?

11     A.    Yes.

12     Q.    You stayed in Auburn until you were

13  terminated in May; is that right?  During that

14  period of time, were you in school?

15     A.    Yes.

16     Q.    Were you registered as a full-time student

17  during that time?

18     A.    To my knowledge I was registered as a

19  full-time student.

20     Q.    Okay.

21     A.    To my knowledge.

22     Q.    And you stayed in Auburn until you were

23  terminated and then came home; is that right?  Or

Deposition of:    Rachael Cumbie        9-28-2006

Page 42

1   did you stay beyond?

2        A.    No, I stayed in Auburn until I worked

3   through Bumpers.

4        Q.    Okay.

5        A.    I stayed in Auburn the whole time.

6        Q.    I see.

7        A.    Until 24, I mean '04.

8        Q.    So another year plus.  While through

9   Appleby's, Copper Creek, and Bumpers?

10       A.    Yes, sir.

11       Q.    So my question is:  To the best of your

12   knowledge, while you were working at Ruby's, you

13   were a full-time student?

14       A.    Yes, sir.

15       Q.    Okay.  Did you date any employees of

16   Ruby's?

17       A.    I did.

18       Q.    Who did you date?

19       A.    His name is Wilfredo Cartagena.

20       Q.    Okay.  And who else?

21       A.    That was it.

22       Q.    Is he the only one you dated?

23       A.    To me knowledge.

Deposition of:  Rachael Cumbie    9-28-2006

Page 43

1     Q.   And by date I don't mean going steady or

2   whatever they call it anymore but just a date.  I

3   mean did you go out on a -- what a boy or girl would

4   know as a date with anyone else other than Wilfredo?

5     A.   No, sir, not that I know of.

6     Q.   Okay.  Did you have any good friends that

7   worked there?

8     A.   Yes, sir.

9     Q.   Who were they?

10    A.   Leanne Jenkins was her name.

11    Q.   Jenkins?

12    A.   Yes.

13    Q.   Lynne is the first name?

14    A.   Leanne.

15    Q.   Leanne?

16    A.   Leanne.  Let's see.  There was Enis.  I

17  don't know his last name.

18    Q.   Wait.  Let me get my notes here.  Enis

19  Kirkland?

20    A.   Yes.

21    Q.   Who else?

22    A.   Kyle Austin, James Burton.

23    Q.   Wait.  I got to get these down.  Who is

Page 44

1    the first one you said?

2        A.    Kyle Austin.

3        Q.    James Burton.  Burton or Burdett?

4        A.    Burton.

5        Q.    Burton?  Okay.  What about Bobby Betts?

6        A.    Yes.

7        Q.    Who else?  Any others?

8        A.    Erica Shehan or Mehan.  I can't remember

9    her last name.

10        Q.    Any others?

11        A.    Sara Novak.

12        Q.    Can you think of any --

13        A.    I'm sure I can if I could see a list.  I

14    was friends with a lot of people at Ruby Tuesdays.

15        Q.    Did you keep in tough with most of these

16    after you left Ruby's?

17        A.    I kept in touch with them but I did not

18    speak to them for a few months.  I don't keep in

19    touch with them if that's what you're trying to say.

20        Q.    You didn't speak to them?

21        A.    Because I was working at Ruby Tuesdays and

22    because it was a sticky situation.

23        Q.    What was the sticky situation that you

Deposition of:   Rachael Cumbie      9-28-2

Page 4͡

1    couldn't speak to them for a few months?

2         A.   Well, the termination and the lawsuit.

3         Q.   What was it about the termination that

4    made it difficult to speak to them?

5         (A.)   Well, basically whenever I was fired, I

6    felt I was wrongly fired because of supposedly

7    drinking behind the bar when Zach whatever his last

8    name is and Erica Shehan were both drinking at the

9    same time and they were not fired as well.

10        Q.   Okay.  Just for the record is that Zach

11   Taylor?

12        A.   Yes.

13        Q.   Was there ever a time when you considered

14   Zach to be one of your friends?

15        A.   I never considered him as a close friend.

16   I tolerated him as an acquaintance but never as I

17   close friend.

18        Q.   Okay.  Now, you mentioned that you didn't

19   speak to him for a few months because of the

20   termination and lawsuit.  But again what was it

21   about the fact that you were filing a suit or

22   contemplating filing a suit that caused you not to

23   be able to talk to your friends?

Deposition of:   Rachael Cumbie      9-28-2006

Page 46

1          MS. MCKENZIE:   Object to the form.  You

2    can answer.

3          A.   Well, basically Bobby Vaughn was a really

4    good friends with a lot of those friends that I was

5    friends with and in regards to the lawsuit somehow

6    or another it had gotten out to some of them that I

7    was accusing them of sexual harassment when I was

8    not accusing certain people of sexual harassment on

9    that list.  And a lot of them they were just -- they

10   didn't want to talk to me.

11         Q.   Okay.  When -- so you didn't feel that

12   they'd misunderstood what you were doing apparently?

13         A.   Yes, sir.

14         Q.   And in fact you didn't accuse Wilfredo or

15   Enis or Kyle or James or Bobby or Erica or Sarah or

16   Leanne of sexual harassment?

17         A.   No, sir.

18         MS. MCKENZIE:   Object to the form.

19   BY MR. HEUSEL:

20         Q.   All right.  I wanted to cover all of them.

21   If any of those that you felt engaged in sexual

22   harassment toward you, I'd like to know that?

23         A.   No, sir.

Deposition of:   Rachael Cumbie        9-28-2006

Page 47

1      Q.   Okay.  Did any of them -- what was the --

2   was Zach the only person that you felt sexually

3   harassed you?

4           MS. MCKENZIE:   Object to the fact.  Define

5   sexually harassed.

6   BY MR. HEUSEL:

7      Q.   Well, I mean this lawsuit is about

8   harassment.  I want your understanding -- you've

9   been talking sexual harassment.  Whatever you

10  consider to be sexual harassment.  Was Zach the

11  person that did it?

12     A.   Yes.

13     Q.   Okay.  Was there anyone else that you

14  thought sexually harassed you?

15     A.   No.

16          MS. MCKENZIE:   Same objection.  Answer the

17  question.

18     A.   Okay.  No.  I do not feel any one of them

19  sexually harassed me.  They never crossed a line

20  with me.

21  BY MR. HEUSEL:

22     Q.   Okay.  And were there other employees that

23  we didn't name that sexually harassed you?

Deposition of:    Rachael Cumbie        9-28-2006

Page 48

1      A.    No.

2      Q.    Okay.

3      A.    No, sir.

4      Q.    I mean the lawsuit says what it says and

5   I've read it, obviously, and you named, obviously,

6   Zach Taylor.  I just wanted to be sure there was no

7   one else other than Zach Taylor that you felt

8   sexually harassed you.

9      A.    No.

10      Q.    Okay.  When did -- let me rephrase this.

11   Did you go to school with any of these individuals?

12      A.    A few of them were going to school at

13   Auburn but I never had any classes with any of them.

14      Q.    Okay.  So your friendship developed out of

15   working at Ruby'?

16      A.    Yes, sir.

17      Q.    And you said you didn't speak to them for

18   a few months but then it -- apparently y'all got

19   over that and you reestablished contact with these

20   people?

21      A.    Yes, sir.

22      Q.    About when did that occur?

23      A.    It was just kind of sporadically.  Every

Deposition of:    Rachael Cumbie        9-28-2006

Page 49

1  now and then after I started working at Appleby's,

2  you know, a few of them would come to Appleby's and

3  they would sit around the bar and have drinks after

4  work and I would work there.  So sometime while I

5  was working at Appleby's, I kind of mended ways with

6  most of them.

7      Q.    Okay.  When is the last time you talked to

8  any of these individuals?

9      A.    I haven't spoken to a lot of them.  I

10 maintain contact with Sarah Novak and Erica Shehan.

11 I've spoken to Will on one occasion this past year

12 after his friend passed away but in regards to all I

13 haven't seen any of them in over a year.

14     Q.    Where is Will now?

15     A.    To my knowledge he's in Huntsville working

16 at Boeing.

17     Q.    Do you know where Leanne is?

18     A.    I think she's in Birmingham.

19     Q.    Do you know what's she doing or what's the

20 last thing you know she was doing?

21     A.    I don't know what she was doing as for

22 work.  I just know she moved up there.

23     Q.    Is -- have you been able to contact her?

Deposition of:    Rachael Cumbie        9-28-2006

Page 50

1      A.    Not in the past eight or nine months.

2      Q.    Okay.  Do you have a number for her or an

3  address?

4      A.    I do.

5      Q.    Okay. Enis, I take it, is a man?

6      A.    Yes.

7      Q.    When is the last time you spoke to him?

8      A.    Last time I spoke with Enis I don't

9  remember the date but I know I have not spoken to

10  him since I moved home to Thomasville after I left

11  Auburn.

12     Q.    Do you know where he -- or what he's

13  doing?

14     A.    No, sir, I do not.

15     Q.    Do you know where he's from?

16     A.    No, sir.

17     Q.    Do have you a number or an address for

18  him?

19     A.    No, sir.

20     Q.    How about Kyle?

21     A.    I have not maintained contact with Kyle.

22  I haven't spoken to him or seen him over a year.  I

23  don't know where he is or what he's doing.

