# EXHIBIT 2

Deposition of:   Bobby Vaughn          9-28-2006

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

EASTERN DIVISION


RACHAEL CUMBIE,

          Plaintiff


v.                                      Civil Action No.

                                        3:05CV569-W


RUBY TUESDAY, INC.

BOBBY VAUGHN,

          Defendants


     The deposition of BOBBY VAUGHN was taken at the

offices of Sherrie V. McKenzie, 25 West Claiborne

Street, Monroeville, Alabama 36460 on the 28th day

of September 2006, commencing at approximately

1 p.m.


# ORIGINAL

Page 2

1                    A P P E A R A N C E S

2

3    For the Defendants:

4    BY:  CORNELIUS R. HEUSEL

5    JONES, WALKER, WAECTHER,

6    POITEVANT, CARRERE & DENEGRE LLP

7    201 St. Charles Avenue

8    Suite 5100

9    New Orleans, Louisiana 70170

10

11   For the Plaintiff:

12   BY:  SHERRIE V. MCKENZIE

13   LAW OFFICES OF SHERRIE V. MCKENZIE

14   25 West Claiborne Street

15   Monroeville, Alabama 36460

16

17   Also Present:  Rachael Cumbie

18

19

20

21   Dianne Phillips

22   Court Reporter

23

Deposition of:   Bobby Vaughn        9-28-2006

Page 3

1                    I N D E X

2

3    WITNESS:

4    BOBBY VAUGHN

5

6    EXAMINATION:                          PAGE:

7

8    By Ms. McKenzie                          6

9

10

11

12

13   EXHIBITS:                             PAGE

14

15   Plaintiff's Exhibit 1                    37

16        (Ruby Tuesday letter to EEOC)

17

18

19   Certificate                              41

20   Reporter's Page                          42

21   Errata Sheet                             43

22   Certificate of Witness                   44

23

Deposition of:    Bobby Vaughn                     9-28-2006

Page 4

1                    S T I P U L A T I O N

2

3        It is stipulated by and between the parties

4    hereto, through their respective counsel, that the

5    deposition of BOBBY VAUGHN be taken before Dianne

6    Phillips, Notary Public for the State at Large, at

7    the offices of Sherrie V. McKenzie, 25 West

8    Claiborne Street, Monroeville, Alabama 36460, on

9    September 28, 2006.

10

11       It is further stipulated and agreed that this

12   deposition is taken pursuant to the Federal Rules of

13   Civil Procedure.  The provisions of Rule 32(d)(3)

14   dealing with waiver of errors and irregularities as

15   to the taking of the deposition apply fully to this

16   deposition.

17

18       Notice of the deposition and any errors or

19   irregularities therein [Rule 32(d)(1)] and any

20   objections to the qualifications of the officer

21   before whom this deposition is taken [Rule 32(d)(2)]

22   are waived.

23

Deposition of:    Bobby Vaughn              9-28-2006

Page 5

1      The submission of the deposition to the witness

2  for reading to or by him and the signing of the

3  deposition by him [Rule 30(e)] is NOT WAIVED

4

5      Filing of the original of the transcript of

6  this deposition [Rule 30(f)(1)] is waived.

7

8      Any other technicality or defect in the taking

9  of this deposition not otherwise covered by the

10  terms of this stipulation is waived.

11

12              *  *  *  *  *  *

13

14      I, Dianne Phillips, Commissioner and Court

15  Reporter, certify that on this date, as provided by

16  the Federal Rules of Civil Procedure and the

17  foregoing stipulation of counsel, there came before

18  me at the offices of Sherrie V. McKenzie, 25 West

19  Claiborne Street, Monroeville, Alabama 36460, on

20  September 28, 2006, commencing at 1 p.m., BOBBY

21  VAUGHN, witness in the above cause, for oral

22  examination, whereupon the following proceedings

23  were had:

Deposition of:    Bobby Vaughn                9-28-2006

Page 6

1                          BOBBY VAUGHN

2     having been first duly sworn to tell the truth, the

3     whole truth, and nothing but the truth, was examined

4     and testified as follows:

5                          EXAMINATION

6     BY MS. MCKENZIE:

7          Q.    State your name for the record, please.

8          A.    Bobby Vaughn.

9          Q.    Is that V-A-U-G-H-N?

10         A.    That's it.

11         Q.    Okay.  Mr. Vaughn, I guess you know that

12    I'm Sherrie McKenzie and I represent the plaintiff

13    in this case, right?

14         A.    Uh-huh.

15         Q.    Have you ever given a deposition before?

16         A.    This is the first time.

17         Q.    All right.  Well, you sat in on Rachael's

18    but I'll remind you:  Let's don't talk over one

19    another because it makes it much easier for her.

20    And you're already nodding your head.  Try not to do

21    that.  Verbalize yes and no for me.  Okay?

22         A.    Okay.

23         Q.    And again as was stated earlier, let me

Deposition of:    Bobby Vaughn        9-28-2006

Page 7

1    finish my questions.  I know you'll anticipate my

2    answers on some occasions but it does make it easier

3    for her if we don't talk over each other?

4        A.    All right.

5        Q.    Where do you now live?

6        A.    I live in Opelika, Alabama.

7        Q.    What is your address there?

8        A.    1806 Bruce Avenue.  Of course, Opelika,

9    Alabama 36801.

10       Q.    Who lives there with you?

11       A.    My wife.

12       Q.    What's your wife's name?

13       A.    Claire.

14       Q.    Do have you any children?

15       A.    Yes.

16       Q.    You do have children?

17       A.    Yes.

18       Q.    How many?

19       A.    One.

20       Q.    One.  Okay.  Where are you currently

21   employed?