Deposition of:    Rachael Cumbie        9-28-2006

Page 51

1    Q.   What was the occasion when you last saw

2  him?

3    A.   Just a friendly get together in Auburn at

4  a party during football season.

5    Q.   Who sponsored the party?

6    A.   I cannot remember.

7    Q.   Do you remember how many of these

8  individuals were at that party?

9    A.   Yes, I do.  Bobby Betts was there, James

10  Burton was there, and that's all I can remember.

11    Q.   And Kyle, I take it, was there?

12    A.   Yes, he was there.

13    Q.   Was Erica or Sarah there?

14    A.   Not that I remember.

15    Q.   Wilfredo?

16    A.   No, sir.

17    Q.   Or Leanne?

18    A.   No, sir.

19    Q.   What -- do you know what James Burton is

20  doing?

21    A.   No, sir.

22    Q.   Do you know if he is still a student?

23    A.   He's not a student.  He graduated the last

Deposition of:    Rachael Cumbie        9-28-2006

Page 52

1    time I heard.

2        Q.    Have you talked to him since that party?

3        A.    I think I might have saw him at a bar in

4    Auburn one weekend but cannot recall the date of the

5    weekend.

6        Q.    And Bobby Betts?  When's the last time you

7    saw him?

8        A.    I've spoken to Bobby I want to say around

9    four months ago.

10        Q.    Where?

11        A.    I think he lives in Ozark to my knowledge.

12        Q.    How did you happen to run into him?

13        A.    I did not see him.  I called him.  We

14    spoke over the phone.

15        Q.    Did you call in relation to this case?

16        A.    No, sir.

17        Q.    You have his number then?

18        A.    No, sir.

19        Q.    What's he doing?

20        A.    I'm assuming he's still working for Ruby

21    Tuesday's.  We never touched on that.

22        Q.    What was the nature of the conversation?

23        A.    Basically Hi.  How are you doing?  I'm at

Deposition of:    Rachael Cumbie        9-28-2006

Page 53

1    the beach.  That was it.  Just friendly

2    conversation.

3        Q.    Okay.  And Erica?  When was the last time

4    you spoke to her?

5        A.    I spoke to her last night.

6        Q.    Where does she live?

7        A.    She lives in Atlanta.

8        Q.    Have you talked to her about this case?

9        A.    Yes, sir.

10        Q.    Did you talk to her about it last night?

11        A.    Yes, sir.

12        Q.    Has she indicated she feels she has some

13    information that would be helpful?

14        A.    Yes, sir.

15        Q.    What information did she tell you she has?

16        A.    We did not discuss what she was going to

17    say.  She just said that she would speak to Sherrie

18    and give her a statement.

19        Q.    And Sherrie who?

20        A.    My attorney.

21        Q.    Oh, I'm sorry.  I thought I was looking

22    for another name on my list?

23        Q.    You've talked to her in the past about

Deposition of:    Rachael Cumbie        9-28-2006

Page 54

1    this case though, haven't you?

2        A.    Yes, sir.

3        Q.    What did she tell you in regard to what

4    she thought was happening?  What was -- what did she

5    indicate to you she had observed that she thought

6    was helpful?

7        A.    She had observed the harassment with Zach

8    and said that if she ever -- if I ever needed her

9    for anything, that she would be with me.  And that

10   was about it.  That she observed what went on with

11   him.

12       Q.    What does she do in Atlanta?

13       A.    I do not know.  I think she's working PR.

14       Q.    And Sarah?  You've talked to her recently?

15       A.    Yes, sir.

16       Q.    When was that?

17       A.    That was last night as well.

18       Q.    Was it both together?

19       A.    No, sir.

20       Q.    What did she say -- what information does

21   she indicate she has relative to this?

22       A.    Nothing.

23       Q.    She didn't indicate she has any helpful

Deposition of:   Rachael Cumbie       9-28-2006

Page 55

1   information relative to your case?

2        A.   She said she wasn't getting involved.

3        Q.   Did you -- prior to that, when was the

4   last time you talked with her?

5        A.   Two weeks before that.  We were planning

6   on going to an Auburn game and spending the night

7   with her but that did not work out.

8        Q.   Why not?

9        A.   Well, my ex-boyfriend, Wilfredo Cartagena,

10  was spending the night with her and I'm currently

11  dating someone else.

12       Q.   You had talked to her about this case

13  prior to last night, hadn't you?

14       A.   Yes.

15       Q.   Did you -- when you spoke to her, did

16  you -- let me go back to Erica.  Did you ever ask

17  Erica -- did Erica ever indicate that she was aware

18  as to what knowledge, if any, Mr. Vaughn had of this

19  case?

20       A.   I don't understand the question.

21       Q.   Okay.  When you and Erica were speaking,

22  what -- did you ever talk to Erica about your

23  conversations with Mr. Vaughn regarding your

Page 56

1   complaints about Zach?

2       A.   I spoke to Erica about everything

3   regarding Zach, about how I went to Bobby Vaughn,

4   everything.

5       Q.   Am I correct she wasn't present at any of

6   those discussions with Bobby Vaughn?

7       A.   No, she was not.

8       Q.   And she never indicated that she spoke to

9   Bobby Vaughn about it?

10          MS. MCKENZIE:   Object to the form.

11  BY MR. HEUSEL:

12      Q.   Is that correct?

13      A.   No, not to my knowledge.

14      Q.   And did Sarah ever indicate that she was

15  present in any discussions with Bobby Vaughn about

16  Zach and what he did to you?

17      A.   No, sir.

18      Q.   Did Sarah ever indicate that she ever

19  spoke to Bobby Vaughn about what happened with Zach?

20      A.   She never indicated to me.

21      Q.   All right.  Were both Erica and Sarah

22  hourly employees?

23      A.   Yes, sir.

Deposition of:    Rachael Cumbie        9-28-2006

Page 57

1     Q.   Servers?

2     A.   Yes, sir.  .

3     Q.   Were either bartenders?

4     A.   Sarah was a bartender.

5     Q.   I think you mentioned her earlier when you

6 said that -- you mentioned that one of them had also

7 had drinks the night that you were fired?

8     A.   Yes.

9     Q.   Was that Sarah or Erica?

10    A.   Erica.

11    Q.   Was -- Sarah had been a bartender.  Erica

12 was not?

13    A.   I can't recall if she was a bartender or

14 not.  She could have been.  She might have worked

15 one or two bar shifts to my knowledge.

16    Q.   I asked you a convoluted question there

17 and I'm not sure which one you're refer -- which

18 answer you're giving because I asked a double

19 question so let me rephrase it.  The person you were

20 just talking about working -- possibly working a

21 shift or two.  Who was that?  Erica or Sarah?

22    A.   Erica.

23    Q.   But Sarah did work bar shifts?

Deposition of:   Rachael Cumbie          9-28-2006

Page 58

1      A.    Yes, sir.

2      Q.    Okay.  And the night you were -- the

3  events of the night that lead to your termination,

4  Erica was present but Sarah was not; is that right?

5      A.    Yes, sir.

6      Q.    And Zach was also present?

7      A.    Yes, sir.

8      Q.    And -- but the drinks in question, you

9  were the bartender at that time?

10     A.    Yes, sir.

11     Q.    Who made the drinks that Zach and Erica

12  were drinking?

13     A.    They did.

14     Q.    So they just went behind the bar and made

15  their own?

16     A.    They didn't go behind the bar.  They stood

17  at the bar -- there's an area at the bar where you

18  can lean over and grab the gun, we call it, and mix

19  everything together.

20     Q.    What did they make?

21     A.    I know they used watermelon Smirnoff

22  miniatures and I think lemonade.

23     Q.    By miniatures you mean the small bottles?

Deposition of:   Rachael Cumbie      9-28-2006

Page 59

1      A.   Yes.

2      Q.   Okay.  Is that the way the drinks are

3  served to customers?

4      A.   No, sir.

5      Q.   Okay.  What kind were you using?

6      A.   The same.

7      Q.   Same.  What did you make for yourself?

8      Ⓐ    I made the same thing.  I made watermelon

9  Smirnoff and lemonade.

10     Q.   Is there a name for that?

11     A.   No, we were just trying it.

12     Q.   All right.  So watermelon Smirnoff and

13  lemonade?

14     A.   Yes, sir.

15     Q.   And by watermelon you mean actual

16  watermelon not watermelon liquor?

17     A.   Yes, sir.  It was watermelon liquor.  It

18  was more watermelon vodka.

19     Q.   I see.

20     A.   Watermelon flavored Vodka.

21     Q.   And the Smirnoff was regular vodka?

22     A.   They were all together.  The Smirnoff was

23  a brand of vodka and the watermelon was a flavor of

Deposition of:    Rachael Cumbie      9-28-2006

Page 60

1   vodka that Smirnoff made.  So they were all one

2   alcohol.

3        Q.    So two types of vodka and lemonade?

4        A.    One type of vodka and lemonade.

5        Q.    All right.

6        A.    Watermelon Smirnoff Vodka and lemonade.

7        Q.    I just drink.  I don't know what any of

8   this is.  And how many drinks did y'all make each?

9        A.    One.

10       Q.    Were you all standing at the end of the

11  bar just talking and drinking?