22       A.    Ruby Tuesday.

23       Q.    Why don't you tell me who were your

Deposition of:    Bobby Vaughn          9-28-2006

1  employers before Ruby Tuesdays?

2      A.   Wow.  Let's see I worked for Appleby's for

3  three years.

4      Q.   Okay.  Why don't I do it this way.  What

5  year did you graduate from high school?

6      A.   Oh, man, I want to say '93.

7      Q.   Okay.  What was your first job after high

8  school?

9      A.   My first job after high school I believe

10  was Appleby's.

11      Q.   Okay.  Do you remember when you were hired

12  by Appleby's?

13      A.   Oh, God, no.  I guess it would have to be

14  '93.  Because it was -- let me think -- right after

15  high school.  I've been with Ruby Tuesday's for 10

16  years so everything before that is kind of a blur.

17      Q.   All right.  That's a good starting point.

18  That would be that you began with Ruby Tuesday's in

19  '96.  Does that sound right?

20      A.   That sounds about right.  December 14, I

21  think, is my 10 year anniversary.

22      Q.   Okay.  Where did you go to high school?

23      A.   Kendrick High School, Columbus, Georgia.

Page 9

1     Q.    Okay.  Where was the Appleby's where you

2  were first hired?

3     A.    In Columbus, Georgia.

4     Q.    In Columbus.  Okay.  How long did you work

5  for them?

6     A.    Three to four years.

7     Q.    Okay.  If you started in say '93 and you

8  began with the Ruby Tuesday's on December 14 of '96,

9  did you work for Appleby's continuously from that

10  point to when you began at Ruby Tuesday's?

11     A.    No.

12     Q.    Okay.

13     A.    There was -- I actually worked for my

14  cousin, who owned his own construction company.  So

15  I actually did some construction work after

16  Appleby's and before Ruby's.

17     Q.    You decided you didn't like that very

18  much?

19     A.    Well, actually, I loved construction.  I

20  hated the cold weather.  That's the only reason I

21  went back in the restaurant business at all.

22     Q.    Do you have any college training?

23     A.    I have about a year.

Deposition of:   Bobby Vaughn                9-28-2006

Page 10

1      Q.    Okay.  What areas?

2      A.    Well, my major was going to be electronic

3   engineering.  I was actually in college when I was

4   working for Appleby's and actually when I first

5   started with Ruby's.

6      Q.    What position did you hold at Appleby's?

7      A.    I was a cook there.

8      Q.    Were you ever anything else?

9      A.    No.  Well, shift leader, you know, I did a

10  bunch of training and stuff for them.

11     Q.    What were you when you left?

12     A.    Same thing shift leader, cook.

13     Q.    When you -- Okay.  I understand that

14  there's a shift leader for the cooks.  Is that what

15  you were?

16     A.    Correct.

17     Q.    All right.  What kind of training did you

18  receive at Appleby's?

19     A.    As far as when I first started?

20     Q.    Yeah.  Why don't you just describe for me

21  what they did?

22     A.    Well, when that store opened, I actually

23  started when they opened.  They had trainers come

Deposition of:    Bobby Vaughn        9-28-2006

Page 11

1    from other units that trained the people in the

2    front of the house and in back of the house.  Which

3    is -- the back of house is the kitchen.  So you got

4    basically five days of training and then after that

5    point you were on your own.  And as far as becoming

6    a trainer, that's just something you earned as you

7    go along.

8        Q.    You were hired in as a cook; is that

9    right?

10       A.    Yes.

11       Q.    Was it a new store?

12       A.    Yes.

13       Q.    Okay.  Were you hired by a manager?

14       A.    Yes.

15       Q.    Do you remember that person's name?

16       A.    No.  I can tell you that my general

17   manager for most of my duration there his name was

18   Dennis Butterfield.

19       Q.    Okay.  Is he still there?  Do you know?

20       A.    No.  He's not.  He actually owns a

21   restaurant in Columbus.  It's called Butterfingers.

22   So he owns his own restaurant now in that area.

23       Q.    Okay.  Why did you leave Appleby's?

Deposition of:   Bobby Vaughn          9-28-2006

Page 12

1     A.    Well, at that time I decided I'd really

2   had enough of the restaurant business to be honest

3   with you.  I wasn't fired.  I left on my own free

4   will.

5     Q.    What shift did you work?

6     A.    Both.  Just whenever.  You know, I worked

7   nights sometimes, days other times, sometimes both.

8     Q.    Okay.  So you left Appleby's and then you

9   went to work for your cousin in the construction

10  business?

11    A.    Yes.

12    Q.    What was the cousin's name?

13    A.    Phil -- let me think.  He's a distant

14  cousin.  I know his name is Philip.

15    Q.    Do you remember the name of the

16  construction company?

17    A.    I don't think it really had a name to be

18  honest with you.  It's just one of those things

19  where, you know, he got -- he had a general

20  contractor that subcontracted the jobs out to him.

21  So it was basically a family business, I mean,

22  everybody that worked for him was family.

23    Q.    I understand.  And why did you leave Phil?

Deposition of:    Bobby Vaughn        9-28-2006

Page 13

1    You didn't like the cold whether?

2        A.    That was basically the only reason.    And

3    work was getting low.    I had a friend that actually

4    worked at Appleby's as a bartender who become a

5    manager for Ruby Tuesday and talked about how much

6    he liked it.

7        Q.    Who was that person?

8        A.    That's another good question.    I know his

9    name's Jake.    Anything else I couldn't tell you.