12       A.    They were sitting at the bar.  I was

13  behind the bar cleaning.

14       Q.    Okay.  Did you -- who concocted the drink?

15       A.    I made mine, Erica made hers, and Zach

16  made his.

17       Q.    Okay.  What were you all talking about?

18  Do you remember?

19       A.    Well, basically how we came about the

20  little miniatures.  A Smirnoff representative came

21  into the bar earlier that evening and was eating,

22  having drinks, and saw that we had a certain type of

23  vodka on our selves in the back.  He was like,

Deposition of:    Rachael Cumbie        9-28-2006

Page 61

1    "Well, you know I've got miniatures and bar mats and

2    everything in my car.  Why don't you let me give you

3    these because of -- as reward for y'all having this

4    type of vodka.  This is what I do.  This is my job.

5    So he handed me a whole bag full of miniatures.

6        And we asked -- what is her name?  Not Keely,

7    the other manager.  Anyway, we asked a manager if it

8    was okay if we tried it, if we tasted it.  And she

9    said, "Yes.  As long as I do not see it."  And we

10   made the drinks and I sat mine on the bar.  Took a

11   drink.  Sat it on the bar and then didn't touch it

12   the rest of the night.  And Erica and Zach sat at

13   the bar with their drinks and drank theirs.

14       Q.    What time of night was this?

15       A.    It was about one-thirty to two in the

16   morning.

17       Q.    So the restaurant had closed?

18       A.    Yes, sir.

19       Q.    And all the customers were gone?

20       A.    Yes, sir.

21       Q.    Had you already cleaned up?

22       A.    I was cleaning.  I was in the process of

23   cleaning.

Deposition of:   Rachael Cumbie        9-28-2006

Page 62

1      Q.    Now, when did you speak to Bobby Vaughn?

2  When did he speak to you about the fact liquor was

3  being served that night?

4      A.    He did not say anything to me that night.

5  I can't recall if it was the day after that.  But it

6  was recent -- it was not soon after that that he

7  came to me and told me that he knew of my drinking

8  behind the bar, of me making Margaritas and drinking

9  them behind the bar and of me getting drunk behind

10 the bar and it was not tolerated.

11     Q.    Now, you knew it was not tolerated?

12     A.    Yes.

13     Q.    For people to drink?

14     A.    Yes.

15     Q.    Was he -- do you even recall him being --

16 even working that night?

17     A.    No, sir, he was not working that night.

18     Q.    Okay.  So whatever he knew he knew from

19 someone else?

20     A.    Yes, sir.

21     Q.    Do you know who told him?

22     A.    I do not know who told him.

23     Q.    Did you -- did you ask who told him?

Deposition of:    Rachael Cumbie      9-28-2006

Page 63

1      A.   Yes.

2      Q.   Did anyone tell you who told him?

3      A.   No.

4      Q.   Did you ask people who told him?

5      A.   Yes.

6      Q.   Who did you ask?

7      A.   I asked Erica.  I asked Zach and that's

8  pretty much who all I asked.  I might have asked

9  Bobby Betts.

10     Q.   What did Erica tell you?

11     A.   To my knowledge, Erica said that she

12 didn't know who had told him and that was it.

13     Q.   Did you believe her?

14     A.   Yes.

15     Q.   And did --

16              (A short break was taken.)

17 BY MR. HEUSEL:

18     Q.   Let me think where I was.  You had told me

19 that you had talked to Erica, Zach, and Bobby Betts.

20 And I was asking you questions about if they told

21 you who told Mr. Vaughn.  When you spoke to Zach,

22 where did you speak with him?  How did you speak to

23 him?

Deposition of:   Rachael Cumbie      9-28-2006

Page 64

1      A.    I spoke with him over the phone and at the

2  restaurant itself wanting to know what was going on,

3  you know.

4      Q.    Now, did you talk to Mr. Vaughn the day

5  after the event or do you recall when you spoke to

6  Mr. Vaughn?

7      A.    I know it was right -- I know it was not

8  too far after the night that we were drinking behind

9  the bar.  I don't recall if it was the day after or

10  the following day.

11      Q.    Okay.  Where did he talk to you?

12      A.    In the office in the kitchen.

13      Q.    Who else was there?

14      A.    Just him.

15      Q.    Was Kathy Reed present at any point during

16  your discussions with him or when you were

17  terminated?

18      A.    I don't recall her being.

19      Q.    Okay.  When you spoke to him, what did he

20  tell you?

21      A.    He just told me that he had knowledge of

22  me drinking behind the bar and didn't tolerate it

23  and that I was fired.

Deposition of:    Rachael Cumbie        9-28-2006

Page 65

1      Q.    Did you acknowledge to him that you had

2    had a drink behind the bar?

3      A.    I tried to defend the fact.  He was

4    referring to a different incident of me making a

5    Margarita behind the bar and drinking it.  And I was

6    not.  That wasn't even in my head at that point in

7    time because I was under the assumption, whenever he

8    was coming at me with this, that it was about the

9    night before.

10      Q.    I see.

11      A.    And it finally came out it was about a

12    Margarita that I had supposedly made which I had

13    made for a customer.  And it had been sent back with

14    a claim there were no liquor in it.  I put it in a

15    styrofoam cup and drank it because Bobby Betts told

16    me -- as a bartender, I was told while I was

17    training as a bartender at Ruby Tuesdays that that

18    was one of the -- not necessarily privileges, but

19    that was one of our duties.  If a drink is sent

20    back, we have to make sure that alcohol was in the

21    drink.

22      Q.    Okay.  But you drank the Margarita?

23      A.    I did not.  I did not.  I tasted it to see

Deposition of:   Rachael Cumbie          9-28-2006

Page 66

1  if there was alcohol in it and threw it away.

2      Q.   Do you contend that you never drank while

3  you were behind the bar?

4      A.   Yes.

5      Q.   The night that we referred to earlier

6  where you made the watermelon vodka drink, that

7  didn't have anything do with a customer sending a

8  drank back?

9      A.   No, it did not.

10     Q.   Okay.  And do you contend that Erica and

11  Zach drank their drinks?

12     A.   Yes, sir.

13     Q.   And did you drink yours?

14     A.   I had one sip out of it because I know I

15  didn't like it and I have a bad case of heartburn

16  and I don't drink stuff like that.  That's why I did

17  not finish it.

18     Q.   What was the rule in Ruby Tuesdays

19  regarding any employee drinking after hours in the

20  restaurant?

21     A.   We could not drink.  If we came in while

22  we were off the clock, we could not drink before

23  shifts.  If we came in while we were not working

Deposition of:    Rachael Cumbie        9-28-2006

Page 67

1  that day, we had to be -- we could not sit at the

2  bar.  We could sit in the bar area but we could not

3  sit at the bar and drink.  We could sit in the

4  smoking area which was around the bar.

5      Q.    And after you finished your shift, you

6  couldn't drink either, could you?

7      A.    Yes.

8      Q.    Yes, you could?

9      A.    Yes, you could drink.  A lot of people, as

10 soon as they got off work, if they did not have

11 another shift afterwards, they would drink.  If they

12 worked that morning and they decided they wanted to

13 get off work and have a drink, they could sit in the

14 smoking section and have a drink.

15     Q.    Did they pay for their drinks?

16     A.    Yes, they did.

17     Q.    After work could you drink free on the

18 company?

19     A.    No, sir.

20     Q.    Was it your understanding that what Erica

21 and Zach did was a violation of company rules?

22     A.    Yes.

23     Q.    And you don't feel that you violated the

Deposition of:    Rachael Cumbie        9-28-2006

Page 68

1    company rules only because you sipped it?

2        A.    I feel like I did violate the company

3    rules.  I should not have done that.

4        Q.    I see.

5        A.    And -- but the fact of the matter is that

6    the reason why I was upset is the fact they did the

7    same thing I did.  They finished their drink.  I

8    took one sip out of mine.  Nothing happened to them.

9        Q.    Did you ever -- you never told him though

10   about them drinking their drink, did you?

11       A.    I told him the night he was firing me.

12       Q.    Okay.

13       A.    I told him what was happening and he

14   thought it was BS.  He wouldn't hear it.

15       Q.    Okay.  Let me back up a second.  When he

16   called you in, he told you -- what exactly did he

17   tell you and what was your response to him.  As best

18   you can remember?

19       A.    As best as I can remember, he said, "Okay.

20   Look, we're firing you because you have been -- I've

21   heard that you have been drinking behind the bar."

22   And I did my best to defend myself and that's all I

23   could do.

Deposition of:   Rachael Cumbie        9-28-2006

Page 69

1      Q     All right.  When he said I heard you have

2  been drinking behind the bar, did you ask him:  What

3  do you mean?  What drink?  When?

4      A     Yes.  I said, "What do you mean?  Give me

5  an instance."  And you said you were making

6  Margaritas and drinking them and I denied that

7  because I never made a Margarita for myself, ever.

8      Q     Okay.  I take it that you told him about

9  the cup -- the styrofoam cup and tasting it?

10     A     I told him that I might have tasted it.

11  That's what I did.  I tasted it.

12     Q     Okay.

13     A     While Bobby Betts was standing right

14  beside me.