10        Q.    Jake recommended Appleby's, I mean Ruby

11    Tuesday's?

12        A.    Ruby's.

13        Q.    Okay.    And at what location did he work?

14        A.    He worked at the one in Columbus Square

15    Mall, not Columbus Square Mall, sorry.    Peach Tree

16    Mall.    There's two malls in Columbus.

17        Q.    There's more than one Ruby's in Columbus?

18        A.    There is now.    There wasn't back then.

19        Q.    All right.    So did you go and apply at

20    Ruby's or what?

21        A.    Yes.

22        Q.    Which one did you apply at?

23        A.    At the one in the mall.

Deposition of:    Bobby Vaughn            9-28-2006

Page 14

1       Q.    Do you remember what position you applied

2   for?

3       A.    Cook.

4       Q.    Okay.  What were you hired in as?

5       A.    Cook.

6       Q.    Now, succinctly, tell me about you're

7   progression of employment with Ruby's.  Okay?

8       A.    Okay.  The first three and a half four

9   years I was, you know, basically I was a cook but

10  then I became a shift leader and then, of course, I

11  learned the whole front of the house.  So I knew

12  every position in the restaurant basically, plus, I

13  was a shift leader on top of it.  So I could run

14  shifts.

15      Q.    You became a shift leader as a cook first?

16      A.    Correct.

17      Q.    All right.  When did you progress to being

18  a shift leader in the front?

19      A.    That didn't happen until I went into

20  management.

21      Q.    Okay.  After you became the shift leader

22  as a cook, what was your next position?

23      A.    Back then they had the star program.

Deposition of:    Bobby Vaughn          9-28-2006

Page 15

1    Which once you get to four star level, you can run

2    shifts in the area you work in.  So I was

3    basically -- could run shifts in the kitchen after

4    about two and a half years with the company.  I'm

5    sorry, what else did you need out of that.

6         Q.    Well, let me reask you the question?

7         A.    Okay.

8         Q.    After you -- your answer to the question

9    was:  After you become the shift leader for the cook

10   -- for the back.  When was the first job you had

11   after that that was up front?

12        A.    Oh, any job up front?

13        Q.    Yeah.  I'm just trying to get a timeline

14   here?

15        A.    Okay.  Let's see, I started working out

16   front, I guess, it would be two and a half years

17   after I started with the company.

18        Q.    Okay.  And what was the first position

19   that you held up front?

20        A.    First position was serving.

21        Q.    Okay.  Then what?

22        A.    Then I worked the hostess position.

23        Q.    Okay.

Deposition of:   Bobby Vaughn        9-28-2006

Page 16

1      A.    Or host.

2      Q.    You might have been a host.

3      A.    Yeah.

4      Q.    And after becoming a host, did you then

5   learn how to be a shift leader up front?

6      A.    No.  I just had to learn all the positions

7   up front to move to the next level.

8      Q.    All right.  Then what is the next level?

9      A.    Next level was an assistant manager.

10      Q.    Okay.  And what does the assistant manager

11   do?

12      A.    The assistant manager is basically in

13   charge of one of a couple of areas.  Me, when I

14   first started because I had the kitchen knowledge,

15   when I first become an assistant manager, they put

16   me in charge of the kitchen.

17      Q.    Okay.  And when did you finally move up to

18   becoming a manager?

19      A.    I was a manager at that time.

20      Q.    I mean the general manager?

21      A.    Oh, that was about two and a half years

22   ago.

23      Q.    Okay.  All right.  So that puts us around

Deposition of:    Bobby Vaughn              9-28-2006

Page 17

1    the beginning of '04; is that right?

2        A.    No.    Not as general manager.    Yeah.    That

3    would be right.

4        Q.    So your first job as general manager would

5    have been at the Opelika Ruby's; is that right?

6        A.    Correct.

7        Q.    And did you move from the Columbus Ruby's

8    to the Opelika Ruby's to become the general manager?

9        A.    No.

10       Q.    All right.    Tell me how that happened?

11       A.    All right.    Once when I -- when I first

12   got promoted, I was an assistant manager in the

13   Auburn store.

14       Q.    Okay.

15       A.    I worked there for about two years and

16   then I got transferred to La Grange, Georgia.    I

17   worked there for about another two years and then I

18   came back as the general manager of the Ruby

19   Tuesday's on Opelika Road.

20       Q.    Okay.    So you went from Columbus to Auburn

21   to La Grange and back to Opelika as the general

22   manager?

23       A.    Right.

Page 18

1      Q.    All right.  Gotcha.  Now, when you were

2  first hired in as a cook at Ruby's, tell me about

3  any EEO training you got?

4      A.    What do you mean by EO?

5      Q.    EEO.  Equal Employment Opportunity.

6      A.    Equal Employment Opportunity.  Well, I

7  mean, in every orientation that you have when you

8  first start with Ruby Tuesday, they go through all

9  of that stuff as far as your EEOC and all of that

10  stuff in your orientation.  So basically your first

11  day with Ruby Tuesday there's video tapes, there's

12  paperwork that you fill out.  I mean from the very

13  first day went through all that.

14      Q.    What were you told as just an employee

15  now, not a manager, if you can recall, with regard

16  to sex harassment and what the policy on sex

17  harassment was?

18      A.    The policy -- the best way I can describe

19  that the video said was that, basically, if you feel

20  like you are being sexually harassed, that you need

21  to let a member of management know.  I think the

22  video is close to exactly the same as it is now.

23  You need to let a member of management know.  If you

Deposition of:    Bobby Vaughn        9-28-2006

Page 19

1  are not comfortable telling a member of management,

2  you need to inform somebody that was higher up.  And

3  they always did the same thing.  They gave the 1-800

4  number.  And also it wasn't a video just about

5  sexual harassment so much as it was a video about

6  all types of harassment.