15     Q     Then did you volunteer about the Erica

16  Zach --

17     A     Yes.

18     Q     -- drink that and the three of you.  The

19  drinks that you had?

20     A     Yes.

21     Q     All right.  What did he say about that?

22     A     He said it was irrelevant, that this was

23  about me.  So he wouldn't really hear of that.

Deposition of:    Rachael Cumbie        9-28-2006

Page 70

1    Q.    Now, you said you spoke to Zach. What did

2  Zach tell you about who, if anyone, told about the

3  drinks?

4    A.    He denied that he had anything to do with

5  it.  I suspected that he had something to do with it

6  because he was there the day that I tasted the

7  Margarita.  He was sitting -- he was standing at the

8  bar.  And while I was -- he brought back the

9  Margarita.  He was like look, you know, "This person

10  thinks there's not any alcohol in it." And that's

11  when Bobby and I started talking -- Bobby Betts not

12  Bobby Vaughn -- started talking and he sat there.

13  He saw.  And that was the only thing that I could

14  think of the reason why that was going on.  Why

15  Bobby was accusing me of that.

16    Q.    Okay.

17    A.    While Bobby Vaughn was accusing me of

18  that.

19    Q.    What was Bobby Betts' position?

20    A.    He was a manager or shift leader.

21    Q.    Do you know which?

22    A.    To my knowledge, he was on the floor that

23  night dealing with all the money.  So technically,

Deposition of:    Rachael Cumbie       9-28-2006

Page 71

1    if he was a manager then I don't know.  But I know

2    he was a shift leader because he was working that

3    night because all the money, taking up money and

4    everything.

5        Q.    I understand as a shift leader they have

6    certain responsibilities that a regular server or

7    bartender doesn't have; is that right?

8        A.    Yes.  They have to maintain customer

9    satisfaction and maintain the restaurant at all

10   times.

11       Q.    But am I correct that if, in fact, he was

12   a shift leader, he does not have the authority to

13   hire and fire the way a manager does?

14       A.    No.

15       Q.    No.  That's right?

16       A.    He does not have the authority.

17       Q.    Okay.  And he is an hourly paid employee?

18       A.    I don't know if he is or not.  I'm

19   assuming he is.

20       Q.    Okay.  Do you know what he's doing now?

21       A.    As I said earlier, I'm not sure of what

22   he's doing.  I'm assuming he's still working for

23   Ruby Tuesday because that's all he's done ever since

Deposition of:   Rachael Cumbie          9-28-2006

Page 72

1    I've known him.

2        Q.    I see.   That's the one you said you called

3    about four months ago in Ozark?

4        A.    Uh-huh.

5        Q.    Did you call him to talk about this case

6    at all?

7        A.    No, sir.

8        Q.    Have you asked any of the individuals

9    other than Erica or Sarah that we talked -- the ones

10   that were named before.   Have you asked any of them

11   to testify in connection with this?

12       A.    No, sir.

13       Q.    Have you talked to anyone else about

14   testifying as a witness?

15       A.    I've spoken to the girl that I was

16   training the night that all this happened.   Her name

17   is Tracy?   Anyway she was a little girl that just

18   had been hired and I was training her the night that

19   Zach kept hitting me repeatedly.   And she was with

20   me by my side the whole time.   And I asked her but

21   I've lost touch with her.   Lost her number.   Haven't

22   been able to get up with her since.

23       Q.    Okay.   How long had Zach worked there when

Deposition of:    Rachael Cumbie        9-28-2006

Page 73

1    you left?

2        A.    I guess around six months.

3        Q.    Had you ever been in a situation where you

4    socialized with Zach outside of work either in a

5    group or alone?

6        A.    Yes, sir.

7        Q.    What kind of situation?

8        A.    Employees at Ruby Tuesdays would get

9    together either after hours or when they were not

10   working on the weekends.  Have a get together at

11   Leanne Jenkins house or wherever we decided to meet

12   up.  He would be there on occasion.

13       Q.    And I know from the complaint you've

14   alleged that he's gay or known to be gay; is that

15   right?

16       A.    Yes.  He has said openly that he is gay.

17       Q.    Obviously that wasn't a problem for you?

18      (A.)   It was a problem whenever he professed

19   that he wanted to date Leanne and tried to kiss her

20   at a party.  That's when it became a problem.

21       Q.    But in terms of being a social

22   acquaintance or friend, the mere fact that he was

23   gay didn't matter to you?

Deposition of:    Rachael Cumbie        9-28-2006

Page 74

1      A.    No.  I don't discriminate against gays.

2  It doesn't --

3      Q.    All right.  And would this group that we

4  named earlier beginning with Wilfredo, Leanne, Enis,

5  etc.  Was that kind of the group that would hang out

6  together outside of work?

7      A.    Yes, sir.  There might be a few people

8  that had just been hired in or just acquaintances

9  from everybody else who would show up.  I can't

10  recall the names of who all was there but those

11  people were normally there.

12      Q.    Okay.  Who -- we've been talking around

13  the issue of Zach and what it is that he did.  Let's

14  talk about it directly.  What did Zach do that you

15  considered to be inappropriate in the work place?

16      A.    Well, to begin with Zach came in -- of

17  course, professed that he was gay.  And, basically,

18  he would come up behind me and just slap the tar out

19  of my but.  He would just slap it as hard as he

20  could.  And, you know, I would literally just, you

21  know, I'd scream a little bit.  I wouldn't scream

22  loud.  But there were instances that he hit it so

23  hard that I would scream and it would leave

Deposition of:   Rachael Cumbie      9-28-2006

Page 75

1   handprints and bruises.

2       Q.    In -- in talking to people it's -- there's

3   been indications that it was not uncommon for

4   employees to slap, pat, whatever you want to call

5   it, each other on the but.  Is that a fair

6   statement?

7       A.    Yes, that is fair.  It was not uncommon

8   for that to happen.  Basically everybody would do it

9   to everybody.  In a sense they would come up and

10  just try to hit each other as hard as they could to

11  see who would, you know, could hit each other the

12  hardest.  And it started happening to, you know,

13  girls and everything.

14      Q.    Did you ever do it to anyone?

15      A.    Yes.  I did it to Kyle and James and Enis.

16  I know I did it to Will.  I might have been done it

17  to Zach.  But if they ever told me to stop, I always

18  told -- I never did it again.

19      Q.    Okay.

20      A.    And the thing is with Zach is that I told

21  him to stop repeatedly.  He never stopped.  I told a

22  manager.  And it never stopped.  When it happened

23  again the manager said, "Will you f-ing stop yelling

Deposition of:    Rachael Cumbie        9-28-2006

Page 76

1  so loud."

2       Q.    And the manager you are talking about is

3  Mr. Vaughn?

4       A.    Keely.  Bobby Vaughn was not there that

5  night.

6       Q.    Keely?  I know you said that name before

7  and I'm just trying -- is that a man or a woman?

8       A.    A woman.

9       Q.    Now, on my notes I indicated that you said

10  she was a manager-in-training; is that right?

11       A.    To my knowledge, yes.

12       Q.    Where did she go after she finished her

13  training period?

14       A.    I have no idea.

15       Q.    Do you recall how long she was there?

16       A.    I don't recall.  I know she was there at

17  least a good three months.

18       Q.    But that -- this all occurred before Bobby

19  Vaughn ever got there?

20       A.    No.  He was there.  Ha had been there a

21  long time.

22       Q.    Okay.  And when you told this to Keely,

23  what did she say?

Deposition of:    Rachael Cumbie        9-28-2006

Page 77

1    (A)    She turned around and looked at me because

2    I went to her directly.  He had already hit me once

3    at the hostess stand while customers were coming in.

4    And just, you know, I was looking at our seating

5    chart and he just laid it on me.  Just hit my rear

6    end so hard I couldn't even do anything.  I couldn't

7    scream, couldn't do anything because there were

8    customers there.  He would do it in the back of the

9    kitchen.  He did it around three times before I went

10   to Keely.  And I told her, "Look, if you don't make

11   him stop, I will."  And she was like, "Well, you're

12   a big girl.  Do it yourself.  You can take care of

13   this."  And so the next time he did it I was at a

14   micro and Tracy -- I was showing Tracy how to punch

15   in an order.  Showing her the stuff on the micro.

16   Next thing I know slap and it hurt so bad I screamed

17   to the top of my lungs.  And I said, "Will you f-ing

18   stop."  People at the hostess stand could hear me.

19   That's how loud I yelled.  And Keely turned around

20   and she said, "Will you f-ing stop yelling so loud?"

21        Q.    And just -- I know it's obvious but,

22   again, for the record when you say f-ing, you mean

23   fucking stop?

Deposition of:   Rachael Cumbie        9-28-2006

Page 78

1      A.   Yes.  I don't want to cuss.

2      Q.   So you said to him will you fucking stop

3 and then she said something to you about stop

4 yelling but using the same word?

5      A.   Yes.  And nothing was ever done to Zach

6 about that.

7      Q.   Why did you feel comfortable slapping male

8 employees and other females on the back?

9           MS. MCKENZIE:  Object to the form.  Go

10 ahead.

11      A.   For one thing, they had been my friends

12 ever since I started working at Ruby Tuesdays.  And

13 if I ever told them to stop, they stopped.  And, you

14 know, there'd be times it would get out of hand, you

15 know, and we'd be like, "Okay.  That's enough."