7      Q.    And probably about race discrimination and

8  discrimination on the basis of religion or

9  disability or national origin or pregnancy or

10  anything that fits under Title 7; is that right?

11      A.    Yes.

12      Q.    Okay.  And you said that as far as you can

13  recall the policy has not changed very much since

14  the time that you began working for Ruby's; is that

15  right?

16      A.    Correct.

17      Q.    How often did you get a physical copy of

18  that document?

19      A.    When I first started, of course, you fill

20  it out and you sign the paperwork saying that you've

21  seen the video.  And then once every six months the

22  team members they got in a whole employee meeting

23  together and then you had to watch a sexual

Deposition of:   Bobby Vaughn        9-28-2006

Page 20

1   harassment video together everybody as a whole unit.

2        Q.   Okay.  Did somebody come from another

3   office and conduct that meeting or was it the

4   responsibility of the team leaders to do that?

5        A.   It was the responsibility of the general

6   manager to do that.

7        Q.   Okay.  All right.  Tell me who the team

8   leaders are?

9        A.   Team leaders as far as?

10       Q.   The team members.

11       A.   Team members are anybody that is employed

12   by that restaurant.

13       Q.   Okay.  All right.  I'm going to show you

14   what was marked as Defendant's Exhibit 2 in

15   Ms. Cumbie's deposition and ask you if you've seen

16   that before?

17       A.   Have I seen this before?  Yes.

18       Q.   Okay.  How many times?

19       A.   Honestly I see it about once a week.

20       Q.   Where do you see it?

21       A.   In orientation that I do now.

22       Q.   Okay.  Is it posted anywhere physically in

23   the building?

1    A.   No.  Not right now.  No.

2    Q.   Has it ever been?

3    A.   No.

4    Q.   Is there a big poster anywhere like in the

5    kitchen or in abreak area that says equal employment

6    opportunity and it has a number to call and stuff to

7    do if you feel like you're being harassed?

8    A.   Yes.

9    Q.   Okay.  Where is that?

10   A.   It's located in several areas.  Kitchen

11   door heading out of the kitchen.  I think there's

12   one on the office door.  I just moved the schedule.

13   There was one by the schedule box but there isn't

14   now.

15   Q.   Okay.  Is this team member hotline the

16   phone number that's located on that poster?

17   A.   Yes.

18   Q.   Okay.  Now, look at the last paragraph.

19   Where it says, "If you see a violation of company

20   policy, you must promptly inform us.  Communication

21   is the key."  And then it says, "Talk to your

22   manager at the Ruby's location."  That would be you?

23   A.   Correct.

Page 22

1      Q.    Well, then it says general manager.  So

2   manager might be -- that confuses me.  Explain it to

3   me.

4      A.    That's the assistant managers.  Those are

5   the guys that work directly -- or girls -- that work

6   under me.

7      Q.    Does that include shift leaders?

8      A.    They're hourly team members.  They're

9   considered hourly team members that can work manager

10  functions.

11     Q.    Okay.  Then you got general manager which

12  is?

13     A.    Which is the person that runs the unit.

14     Q.    I mean that is?

15     A.    Me.

16     Q.    You.  Okay.  Who's the director?  Well,

17  let's get this right.  There's director dash people

18  standards and results.  Can you explain that for me?

19     A.    They are called DPSR's and that's what

20  that stands for.  Director of Peoples, Standards and

21  Results but basically they are director of

22  operations.

23     Q.    Where are they?

Deposition of:    Bobby Vaughn        9-28-2006

Page 23

1        A.    What do you mean where are they?

2        Q.    Well, it's not clear to me from this

3   policy who those people are and how you get in touch

4   with them?

5        A.    They basically are multi-unit partners.

6   So they run more than one unit.  The general manager

7   is the overall say so in each unit.  But then our

8   boss is the director of operations.

9        Q.    Okay.  Then you've got regional partner.

10  Who is that?

11       A.    That's his boss.

12       Q.    Do you know where that person is located?

13       A.    Do I know where he is?

14       Q.    Yeah.

15       A.    A phone call away.  But he's over about 40

16  units.

17       Q.    Well, that's not a tricky question.  I

18  probably should have asked this earlier.  Do you

19  know how many Ruby's there are?

20       A.    In my district?

21       Q.    No.

22       A.    Overall?

23       Q.    Yeah.

Deposition of:   Bobby Vaughn          9-28-2006

Page 24

1       A.    700 and something.

2       Q.    Are they all owned by the same

3  corporation, as far as you know, or are there

4  franchises?

5       A.    There are some franchise units.

6       Q.    Okay.  Do you know where the home office

7  is?

8       A.    Yeah.

9       Q.    Where is it?

10      A.    Maryville, Tennessee.

11      Q.    Okay.  And then you've got the direct --

12  the DHR director for the entire corporation.  Is

13  that the next person?

14      A.    Above that is regional VP.

15      Q.    Well, regional partner and then after that

16  it says director of human resources?

17      A.    Then you have -- a director of human

18  resources is a -- well, that's a human resource

19  department.  That's kind of a different area.

20      Q.    Okay.  Or call the team member hot line,

21  right?

22      A.    Yes.

23      Q.    And then it says, "Whichever is most

Deposition of:    Bobby Vaughn        9-28-2006

Page 25

1    comfortable for you."  Is that right?

2        A.    Correct.

3        Q.    So would you have assumed as a manager

4    that when this is given to an employee they're given

5    lee way to use whichever one of these things is most

6    comfortable for them if they feel they are being

7    sexually harassed.

8        A.    Correct.

9        Q.    Okay.  Were you given a different policy

10   from this policy when you become a manager regarding

11   sex harassment?