16      There was one instance though Chad

17 Zuwingas[PHONETIC] is his name.  He came up to me

18 one time.  I had a handful of plates just food and

19 he popped my rear end with a towel and drew blood

20 with it.  That happened too a bunch there and I'd,

21 you know, I could never pop anybody with a towel

22 because I had never accomplished that feat, but, you

23 know, he went around to anybody that he could and

Deposition of:    Rachael Cumbie         9-28-2006

Page 79

1    did it.

2    BY MR. HEUSEL:

3        Q.    Did you tell him to stop?

4        A.    Yes, I did.

5        Q.    Did he stop?

6        A.    Yes, he stopped.  He apologized for it.

7    But, I mean, he had done it once or twice before

8    that and didn't get the picture.  But after he did

9    that, you know.

10        Q.    What -- after the incident you described

11    with the -- involving Zach and the Keely, when was

12    the first time you spoke to Mr. Vaughn about Zach?

13        A.    I don't remember a date.  I don't remember

14    going straight to Bobby Vaughn about it.

15        Q.    Okay.

16        (A)    I know he saw it on occasion.  He saw it.

17    He seen Zach fondle my breasts and didn't do

18    anything about that.  He seen him hit me on my but

19    before and never did anything about that.  He seen

20    Zach hit me after that instance and never did

21    anything about it.  Nothing was ever done to Zach

22    about that.  And I had already gone to Keely about

23    it.  So I called a 800 number and I never got an

Deposition of:   Rachael Cumbie        9-28-2006

Page 80

1   answer back from that.

2       Q.    Okay.   Let me -- I'm going to cover all of

3   these believe me.   I want to get as much information

4   as you have regarding these events.   I'm not going

5   to minimize any of them but getting back to -- did

6   you ever specifically talk to Mr. Vaughn about Zach?

7       (A)   I know that I had spoken to Bobby once or

8   twice and just told him about Zach and how it made

9   me kind of uncomfortable about it.   And the fact

10  that, you know, I didn't necessarily like it but, I

11  mean, the atmosphere in that restaurant was just

12  almost like, you know, it didn't really matter who

13  hit whatever.   It was just like nothing was ever

14  done about it anyway.

15      Q.    Well, you did continue to hit your friends

16  though, didn't you?

17      A.    They were my very good friends and they

18  never said anything to me about it.   The thing is is

19  that I said no to Zach many times.

20      Q.    I understand.   I'm not arguing.   I'm just

21  asking.   You did continue to hit your friends?

22      A.    Yes, I'm assuming I did.

23      Q.    And they continued to hit you?

Deposition of:   Rachael Cumbie          9-28-2006

Page 81

1      A.    Yes.

2      Q.    So if it was that noticeable that everyone

3   was doing it and it was being done among friends who

4   weren't complaining about it.   Am I understanding

5   that you thought that Mr. Vaughn should have singled

6   out which hits to discipline and let the others go?

7      A.    Okay.   For one thing there were -- Erica

8   Shehan, she would not tolerate that stuff for one.

9   She knew -- she did not like it.   There were a lot

10  of women that worked at Ruby Tuesdays that were

11  outspoken about it.   Don't touch me.   Don't do any

12  of that to me.

13     Q.    All right.   And did it stop for Erica

14  because she made it clear that she didn't want it?

15     (A)    She was popped on the rear end a few times

16  by Zach and by other men and she didn't like it

17  either.   You know, it's not like it was going to

18  stop.   I mean even the women who did not like it --

19  nothing was ever done about it anyway.

20     Q.    Did you see any problem at all in your

21  continuing to do the same conduct you were

22  complaining about in the restaurant?

23          MS. MCKENZIE:   Object to the form.

Deposition of:    Rachael Cumbie        9-28-2006

Page 82

1      A.    No.  Unless somebody told me to stop, I

2   didn't, I mean --

3      Q.    Okay.

4      A.    It's not like I went around hitting

5   everybody on the but just to hit them.  But if

6   anybody -- if I ever hit anybody hard enough for

7   them to tell me to stop, I stopped.

8   BY MR. HEUSEL:

9      Q.    Okay.  Why did you hit them on the but?

10      A.    Because it was a thing that we just did.

11      Q.    Was it a sign of friendship?

12      A.    No, not really.  It was just:  Let's see

13   how hard we can hit Rachel on the but or let's see

14   how hard we can hit Bobby Vaughn on the but.  See

15   how hard we can hit Kyle Austin on the but.

16      Q.    Did you ever hit Bobby Vaughn on the but?

17      A.    No.  Never touched Bobby Vaughn.  I was

18   just saying as an example.  Never touched him.

19      Q.    But you did the same thing with others.

20   That's what I'm asking.  You did -- when you hit

21   others, some of them were friendly pats, some of

22   them were let's see how hard Er -- I mean --

23      A.    Mine were friendly pats.

Deposition of:    Rachael Cumbie        9-28-2006

Page 83

1    Q.    Wait.  Wait.  Wait.  You've got to let one

2    of us talk.

3    A.    I'm sorry.

4    Q.    So you never hit anybody hard.  You just

5    had friendly pats.  Is that what you're saying?

6    A.    Well, I'm sure I've hit somebody hard.

7    They turn around and hit me, I'm going to hit them

8    back.

9    Q.    And sometimes you hit them hard without

10   them hitting you.  Just because it was your turn.

11   Isn't that right?

12   A.    No, we never took turns on who was going

13   to hit who on the but.

14   Q.    How frequently were you hitting people on

15   the but?

16   A.    Well, I don't know.  I didn't count the

17   times that I hit someone on the but.

18   Q.    Would it have been normally, daily, just

19   passing?

20   A.    No, not daily.  It would just happen.  I

21   mean, if somebody came in and hit me on the but, I

22   would turn around and hit them on the but.

23   Q.    You indicated that you -- that Mr. Taylor

Deposition of:    Rachael Cumbie         9-28-2006

Page 84

1    fondled your breasts?

2         (A)    Yes.

3         (Q)    When did that begin?

4         (A)    The same time he started working there.

5    He just felt it was okay to do that.

6         Q.    So for six or seven months he fondled your

7    breasts?

8         (A)    No.  He only -- he did it about four or

9    five times and it's not -- I looked like, I mean, it

10   happened in front of managers and I looked at them

11   like are you going to do anything?  Nothing ever

12   happened.

13        (Q)    Well, you say you looked at them like --

14   did you ever say anything to them?

15        (A)    Yes.  I went to Keely.  I went to -- I

16   mean, I was just -- I told them what was going on.

17   He's hitting me.  He's touching my boobs.  Make him

18   stop.  Nothing was ever done.

19        Q.    How did he touch them?

20        (A)    He would come up from behind and like grab

21   me.  I wouldn't even know he was there.  Come up

22   from behind, reach through my arms.  He would come

23   up towards me and --

Deposition of:    Rachael Cumbie    9-28-2006

Page 85

1    Q.    How do you know that Bobby Vaughn saw

2    anything?

3    A.    Because he was standing in the kitchen at

4    the serving area where you get the food and

5    everything.  We were standing at a micro.  Erica and

6    I were standing at a micro and he just came up.

7    He's like, "Oh, yeah.  These are real nice.  These

8    are real nice."  He looked at Erica and I looked at

9    Bobby and he just smiled and went on about his

10   business.

11   Q.    But did you say anything to him?

12   A.    What am I supposed to do?  I just looked

13   at him and he laughed.  I mean, what else am I

14   supposed to do?  I've already gone to a manager

15   about it before.  What do you expect me to do?  I've

16   called a 1-800 number.  I mean nothing is done about

17   it.  So what do y'all expect me to do?

18   Q.    I'd like you -- I understand this can be

19   difficult.  But it's -- it's necessary.  So I want

20   you to calm down as best you can.  Take whatever

21   time you need and we'll --

22        MS. MCKENZIE:  She's answered your

23   question.  You can ask it one more time and then

Deposition of:    Rachael Cumbie        9-28-2006

Page 86

1    that's it.  About why didn't she talk to a manager.

2              MR. HEUSEL:  I understand.

3    BY MR. HEUSEL:

4        Q.    You said you called the 800 number and no

5    one called you back?

6        A.    Yes.

7        Q.    So you never spoke to anyone?

8        A.    I call a 1-800 number and nobody called me

9    back.

10       Q.    Did you call more -- why didn't you call a

11   second time?

12       (A.)   Because when I didn't get a call back the

13   first time, you know, they're supposed to be there

14   to help you, right?  You know you don't hear from

15   them, then they are not obviously there to help you.

16   So I just figured, you know, nothing is ever going

17   to be done about it.

18       Q.    You didn't -- did you leave a message?

19       A.    Yes.

20       Q.    What was the message?

21       A.    I don't remember the message --

22       Q.    You didn't tell them --

23       A.    -- off hand.

Deposition of:   Rachael Cumbie        9-28-2006

Page 87

1          MS. MCKENZIE:   Let her answer the

2  question.

3      A    I told them that I was being sexually

4  harassed and I didn't know what to do about it.

5  BY MR. HEUSEL:

6      Q.   What number did you leave?

7      A.   Do what?

8      Q.   Did you leave a number?

9      A.   Yes.

10     Q.   Did you leave the restaurant's number or

11 your own?