12       A.    Actually, yeah.  Now that you mention it.

13   It's been a while but the sexual harassment policy

14   is basically this and it also goes into -- and it

15   also even talks about it on the video.  So the video

16   is actually -- I think it kind of hits on both ends.

17   It basically tells you as a manager that you

18   shouldn't obviously engage in, you know, things

19   with team members and what not.

20       Q.    Okay.  Did it tell you as a manager what

21   your responsibility was if you saw somebody engaging

22   in what you thought to be inappropriate conduct?

23       A.    Absolutely.

Deposition of:   Bobby Vaughn          9-28-2006

Page 26

1      Q.    And what did it tell you to do?

2      A.    Well, it depends on the situation to be

3   completely honest with you.  In a situation where a

4   team member comes to me and let's me know that

5   they're uncomfortable with something.

6      Q.    Uh-huh.

7      A.    Obviously it's my job to make sure that

8   that doesn't happen again.

9      Q.    Uh-huh.

10      A.    So it's my job to talk to that team

11   member --

12      Q.    Uh-huh.

13      A.    -- and make sure that it doesn't happen

14   again.  And, of course, if it does happen again,

15   it's usually termination.

16      Q.    Okay.  So are you telling me that you were

17   given discretion to decide whether or not you felt

18   there was something that you needed to take action

19   about.  Or was there a strict liability policy with

20   regard to this conduct?

21      A.    If there is, I don't remember.  But I

22   believe most of it is manager's discretion.

23      Q.    Okay?

Deposition of:    Bobby Vaughn        9-28-2006

Page 27

1       A.    Because I mean it's such a wide subject,

2  you know.

3       Q.    All right.  I'm going to show you what I'm

4  marking as Plaintiff's Exhibit 1, Mr. Vaughn, and

5  ask have you ever seen that?  And you may want to

6  take a couple of minutes to glance through it.

7                    (Plaintiff's Exhibit No. 1 was marked

8                     for identification.)

9       A.    I don't think I've actually read this.

10  This is the first time.

11  BY MS. MCKENZIE

12       Q.    Well, let's talk about that for a second,

13  Mr. Vaughn.  When did you --

14            MR. HEUSEL:  Excuse me just a second.

15            MS. MCKENZIE:  Oh, I'm sorry.

16            MR. HEUSEL:  It's a three page document

17  and you read the first and last page, I think.

18  Didn't you?

19            THE WITNESS:  Yeah.  I think I did.

20            MS. MCKENZIE:  Oh, she got --

21            MR. HEUSEL:  Yeah.  Mine was out of order.

22            THE WITNESS:  Okay.  That's what it is.

23            MR. HEUSEL:  Yeah.  Put it in order.

Deposition of:   Bobby Vaughn           9-28-2006

Page 28

1          MS. MCKENZIE:   Okay.   What was my last

2    question.   Asked him to look at it?

3       A.    Yeah.

4    BY MS. MCKENZIE:

5       Q.    You told me that this is, you believe, is

6    the first time that you've seen this document which

7    is the statement made by Ruby's Leslie Logan, staff

8    attorney to the EEOC; is that correct?

9       A.    Uh-huh.

10      Q.    Say yes --

11      A.    Yes.

12      Q.    I'm not telling you what to say but you

13   were nodding your head.   So she can get it down.

14   When did you first learn that a charge of

15   discrimination had been filed?

16      A.    I would say it was probably a week after

17   Rachael's termination.   I believe that's correct.

18      Q.    Were you told to do any type of

19   investigation regarding the charge that she had

20   filed?

21      A.    I wasn't asked to form an investigation.

22   Basically, I was asked for names of people that may

23   have worked during that time.   People that were --

Deposition of:   Bobby Vaughn          9-28-2006

Page 29

1    may have seen something but not a formal

2    investigation.

3        Q.    Did you talk to anybody about the -- did

4    you see the charge?

5        A.    Well, the charge was, as far as I can

6    tell, that, of course, he was charged for slapping

7    her on the but and fondling her breasts is what it

8    looks like to me.

9        Q.    Okay.  That was a poorly worded question.

10   When, if ever, have you read her charge?

11       A.    It was sent to me in the mail.

12       Q.    Okay.  At Ruby Tuesday's or by Ruby

13   Tuesday's?

14       A.    I think it was at Ruby Tuesday.

15       Q.    Okay.

16       A.    Yeah.

17       Q.    And so then again I didn't understand the

18   answer to my question.  Did you talk to any of the

19   other employees regarding the charges that were made

20   in the charge.  The allegations that were made in

21   the charge?

22       A.    Well, if I can remember it correctly, I

23   believe I got something in the mail once.  I ended

Deposition of:    Bobby Vaughn                    9-28-2006

Page 30

1    up getting something in the mail twice and I think

2    it was from two different places.  Of course I did

3    ask questions.  I didn't find out that much to be

4    completely honest with you.

5         Q.    Did you get any statements?

6         A.    Well, yeah.  I got a few statements and

7    most of the statements that I got were, basically,

8    statements of about that they all did it to each

9    other and that's basically what I got.

10        Q.    Were they written statements?

11        A.    No.

12        Q.    They were just oral statements?

13        A.    Yeah.  They were just me trying to find

14   out, basically, what happened here.

15        Q.    Okay.  Did you get any written statements

16   other than something an attorney may have gotten?

17        A.    No.

18        Q.    Okay.  You didn't turn anything of that

19   nature in to a lawyer for Ruby's?

20        A.    No.  I've got a couple of phone calls from

21   Ruby's asking me questions personally.

22        Q.    I don't want to know what they asked you.

23        A.    But that's it.

Deposition of:   Bobby Vaughn        9-28-2006

Page 31

1      Q.    All right.  If you'll look on the second

2   page of this, you indicated to me just a moment ago,

3   I believe, that some of the people that you talked

4   to did say that there was this but slapping practice

5   going on?