12     A    No.  I left my cell phone number.

13     Q.   Do you know the district manager?

14     A.   Yes.

15     Q.   Who was it?

16     A.   Greg Thompson.

17     Q.   How often did he come in the restaurant?

18     A.   Maybe once or twice a month.

19     Q.   Did you ever talk to him about it?

20     A.   No.

21     Q.   Did you have an opportunity to talk to

22 him?

23     A.   Just in passing I was able to say hi.  I

Deposition of:    Rachael Cumbie          9-28-2006

Page 88

1    was always working whenever he came in there.  I

2    never had a chance to talk to him.

3        Q.    When did you make the call to the 800

4    number?  Well, let me ask you this:  Was it after

5    you quit?

6        A.    No, it was not.

7        Q.    Do you know how long before you quit you

8    made the call?

9        A.    It was about a week before.

10       Q.    A week before?  Why did you wait seven

11   months to call?

12       A.    Because I'd already gone to a manager,

13   okay.  Nothing is going to be done about it at all.

14   So I called the number.  I tried everything I could,

15   so.

16       Q.    After -- did Bobby Vaughn ever tell you he

17   talked to Zach?

18       A.    No.

19       Q.    You sure of that?

20       A.    I don't know if he talked to him or not.

21   All I know is that nothing was ever done to Zach.

22       Q.    Do you recall if he ever told you he had

23   talked to Zach about the complaint you made?

Deposition of:  Rachael Cumbie          9-28-2006

Page 89

1     (A)     No, I don't recall if he told me.

2       Q.     Is it possible he spoke to him and you

3    don't remember?

4       A.     I don't know if he spoke to him or not.

5              MS. MCKENZIE:   Listen to the question.

6    BY MR. HEUSEL:

7       Q.     My question was:  Is it possible he spoke

8    to you and told you that and you don't remember?

9       A.     Yes, it's possible.

10      Q.     Did you tell your boyfriend what was

11   happening?

12      A.     Yes.

13      Q.     Did he see what was happening?

14      A.     Yes.

15      Q.     Did he ever say anything to Zach?

16      A.     Yes.

17      Q.     How do you know?

18     (A.)    Because he was my boyfriend and he didn't

19   like the way that it went down.  When I was working

20   the night that I was hit five times and I told him

21   about it.  And he went up to Zach and he was like,

22   "Hey, man don't do it anymore."  After I screamed at

23   Zach and I was told to f-ing shut up.  When I went

Deposition of:    Rachael Cumbie        9-28-2006

Page 90

1    to him and said, "Hey, leave her alone, man."

2        Q.    And do you know that because he told you

3    or because you heard it?

4        A.    Because he told me.  Because I wasn't -- I

5    was too busy working.  All I know is that Will told

6    me that he told him to stop.

7        Q.    All right.  Do you contend that even after

8    your boyfriend told him he still did it?

9        A.    Do what?

10        Q.    Do you contend that even after your

11    boyfriend told him to stop that he still did it?

12    That Zach still slapped?

13        A.    That night he did not slap me again.

14        Q.    Did he ever slap you again after that?

15        A.    I don't know if he did or not.

16        Q.    Did he ever touch you on the breasts after

17    your -- Zach -- after your boyfriend told him to

18    leave you alone?

19        A.    I don't recall if he did or not.

20        Q.    Was he concerned about your boyfriend

21    being there and seeing this?

22        MS. MCKENZIE:    Object to the form.

23        A.    No, sir, he was not.

Deposition of:   Rachael Cumbie          9-28-2006

Page 91

1   BY MR. HEUSEL:

2       Q.   I'm sorry?

3       A.   No, sir, he was not.

4       Q.   All right.  Did you tell all your other

5   friends in the group that you all were hanging

6   around with that -- what he was doing?

7       A.   Yes, they knew.  They saw.

8       Q.   Did any of them talk to him?

9       A.   I don't know if they did or not.

10      Q.   Were there any other instances or types of

11  conduct that you contend Zach engaged in that we

12  haven't talked about that you thought was offensive?

13      A.   Yes.  He would hit me on the but several

14  times before.  It was not just that night.

15      Q.   I understand.

16      A.   And it happened repeatedly.  So I don't

17  know a specific date or when it happened.

18      Q.   When you said that night, which night were

19  you referring to?

20      A.   The night when he hit me on the rear end

21  at least five times.

22      Q.   Okay.  And do you recall how long that was

23  before you were fired?

Bay Area Reporting, Inc.
2102 Government Street, Mobile, AL 36606

Deposition of:    Rachael Cumbie        9-28-2006

Page 92

1        (A.)    It wasn't too long before I was fired.   I

2    don't recall the day or --

3        Q.    Have you talked to Zach since you left?

4        A.    I saw him one time in Bumpers Billiards

5    and that was it.  I said hi in passing and that was

6    it.

7        Q.    Did you -- do you know what he's doing

8    now?

9        A.    No, sir.  I have no idea.

10        Q.    What other individuals indicated that they

11    had information that would be helpful to you in this

12    case other than the ones we've named so far?

13        A.    No other ones.  No.

14        Q.    Did you ever date Enis?

15        A.    No, sir.

16        Q.    Am I correct that in regard to Mr. Vaughn

17    that you spoke to Mr. Vaughn only once regarding

18    Zach?

19        A.    Yes.  We never really talked about it.

20        Q.    I'm sorry, what?

21        A.    We never really talked about it at all.  I

22    just know that there was once instance when I did

23    speak to him about it.

Deposition of:    Rachael Cumbie        9-28-2006

Page 93

1      Q.    And when you spoke to him that time, did

2  you talk to him about him touching your breasts or

3  just slapping you on the rear end?

4      A.    I think it was mostly just slapping on the

5  rear.  I mentioned the breasts and that it wasn't

6  cool and that was it.

7            MS. MCKENZIE:  We need a break.

8            MR. HEUSEL:  Sure.  I'm almost done so.

9  No.  That's okay.  I've got to get my papers

10  together.  I've got a few exhibits to introduce and

11  then we will be close to done.

12                  (A short break was taken.)

13     Q.    I'll mark this copy of your EEOC charges

14  as Exhibit 1.  Would you take a look at this.  Do

15  you recall that document?

16                  (Defendant's Exhibit No. 1 was

17                  marked for identification.)

18     A.    Yes, sir.

19     Q.    Take a look at the next page.  Is that

20  your signature on it?

21     A.    Yes, sir.

22     Q.    Who prepared this?  Did the EEOC do it?

23     A.    No, my attorney.

Deposition of:    Rachael Cumbie        9-28-2006

Page 94

1      Q.    Okay.  And by your attorney you mean

2  you're current attorney?

3      A.    Yes.

4      Q.    Okay.  I don't want to know any

5  discussions you had with your attorney but when did

6  you first contact your attorney after -- was it

7  before or after your termination?

8      A.    It was right after my termination.

9      Q.    And this is dated on the second page 18th

10  of May 2004.  Is that your signature date, right?

11      A.    Yes, sir.

12      Q.    Would it have been between the day you

13  left Ruby's and the date that you signed this that

14  you spoke with your attorney?

15      A.    I don't understand the question.

16      Q.    I'm trying to find out when you first

17  spoke to an attorney not what you talked about you.

18  Just when you first spoke to an attorney.  And you

19  left on May 14 I believe we established.  And this

20  was --

21      A.    May 18.

22      Q.    May 18.  So that it would have been

23  between -- in those four days or so?

Deposition of:    Rachael Cumbie      9-28-2006

Page 95

1      A.    Yes, sir.

2      Q.    Okay.  When you referred earlier to

3 being -- to the conversation with the lady manager

4 who you sai used the term f-ing term toward you.

5 Mr. Vaughn never cursed you, did he?

6      A.    He cursed -- the day that I was fired it

7 was very heated.  There was cussing going on.

8      Q.    Were you crying?

9      A.    Yes.

10     Q.    Were you cursing?

11     A.    Yes.

12     Q.    Okay.  Prior to that time he never -- did

13 he say anything in the way of cursing in that

14 meeting?

15     A.    To me personally?

16     Q.    Yeah.

17           MS. MCKENZIE:  During what meeting?

18     Q.    The termination.

19     A.    During the termination.  I don't

20 understand.

21     Q.    Yeah.  Did he ever curse you period?

22 Let's start with that?

23     A.    Yes.

Deposition of:    Rachael Cumbie        9-28-2006

Page 96

1      Q.    When?

2      A.    If I ever screwed up an order or anything

3  like that, he would cuss me out for doing something

4  like that.

5      Q.    Okay.  Did he ever curse at you in

6  connection with any complaints about Zach Taylor or

7  slapping or grabbing your boobs or anything like

8  that?

9      A.    I'm not sure if he cussed during our

10  conversations.

11      Q.    Okay.  Your complaint mentions an issue

12  regarding overtime.  Does that relate to the night

13  of the alleged drinking that lead to your

14  termination?

15      A.    Yes.

16      Q.    And specifically does it relate to a

17  manager changing your hours that night?

18      A.    Basically if I ever had any overtime,

19  they'd knock it down.