6      A.    Correct.

7      Q.    Okay.  And you heard Ms. Cumbie tell us

8   that it got out of control in her opinion.  Did you

9   remember that?

10      A.    Reask the question.

11      Q.    Okay.  She tearfully reiterated a story in

12   which it got out of control --

13      A.    Today?

14      Q.    Yes, today.  And you heard that?

15      A.    Yes.

16      Q.    Right?

17      A.    Yes.

18      Q.    She also testified that she saw you see

19   Zach touch her breast?

20      A.    I do not recall that.  I honestly do not

21   recall that.

22      Q.    Okay.  If you had seen that, would you

23   have thought it was mandatory for you to report that

1    as sex harassment?

2        A.    I don't know so much as report it as at

3    least do something about it myself.

4        Q.    Okay.  What about the but slapping?  Did

5    you not consider that that was something that you

6    needed to tend to?

7        A.    I will be completely honest with you.  As

8    a general manager of a restaurant, there's a lot

9    that you don't see.  I can't say that I haven't seen

10   one of my cooks slap another cook on the but.  But

11   they're both male.  But as bad as the but slapping

12   thing has been made to sound, I didn't see that much

13   of that going on as the general manager.  Now, I

14   can't speak for anybody but myself.

15       Q.    Would you have expected your shift leaders

16   or your assistant managers to tell you if they saw

17   it?

18       A.    Yes.

19       Q.    Did you ever have an occasion to counsel

20   Zach about his behavior?

21       A.    Yes.

22       Q.    And what did you do?

23       A.    Rachael came to me and told me what had

Page 33

1    happened and she basically told me --

2        Q.    Wait.  Wait.  Wait.  I'm going to stop

3    you.  When did she come to you and talk to you?  Do

4    you recall?

5        A.    Time of day or --

6        Q.    No.  Month.  You know, time of year?

7        A.    Oh, I would honestly say it was probably

8    about a week or two before her termination.

9        Q.    Okay.  All right.  What did she tell you?

10       A.    She told me that Zach was making her feel

11   uncomfortable.

12       Q.    Uh-huh.

13       A.    And I asked her why and, of course,

14   everything that's in here that she alleges is what

15   she told me.

16       Q.    She told you about this but slapping?

17       A.    And --

18       Q.    And the breast grabbing?

19       A.    Yes.

20       Q.    Okay.

21       A.    And I told her at that point that I would

22   take care of it.

23       Q.    Okay.

Deposition of:    Bobby Vaughn        9-28-2006

Page 34

1      A.    And the very next time that I saw Zach.  I

2  sat him down.

3      Q.    Okay.

4      A.    And I basically told him that because he

5  is gay that it doesn't give him a reason to be able

6  to push the envelope more than anybody else.  I

7  said, you know, you're still a man and you're going

8  to make people feel uncomfortable if you act that

9  way.  So would you please stop it.  Basically.  So

10 at that point, I don't know maybe a day later, I saw

11 Rachael and I told her that I'd had a talk with him

12 and if any other occurrences happened to please let

13 me know and that was it.

14     Q.    Okay.  Tell me what you remember about her

15 termination?

16     A.    From beginning to end, I guess?

17     Q.    Did somebody tell you that she'd been

18 drinking behind the bar?

19     A.    Yes.

20     Q.    Who?

21     A.    I guess I can say now.  It was Zach.

22     Q.    Okay.  And you believed him?

23     A.    Well, I didn't necessary believe him.  See

Page 35

1    the thing is the way you handle it as a manager.  If

2    you get a bit of information, you actually want to

3    go to the person and ask them personally and that's

4    when me and Rachael were in the office together.

5         Q.    Okay.  Tell me what you remember about

6    that conversation?

7         A.    With me and Rachael?

8         Q.    Yes.

9         A.    It was me and one of my assistant managers

10   in the office and that was Kathy.  And, basically, I

11   believe Rachael was off that day.  She just happened

12   to come in.  I had just gotten the information a

13   short time before that.  So I asked her, you know,

14   if she wouldn't mind coming in the office.  I needed

15   to talk to her about something.  And I, basically,

16   asked her directly, you know, were you drinking

17   behind the bar on your last shift.

18        Q.    Uh-huh.

19        A.    She said yes.  And then at that point I

20   believe I said, "Well, Rachael, you do understand at

21   this point that there's nothing I can do.  I mean at

22   this point I have to terminate you.  Especially

23   since other people know about it.  I mean I can't

Page 36

1    let somebody work here -- other people knowing that

2    you were drinking behind the bar and let it go.

3    Because that's just a bad example."

4         Q.   Uh-huh.

5         A.   Okay.  And I'll be honest with you.  At

6    that point Rachael got upset.

7         Q.   Uh-huh.

8         A.   I know -- there was a few strange things

9    that went on that night.  Will, which was her

10   boyfriend at the time, came in the office, was

11   asking for her file.  And all kinds of strange

12   stuff.  I don't know exactly what was going on out

13   front but I, basically, asked him to take Rachael

14   out of the restaurant because she was a little irate

15   at the time.  She was upset.  Which understandably

16   so, if you get terminated, you're going to be upset.

17        Q.   Go ahead.

18        A.   And that's basically it.

19        Q.   Well, then I know you know what my next

20   question is going to be.

21        A.   I don't.

22             MR. HEUSEL:  Objection.  I don't know.

23   Why would he know?

Deposition of:    Bobby Vaughn            9-28-2006

Page 37

1           (Plaintiff's Exhibit No. 1 was

2           marked for identicaiton.)