20      Q.    Okay.  But am I correct that the overtime

21  -- when you say change your overtime, it refers to

22  the fact that you -- you are alleging that you

23  worked past your normal shift and somehow or other

Deposition of:    Rachael Cumbie        9-28-2006

Page 97

1    they changed your time.   Is that what you're saying?

2        A.    Yes.

3        Q.    Your schedule was never changed to reduce

4    your hours simply because of this allegation, was

5    it?

6        A.    I don't understand the question, I mean.

7        Q.    Okay.   On the second page it relates --

8    you say in here they cut all my overtime hours that

9    I had already worked so that management could get a

10   bonus?

11       A.    Yes.

12       Q.    Did they do that to other employees?

13       A.    Yes.

14       Q.    It was because of the bonus issue that you

15   believe they cut hours; is that right?

16       A.    Yes.

17       Q.    It was not because you were being slapped

18   on the but?

19       A.    No.

20       Q.    Or Zach had anything to do with it.   It

21   was strictly an issue of overtime nothing else;

22   isn't that right?

23       A.    Yes.

Deposition of:    Rachael Cumbie        9-28-2006

Page 98

1      Q.    Okay.  And on the second page, when you

2    said you complained to several managers -- at the

3    top of the second page -- to please help me.  They

4    had said to take care of it myself that I'm a big

5    girl.  That actually was that one female manager you

6    referred to?

7      A.    Yes.  That -- and I had spoken to Felicia,

8    the kitchen manager.  I went to her first.  I was

9    like, you know, what do I need to do?  What should I

10    do?  She was like go take care of it.  Go tell

11    management.  You're a big girl.  Go take care of it.

12      Q.    When she told you to go tell management,

13    that's because she was not an assistant manager, was

14    she?

15      A.    Yeah.  She couldn't do anything about it.

16    But she was a kitchen manager.  She was above me.

17      Q.    Right.  But she -- again, she couldn't

18    hire or fire or discipline employees.  She couldn't

19    write them up.

20      A.    No, sir.

21      Q.    Okay.

22      A.    She might could have written up somebody

23    in the kitchen but a server --

Deposition of:    Rachael Cumbie          9-28-2006

Page 99

1        Q.    But not a server because she wouldn't have

2    seen it?

3        A.    No, sir.

4        Q.    Well, let me show you what I've marked as

5    Exhibit 2.

6                        (Defendant's Exhibit No. 2 was marked

7                        for identification.)

8    BY MR. HEUSEL:

9        Q.    Do you recall this being the written

10    version of the information that was conveyed in the

11    sexual harassment video?  That this is actually the

12    written policy?

13        A.    Yes, sir.

14        Q.    Down at the bottom.  The second to last --

15    the last full paragraph it states:  If you see a

16    violation of company policy you must promptly inform

17    us.  Did you promptly inform them of this?

18        A.    The management or the hot line?

19        Q.    Let's talk about the managers.  Did you

20    first -- did you promptly inform them of Zach

21    slapping you on the behind or was it only when it

22    got to a point that you became offended by it that

23    you --

Bay Area Reporting, Inc.
2102 Government Street, Mobile, AL 36606

Deposition of:   Rachael Cumbie      9-28-2006

Page 100

1            MS. MCKENZIE:   Object to the form.

2       A.   Yes.

3   BY MR. HEUSEL:

4       Q.   That's when you reported it; is that

5   right?

6       A.   Yes.

7       Q.   It says, "Communication is the key.   Talk

8   to your manager, general manager, director of people

9   standards and results, regional partner, director of

10  human resources, or call the team member hot line.

11  Whichever is most comfortable to you."   Is that

12  right?

13      A.   Yes.

14      Q.   And you say you did tell a manager and

15  general manager; is that right?

16      A.   Yes, sir.

17      Q.   You didn't talk to the director about it?

18      A.   No, sir.

19      Q.   Or call human resources directly but you

20  did call the hot line?

21      A.   Yes, sir.

22      Q.   Once; is that right?

23      A.   Yes, sir.

Page 101

1      Q.    And in the Exhibit 1 on the first page it

2    refers about five -- six lines from the bottom, I'm

3    sorry, that document there.  In the middle of the

4    page, the sentence -- you see the sentence that

5    begins with the guy started?  About six lines up?

6      A.    Hold on.  Yes.  Right here.

7      Q.    The guys started slapping us harder and

8    harder.  When you filed this with EEOC were you

9    complaining about all of the males who were slapping

10   you?

11     A.    I was complaining that it happened.  That

12   it all was happening, yes.

13     Q.    But you're now telling us that you didn't

14   mind the slapping from the others.  It was just Zach

15   that constitutes sexual harassment; is that right?

16     A.    I minded to a point to where if any of

17   them -- if I told any of them to stop.  They

18   stopped.

19     Q.    Okay.  So you weren't -- this was just a

20   prelude then in terms of telling the EEOC what

21   happened.  You weren't really complaining about all

22   the other guys; is that right?

23     A.    Well, I complained that maybe we should

Deposition of:   Rachael Cumbie          9-28-2006

Page 102

1   stop having everybody slap so hard to make it stop,

2   you know.

3       Q.    Okay.  So soft slaps would have been all

4   right with you?

5       A.    Well, no slaps would have been great with

6   me.  But it's not like it was ever going to stop

7   anyway.

8       Q.    Would that have required you to stop

9   slapping also?

10      A.    Yes.

11      Q.    You were willing to give that up then?

12      A.    Yes.

13      Q.    Let me show you what I'm going to mark as

14  Exhibit 3.  You are aware that Ruby's profess to

15  have what is known as an open door policy; is that

16  right?

17                  (Defendant's Exhibit No. 3 was

18                  marked for identification.)

19      A.    Yes, sir.

20      Q.    Is this a copy of that policy?

21      A.    Yes, sir.

22      Q.    And you're aware that the policy provided

23  that you could use -- get access to the human

Bay Area Reporting, Inc.
2102 Government Street, Mobile, AL 36606

Deposition of:    Rachael Cumbie        9-28-2006

Page 103

1    resource department again by the 800 hot line and

2    calling and asking for human resources to talk about

3    any problems that you had?

4        A.    Yes, sir.

5        Q.    But you didn't do that, did you?

6              MS. MCKENZIE:    Object to the form.

7        A.    I did call them.

8    BY MR. HEUSEL:

9        Q.    I know.  But you didn't ask for the human

10   resources department specifically, did you?

11       A.    I didn't know I had to.  I know I called

12   the hot line because --

13       Q.    I'm not saying you had to.  It was just

14   another option that you could have asked for; isn't

15   that right.

16             MS. MCKENZIE:    Object to the form.

17   BY MR. HEUSEL:

18       Q.    Isn't that right?

19       A.    Yes.

20       Q.    Okay.  Am I correct that you're not

21   alleging that any manager or shift supervisor ever

22   slapped you on the rear end or caused battery on

23   you?

Deposition of:   Rachael Cumbie        9-28-2006

Page 104

1     (A.)   There was one -- I can't remember.  He was

2  a manager-in-training.  He was in and out real

3  quick.  Chad, he become a manager-in-training.  He

4  hit me with a towel many times.

5     Q.   But that was when he was an hourly or

6  manager-in-training?

7     A.   I can't recall.  I just know he did it.

8     Q.   Did you hit him?

9     A.   No, I never touched Chad.

10    Q.   But he was the one that apologized and you

11  didn't have any problem after that?

12    A.   Well, yeah.  I told him to leave me alone

13  but I mean, you know.

14    Q.   Once you made it clear, he didn't do it

15  again; is that right.

16    A.   Yeah, it didn't happen again.

17    Q.   So you don't know of any managers that

18  allegedly touched you in an inappropriate way; is

19  that right?

20    (A.)   There was one other manager that in

21  training.  I cannot remember his name.  I would be

22  able to recognize it if I saw it.  Like I said he

23  was in and out but he did slap me on the rear one

Deposition of:   Rachael Cumbie      9-28-2006

Page 105

1    time.

2        Q.    One time.  Did you slap him?

3        A.    No.

4        Q.    But you didn't file a charge against him,

5    did you?

6        A.    No, sir.

7        Q.    Other than that this gentlemen never

8    touched you?

9        A.    No. He never touched you.

10       Q.    Did you ever curse in the restaurant?

11       A.    Yes, sir.

12       Q.    Did you curse the night you were fired?

13       A.    Oh, yes, sir.

14       Q.    Have you ever been what you consider to be

15   inappropriately touched in any other job you were

16   in?

17       A.    No.

18       Q.    We can take a short break.  I think we are

19   done.  I just want to talk to him.

20             (A short break was taken.)

21       MR. HEUSEL:  I'm done.

22             (The deposition concluded at

23             12:30 p.m.)

Page 106

C E R T I F I C A T E

STATE OF ALABAMA    :

COUNTY OF COVINGTON:


         I do hereby certify that the above and

foregoing transcript of proceedings in the matter

aforementioned was taken down by me in machine

shorthand, and the questions and answers thereto

were reduced to writing under my personal

supervision, and that the foregoing represents a

true and correct transcript of the proceedings given

by said witness upon said hearing.


         I further certify that I am neither of

counsel nor of kin to the parties to the action, nor

am I anywise interested in the result of said cause.