3       Q.    Okay.  Did you consider Ruby's policy on

4   drinking after work to be much more strict than that

5   on sex harassment?

6       A.    Well, what I think is that sexual

7   harassment is a wide subject.  There's a lot to it.

8   Drinking after work, you know, it's pretty cut and

9   dry.  You just don't drink at work on the clock.

10  You just don't do it.

11      Q.    Okay.

12      A.    Sexual harassment.  I mean it gets --

13  there's different types of harassment.

14      Q.    All right.  Well, let me ask you this,

15  then.  Okay?  You told me that a while ago that

16  after Rachael told you that Zach had hit her on the

17  but and grabbed her breasts, long as it didn't

18  happen again Zach still had his job, right?

19      A.    The conversation that I had with him --

20      Q.    Answer my question.  Zach still had his

21  job, right?

22      A.    Unless he did it again, yes.

23      Q.    All right.  Rachael drank on the job.

1  Didn't matter if it happened again.  She was

2  terminated; is that right?

3      A.    Yes.

4      Q.    Okay.  We'll take a break.

5              (A short break was taken.)

6  BY MS. MCKENZIE:

7      Q.    Had you heard before about -- well, let me

8  ask it this way.  Had you seen the guys popping the

9  towels?

10     A.    I have.

11     Q.    You have?

12     A.    Actually when she brought it up I

13  remembered.  Because what they used to do is pop the

14  boxes to see who could like put a hole in it, you

15  know.

16     Q.    Right.  Because they have metal things on

17  the end of them?

18     A.    Well, I didn't know about that.

19     Q.    Okay.

20     A.    Yeah.

21     Q.    Did you know that Chad had done that to

22  her.

23     A.    I didn't.  That was the first I had heard

Deposition of:    Bobby Vaughn        9-28-2006

Page 39

1    of it when she said that today.

2        Q.    Okay.  Do you know where Zach is now?

3        A.    Maybe.  Last I heard he was in Texas.

4        Q.    Where in Texas?

5        A.    I don't know.

6        Q.    Is he from Texas?

7        A.    I think his family is from there.

8        Q.    Do you have an address or a phone number

9    on him?

10        A.    No.  I mean he's just an ex-employee.

11        Q.    Have you talked with him about the

12    allegations in the charge at all?

13        A.    Let me think.  Because I have seen him one

14    time.  He was back in Auburn.  It's possible.  I

15    mean, and if it was, it was a while ago.  I'm not

16    going to say yes.  I'm not going to say no.  But I

17    saw him at a bar in Auburn a long time ago.  Like

18    maybe -- maybe six eight months ago.  And he was

19    just in town for a little while with one of his

20    friends.

21        Q.    Okay.  I guess -- from what I can gather

22    from the testimony that I've heard, he made it

23    pretty well known that he was gay; is that right?

Deposition of:   Bobby Vaughn        9-28-2006

Page 40

1    A.    Yes.

2    Q.    Did he come across, in your opinion, as

3   thinking, you know, he could be a little more

4   forward with women because ostensibly he didn't like

5   women?

6         MR. HEUSEL:   Object to the form.   You can

7   answer it if you can?

8    A.    I don't know.

9    Q.    Like maybe he could act like one of the

10  girls?

11   A.    Yeah.  Yeah.  Yeah.

12   Q.    How long had you been there as manager

13  before you began to observe the but slapping stuff

14  that was going on?

15   A.    Like I said I saw it a couple of times.

16   Q.    Okay.

17   A.    And I mean I can't give a date on that to

18  be honest with you.  I really can't.  If I could I

19  would.

20   Q.    That's fine.  That's it.

21         MR. HEUSEL:   That's all I have.

22              (The deposition concluded at

23              1:50 p.m.)

Page 41

C E R T I F I C A T E

STATE OF ALABAMA    :

COUNTY OF COVINGTON:


        I do hereby certify that the above and

foregoing transcript of proceedings in the matter

aforementioned was taken down by me in machine

shorthand, and the questions and answers thereto

were reduced to writing under my personal

supervision, and that the foregoing represents a

true and correct transcript of the proceedings given

by said witness upon said hearing.


        I further certify that I am neither of

counsel nor of kin to the parties to the action, nor

am I anywise interested in the result of said cause.


                                    *Dianne Phillips*
                                    Dianne Phillips

                                    Court Reporter

Deposition of:   Bobby Vaughn          9-28-2006

Page 42

1                 R E P O R T E R ' S   P A G E

2

3          I, Dianne Phillips, in and for the State

4   of Alabama, the officer before whom this sworn

5   testimony was taken, do hereby state on the record:

6          That due to the interaction in the

7   spontaneous of  discourse of this proceeding, dashes

8   (--) have been used to indicate pauses, changes in

9   thought, and/or talkovers; that same is the proper

10   method for a court reporter's transcription of

11   proceeding; that the dashes (--) do not indicate

12   that words or phrases have been left out of this

13   transcript and that any words and/or names which

14   would not be verified through reference material

15   have been denoted with the phrase (PHONETIC).

16

17

18

19                                 Dianne Phillips

20                                 Court Reporter

21

22

23

Deposition of:   Bobby Vaughn          9-28-2006

Page 43

1                    E R R A T A   S H E E T

2

3        I, Bobby Vaughn, the witness herein, have read

4    the transcript of my testimony and the same is true

5    and correct, to the best of my knowledge, with the

6    exception of the following changes noted below, if

7    any:

8    Page/Line                Change                Reason

9

10

11

12

13

14

15

16

17

18   Sworn to and subscribed before me, this the

19   day of            ,2006.