                                   Dianne Phillips

                                   Court Reporter

Page 107

1                R E P O R T E R ' S   P A G E

2

3            I, Dianne Phillips, in and for the State

4    of Alabama, the officer before whom this sworn

5    testimony was taken, do hereby state on the record:

6            That due to the interaction in the

7    spontaneous of  discourse of this proceeding, dashes

8    (--) have been used to indicate pauses, changes in

9    thought, and/or talkovers; that same is the proper

10   method for a court reporter's transcription of

11   proceeding; that the dashes (--) do not indicate

12   that words or phrases have been left out of this

13   transcript and that any words and/or names which

14   would not be verified through reference material

15   have been denoted with the phrase (PHONETIC).

16

17

18

19                                 Dianne Phillips

20                                 Court Reporter

21

22

23

# CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974; See Privacy Act Statement before completing this form.

| AGENCY | | CHARGE NUMBER |
|---|---|---|
| | FEPA | |
| X | EEOC | 130-2004-02918 |

and EEOC

State or local Agency, if any

| NAME(Indicate Mr., Ms., Mrs.) | HOME TELEPHONE (Include Area Code) |
|---|---|
| RACHAEL CUMBIE | 334 826 6959 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | DATE OF BIRTH |
|---|---|---|
| 243 E. DRAKE AVE., APT. 5 | AUBURN, AL 36830 | 7/1/82 |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME (If more than one list below.)

| NAME | NUMBER OF EMPLOYEES, MEMBERS | TELEPHONE (Include Area Code) |
|---|---|---|
| RUBY TUESDAY, INC. | +500 | 334 821 6327 |

EXHIBIT

| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |
|---|---|---|
| 150 W. CHURCH AVE | MARYVILLE, TN 37801 | LEE |

| NAME | | TELEPHONE NUMBER (Include Area Code) |
|---|---|---|
| BOBBY VAUGHN | MAY 2 0 | SAME |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |
|---|---|---|
| SAME | | SAME |

CAUSE OF DISCRIMINATION BASED ON (Check appropriate box(es))

| | RACE | | COLOR | X | SEX | | RELIGION | | AGE |
|---|---|---|---|---|---|---|---|---|---|
| X | RETALIATION | | NATIONAL ORIGIN | | | | DISABILITY | | OTHER |

DATE DISCRIMINATION TOOK PLACE EARLIEST (ADEA/EPA)

MAY 15, 2004

| | CONTINUING |
|---|---|

THE PARTICULARS ARE:

I HAVE BEEN DISCRIMINATED AGAINST IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS OF 1964, AS AMENDED, BECAUSE OF MY GENDER, FEMALE. I WAS HIRED IN AT THE RESTAURANT IN BAY MINETTE, AL, AROUND JULY, 2001. I WORKED IN THAT RESTAURANT FOR SIX MONTHS AS A SERVER. AT THAT STORE, WE DIDN'T HAVE ANY TROUBLE WITH SEX HARASSMENT. THEN I WAS TRANSFERRED TO AUBURN, AL AT MY REQUEST SO THAT I COULD GO TO COLLEGE. I STARTED OUT AS A HOSTESS THERE BECAUSE I WAS NOT OLD ENOUGH TO SERVE ALCOHOL. AS SOON AS I TURNED 21, IN JULY, 2002, I BECAME A SERVER WHEN I TURNED 21. FROM THE TIME I STARTED IN AUBURN, THERE WAS A SEXUALLY CHARGED ATMOSPHERE INASMUCH AS THERE WAS A GREAT DEAL OF BUTT SLAPPING ON THE FEMALES BY THE MALE EMPLOYEES. AT FIRST, WE HAD A MANAGER NAMED TERRY ABBOTT. SHE WAS A FEMALE, AND THE HARASSMENT WAS NOT AS BAD UNDER HER. SHE LEFT AROUND NINE MONTHS AGO. AFTER THAT, BOBBY VAUGHN BECAME OUR MANAGER. HE CAME FROM A DIFERENT STORE. AFTER THAT, THE HARASSMENT BECAME INCREASINGLY MORE SEVERE. THE GUYS STARTED SLAPPING US HARDER AND HARDER. BOBBY SAW IT ALL THE TIME, AND LAUGHED, LIKE IT WAS SPORT TO SEE WHO COULD HIT US HARDER. I HAVE LEFT THE RESTAURANT WITH HANDPRINT SHAPED BRUISES ON MY BEHIND. THEN SEVERAL MONTHS AGO, A GAY GUY NAMED ZACH WAS HIRED. HE USED HIS GAYNESS AS AN EXCUSE TO REALLY HARASS ME. HE HIT ME ALL THE TIME, IN FRONT OF MANAGEMENT. I TOLD HIM REPEATEDLY TO STOP, BUT HE REFUSED. THEN HE EVEN BEGAN TO OPENLY FONDLE MY BREASTS IN FRONT OF

MANAGEMENT. THEY DID NOTHING ( )OUT IT. I COMPLAINED TO SEVERAL ( )THE MANAGERS TO PLEASE HELP ME. THEY SAID TO TAKE CARE OF IT MYSELF, THAT I AM A BIG GIRL. AT ONE POINT THEY CUT ALL MY OVERTIME HOURS THAT I HAD ALREADY WORKED SO THAT MANAGEMENT COULD GET A BONUS. THEN I CALLED THE 800 NUMBER TO COMPLAIN, AND BOBBY CUSSED ME OUT HORRIBLY, USING F**K REPEATEDLY. I FINALLY HAD TO HANG UP ON HIM. FINALLY, AFTER MY COMPLAINTS, THEY MANUFACTURED A REASON TO TERMINATE ME, AND I WAS FIRED ON MAY 15, 2004. THIS HAPPENED TO A LOT OF THE GIRLS THAT WORKED THERE.

|  | NOTARY - (When necessary for State and Local Requirements) |
|---|---|
| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or telephone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. |
| I declare under penalty of perjury that the foregoing is true and correct. | SIGNATURE OF COMPLAINANT |
| 5/18/04  *Rachael L. Cunt* | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (Day, month, and year) |
| Date          Charging Party (Signature) | 18, MAY '04 |

EEOC FORM 5 (10/94)



RECEIVED
MAY 20 2004

# RESPECT AND RESPONSIBILITY POLICY

Harassment of any type or any nature, whether based on race, gender, sex, age, religious affiliation, disability, national origin, or any other protected category, is wrong, unfair, and will not be tolerated at Ruby Tuesday, Inc. The success of our great Company is based on building great teams. The foundation of great teams is treating people as they want to be treated and showing true respect for all individuals. **Anyone who engages in harassing conduct will be subject to discipline, up to and including termination.**

Company policy prohibits unwelcome advances, propositions, requests for favors, verbal abuse of any nature, offensive jokes, flirtations, explicit or degrading verbal comments about another individual or his/her physical appearance, the display of sexually suggestive pictures or objects, any offensive or abusive physical conduct, sexually or racially explicit language or jokes, unwelcome touches or other unwelcome physical contact, whether on or off Company property, whether on or off duty, or in conjunction with work in any way. Basing employment decisions, such as scheduling, raises or promotions, on a Team Member's agreement or refusal to be subject to or tolerate offensive conduct is strictly prohibited. A Team Member's agreement or refusal to submit to or tolerate this type of conduct cannot be used as a basis for an employment decision. Any type of conduct that interferes with a Team Member's work performance or creates an intimidating, hostile or offensive work environment is a violation of Company policy.

The Company does not permit Management/Team Member dating. Dating or other personal involvement of a romantic nature between a Manager and a Team Member could lead to favoritism (or the appearance of favoritism) and morale issues. If such a situation arises, it is the responsibility of the parties involved to notify their supervisors so that the two parties no longer work in the same unit.

Each of us plays a critical role in the Company's success and is expected to project a positive and professional image. Professionalism in appearance and conduct is crucial to motivating others and promotes a positive and fair work environment.

If you see a violation of Company policy, you must promptly inform us. Communication is the key. Talk to your Manager, General Manager, Director – People, Standards, and Results, Regional Partner, Director of Human Resources, or call the Team Member Hotline, whichever is most comfortable for you. **We want and need you to speak freely without fear of retaliation, or adverse consequences for expressing your concerns.**

Team Member Hotline: 1-800-633-8483

Revised 10/09/03



"NOTHING CONTAINED IN THIS POLICY IS INTENDED TO CREATE A CONTRACT FOR EMPLOYMENT. ALL EMPLOYEES OF RUBY TUESDAY, INC. ARE EMPLOYEES AT-WILL."

## OPEN DOOR POLICY

Ruby Tuesday, Inc. maintains that Team Member concerns can be addressed through fair, honest, and consistent communication of policies and procedures for everyone. If you have concerns about your work, work environment, team, team leadership, policies or any other work related issue, please feel free to discuss them with your Supervisor. If you are not satisfied with your Supervisor's response, you may choose to discuss the matter through Human Resources or the Team Member hotline at 1-800-633-8483. At Ruby Tuesday, Inc. Team Members are free to raise concerns at any level without fear of retaliation.

Revised 08/30/04



<u>"NOTHING CONTAINED IN THIS POLICY IS INTENDED TO CREATE A CONTRACT FOR EMPLOYMENT. ALL EMPLOYEES OF RUBY TUESDAY, INC. ARE EMPLOYEES AT-WILL."</u>