20

21                        Notary Public

22                        My Commission Expires:

23

Page 44

1              CERTIFICATE OF WITNESS

2

3        I, Bobby Vaughn, do hereby certify that on

4   this, the      day of          , 2006, I have read

5   the foregoing transcript and to the best of my

6   knowledge it constitutes a true and accurate

7   transcript of my testimony taken on oral deposition

8   on            ,2006.

9

10

11  Bobby Vaughn

12

13       Subscribed and sworn to before me on this, the

14  day of          , 2006.

15

16

17  Notary Public

18  State of

19  My Commission Expires:

20

21

22

23





PLAINTIFF'S DEPOSITION
EXHIBIT

_____

July 2, 2004

Eddie D. Abdulhaqq, Enforcement Supervisor
US Equal Employment Opportunity Commission
Birmingham District Office
Ridge Park Place
1130 22nd Street South
Birmingham, Alabama 35205

Re:    Charging Party:      Rachael Cumbie
       EEOC Charge No.:     130-2004-02918
       Respondent:          Ruby Tuesday, Inc.  (the "Company")
                            Ruby Tuesday 3945
                            1627-31 Opelika Road
                            Auburn, Alabama 36830

Dear Investigator Abdulhaqq:

Ruby Tuesday, Inc. submits the following position statement in response to the charge of discrimination filed by Rachel Cumbie alleging retaliation and sex discrimination.  The Company has investigated the allegations raised in the charge and has been unable to substantiate that Complainant was subjected to retaliation or discrimination on the basis of sex.  Consequently, the Company denies the claim of discrimination and maintains that Complainant was terminated for violation of company policy.

The Company has a long-standing policy of recognizing the essential rights of all applicants and employees as individuals and of recruiting, hiring, promoting, and retaining the best qualified person(s) to do a particular job without regard to race, color, religion, sex, age, physical handicap or national origin.  This policy is included in the

Company's application for employment and posted in the unit in which Complainant was employed. A copy of Company's application for employment is attached hereto as Exhibit A and is incorporated by reference herein.

With regard to the specific allegations in the Charge of Discrimination, the Company responds as follows:

The Company denies the Complainant has been discriminated against in violation of Title VII of the Civil Rights Act of 1964, as amended, because of her sex.

The Company admits that the Complainant was initially hired at the Bay Minnette, Alabama unit on or about July, 2001. The Company further admits that, upon her request, Complainant was transferred approximately six months following her employment to the Auburn, Alabama unit. The Company admits that Complainant eventually worked as a server at this unit.

The Company denies Complainant's allegations that the atmosphere in the Auburn, Alabama restaurant was sexually charged. More specially, the Company denies that male employees in the unit had a pattern and practice of "butt slapping" female employees. Based upon its investigation, the Company has been unable to find evidence which would substantiate this claim.

The Company admits that Complainant initially worked under General Manager Terry Abbot and that Ms. Abbot is a female. Again, the Company denies that any sexual harassment occurred under General Manager Abbot's management. Additionally, while the Company admits that General Manager Bobby Vaughn later assumed the responsibility of the restaurant, the Company denies that any alleged sexual harassment worsened following this personnel move. The Company investigation into this matter failed to reveal any information which would support Complainant's allegations that male employees constantly slapped female employees under General Manager Vaughn's management.

The Company admits that during Complainant's employment, a male server named Zach Taylor was hired. While the Company admits that, based upon information and belief, Mr. Taylor is homosexual, it denies that Mr. Taylor was allowed to use his sexual orientation as an excuse to sexually harass Complainant. The Company adamantly denies Complainant's allegation that Mr. Taylor "hit [her] all the time." Based upon its investigation, the Company has uncovered one instance in which Mr. Taylor did in fact slap the Complainant on her rear end. All witnesses to this incident, however, indicate that this was done in a playful manner. In addition, all witnesses who were interviewed by the Company indicate that Complainant was far from an unwilling participant in this incident and at, on at least one prior occasion, Complainant had herself slapped Mr. Taylor on his rear end. The Company has been unable to find any evidence that Complainant ever asked Mr. Taylor to stop this behavior or in any other way indicated that it was unwelcome. The Company adamantly denies that Mr. Taylor ever openly

fondled Complainant's breasts in front of management. This allegation is simply without corroboration.

The Company similarly denies Complainant's allegations that management took no action to stop the problem behavior in the unit. General Manager Vaughn, upon becoming aware of Mr. Taylor's action toward Complainant, held a verbal counseling session with Mr. Taylor in which Company standards regarding Respect and Responsibility were explained and Mr. Taylor was told to refrain from such activity in the future. The Company denies that anyone in management ever told Complainant that she would be required to deal with this issue herself.

The Company denies that management staff members cut Complainant's hours in order to receive a bonus. The Company similarly denies that Complainant ever called its 1-800 Team Member Hotline. The Company has thoroughly reviewed these records and has found no record of a call from Rachael Cumbie or of an anonymous call from House Code 3945. The Company denies, based upon its investigation, that General Manager Vaughn ever cursed at Complainant in retaliation for her alleged complaints.

The Company adamantly denies that Complainant's termination was in any way related to her alleged complaints regarding sexual harassment. Based upon its investigation, the Company submits that Complainant was terminated for drinking while on the clock. This is a clear violation of company policy and a terminable offense. The Company admits that, for this behavior, Complainant was terminated on or about May 28, 2004.

The Company denies Complainant's blanket assertion that "this" happened to other female employees in the restaurant.

The Company admits no other allegations raised in the charge of discrimination not specifically addressed herein. Additionally, the Company reserves the right to alter, amend, change, or retract any of the statements made herein on further investigation or information.

Very truly yours,

Leslie Logan
Staff Attorney